# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| **WINDROCK, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **No. _____** |
| **RESONANCE SYSTEMS, INC. and** | ) | |
| **JOSH KELLEY** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, Windrock, Inc. ("Windrock"), hereby files this Complaint against Defendants Resonance Systems, Inc. ("RSI") and Josh Kelley ("Kelley"), and alleges as follows:

### Parties

1.      Windrock is a corporation organized under the laws of the State of Tennessee with a principal office in Knox County, Tennessee located at 1832 Midpark Road, Suite 102, Knoxville, Tennessee 37921-5941.

2.      RSI is a corporation organized under the laws of the State of Tennessee with a principal office in Knox County, Tennessee located at 11403 Couch Mill Road, Knoxville, Tennessee 37931-2908.  Josh Kelley is a citizen of the state of Tennessee, and, upon information and belief, resides at 609 Fernwood Road, Knoxville, Tennessee 37923-2211.

### Jurisdiction and Venue

3.      This Court has original federal question jurisdiction over the claims asserted herein pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Windrock's claims arising under state law.

4.      Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b).

1

## General Allegations

5.      Windrock designs and manufactures data acquisition products and online systems which are used worldwide by operators, engineers, and maintenance personnel to analyze, monitor, trend, alarm, and automatically diagnose the condition of machinery.  Windrock's products and services are used across a broad spectrum of industries including refining, gas transmission, and gas and oil field production/gathering.

6.      In particular, Windrock sells portable analyzers, which are devices that collect data used to assess the mechanical condition and performance of reciprocating compressors and engines, as well as rotating equipment.

7.      In conjunction with its portable analyzers, Windrock sells its industry leading, proprietary software called "Windrock MD."

8.      Windrock MD allows an authorized user to review and analyze data collected on the user's assets from Windrock's data acquisition products to determine the health of the assets. Assets include compressors, engines, pumps, and fans among other types of equipment.   In addition to trending performance and mechanical health indicators, Windrock MD allows authorized users to generate "plots" like "Pressure Traces," "Pressure Vs. Volume," "Ultrasonics," and "Vibration Vs. Crank Angle."  This information provides the licensed Windrock MD user the ability to know the overall health of the asset and assists the user in pinpointing any problems with the asset.

9.      Windrock employed Edward Flanagan as Engineering Manager and then General Manager from August 1996 until July 2017.   Mr. Flanagan is currently employed by or associated with Defendant RSI.

2

4831-5394-0980v1
2955770-000001 08/06/2021

10.     Windrock employed Steve McNair as International Sales Manager and then Product Manager from November 2015 until August 2018.  Mr. McNair is currently employed by or associated with Defendant RSI.

11.     Windrock employed Paul Beam as Senior Engineer and then Engineering Manager from July 2006 until October 2018.  Mr. Beam is currently employed by or associated with Defendant RSI.

12.     Windrock employed Defendant Josh Kelley as Senior Software Developer from November 2007 until January 2018.  Defendant Kelley subsequently worked for Windrock as a contractor from January 2018 until January 2019.  Defendant Kelley is currently employed by or associated with Defendant RSI.

13.     While working for Windrock, Edward Flanagan, Steve McNair, Paul Beam, and Defendant Kelley all gained specific knowledge of Windrock's customers and those customer relationships, including the customers' specific needs and requirements.

14.     As noted in more detail herein, Defendant is a direct competitor of Windrock.

**The License Agreement**

15.     In order to install Windrock MD software, a Windrock customer must accept Windrock's Software License Agreement ("License Agreement").  A copy of the text of the License Agreement is attached as **Exhibit A**.

16.     The License Agreement provides, in relevant part: "… Customer accepts, a personal, non-transferable and non-exclusive license to use the licensed software programs (hereinafter referred to as licensed programs) subject to the following terms and conditions."  (Ex. A).

3

17.     The License Agreement defines Windrock as "Supplier" and further provides: "The licensed programs are supplied by Supplier solely for Customer's internal business purposes…." (*Id.*).

18.     The License Agreement further provides: "Neither the licensed programs nor this Agreement may be assigned, sublicensed or otherwise transferred by Customer without prior written consent from Supplier."  (*Id.*).

19.     The License Agreement further provides: "Customer shall not permit disclosure of any licensed program in any form, to any person other than Customer's or Suppliers employees without the prior written consent of Supplier."  (*Id.*).

20.     The License Agreement further provides: "Customer shall take all reasonable steps to safeguard the licensed programs so as to ensure that no unauthorized person shall have access to any of them…"  (*Id.*).

21.     The License Agreement further provides: "Customer expressly acknowledges that the licensed programs are confidential and proprietary property of Supplier and hereby agrees to receive and maintain same as a confidential disclosure."  (*Id.*).

### Defendant Kelley's Agreements with Windrock

22.     On October 9, 2017, Defendant Kelley entered into a "Retention Agreement" with Windrock.  A copy of this agreement is attached as **Exhibit B**.

23.     Paragraph 3 of the Retention Agreement prohibits the disclosure of Confidential Information, which is defined to include: "any information relating to the business or affairs of Employer and its parents, subsidiaries, affiliates, successors and assigns, including without limitation, (1) any technical or non-technical data, techniques, drawings, designs, processes, procedures, improvements, new products, products in development, inventions, models, manuals,

4

know-how, financial data, lists of actual or potential customers or suppliers of Employer, or any of Employer's parents, subsidiaries, affiliates, successors and assigns; (2) any information regarding the marketing, sales or dealer network, business development or merger, acquisition, or divestiture plans for Employer ...." (*Id.*).

24. Paragraph 3 of the Retention Agreement further provides: "In exchange for Employer's promise to provide Employee with Confidential Information, Employee covenants and agrees that he/she will only access, disclose, transmit, use, store, and/or dispose of Confidential Information for appropriate business purposes for the benefit of Employer, and never for the benefit of Employee or any other person or entity or any other inappropriate purpose." (*Id.*).

25. In Paragraph 11 of the Retention Agreement, Defendant Kelley agreed that he would not "engage in any activities that reasonably could be anticipated to harm" Windrock's "reputation, operations, or relationships with current or prospective customers, suppliers or employees." (Ex. B at ¶11).

26. Following the end of his employment with Windrock, Defendant Kelley was engaged as a contractor for Windrock. He entered into a "Mutual Confidentiality and Non-Disclosure Agreement" ("NDA") with Windrock. A copy of this agreement is attached as **Exhibit C**.

27. The NDA defines its "Purpose" as "software development." (Ex. C).

28. Section 1 of the NDA defines "Confidential Information" to include "all know-how, proprietary, confidential information, documents or materials and trade secrets ... including, without limitation, technical expertise and related experience ... formulas, specifications, engineering or technical data ... engineering and design information ... computer and information

5

programs … designs … concepts … and any other information of any kind that is not generally known."  (Ex. C at §1).

29.     In Section 2 of the NDA, Defendant Kelley, as the "Receiving Party," agreed, as a condition to his receipt of Confidential Information, "to treat such Confidential Information as private and confidential."  (Ex. C at §2).

30.     In Section 2 of the NDA, Defendant Kelley agreed to restrict his "use of any Confidential Information received from Disclosing Party solely for the Purpose."

31.     Pursuant to Section 13 of the NDA, "[t]he confidentiality obligations and restrictions contained" therein were effective "for a period of three (3) years from the date hereof." (Ex. C at §13).

32.     The "subject matter" of the NDA is Confidential Information provided to Defendant Kelley by Windrock for software development on behalf of Windrock.

33.     Edward Flanagan, Steve McNair, and Paul Beam also entered into agreements with Windrock which included confidentiality provisions whereby they each agreed to keep Windrock information confidential.

**Windrock's Software**

34.     Windrock MD enables its authorized users to view trends and data plots obtained from Windrock's portable analyzers and other Windrock products.

35.     Windrock MD generates reports regarding data obtained from portable analyzers and other Windrock products and provides detailed information to its authorized users.

36.     Windrock's portable analyzers and other Windrock products report the data they collect in binary format, which is presented as an unintelligible contiguous series of binary digits having no contextual meta-data for decoding nor interpretation.  Windrock MD translates the

6

encoded data received in binary format into readable data. Specifically, Windrock MD employs proprietary structures in C++ code ("C-structures") which enables Windrock MD to translate the data received from Windrock's portable analyzers and other Windrock products.

37.    In order to decode the data in binary format, a computer programmer would need to know the layout of the C-structures and be able to decode the indexing scheme in order to correlate which numbers in the binary format relate to specific data fields.

38.    There are hundreds, if not thousands, of structures in the encoded data files. In each of these structures, there are as many as one hundred data fields.

39.    Windrock MD's ability to translate the data received from Windrock's portable analyzers other Windrock products in binary format can only be decoded by a computer programmer who has intimate familiarity with Windrock MD's C-structures and data indexing scheme or access to the Windrock MD source code.

40.    Beyond decoding by a computer programmer having possession of the source code or being intimately familiar with Windrock MD's C-structures, the only other way to replicate Windrock MD's ability to translate the data received from Windrock's portable analyzers in binary format would be through utilization of the Windrock MD source code itself.

41.    Windrock MD's source code, which contains the proprietary C-structures, is kept strictly confidential by Windrock. Windrock MD's source code is stored internally on a password-protected server.

42.    Defendant Kelley is intimately familiar with Windrock MD's C-structures and source code based on his former employment with and subsequent provision of contracting services to Windrock.

4831-5394-0980v1
2955770-000001 08/06/2021

## Defendant RSI and Misappropriation by Defendants

43. On or about March 25, 2020, Paul Beam and Steve McNair founded Defendant RSI.

44. On information and belief, Ed Flanagan, Steve McNair, Paul Beam, and Defendant Kelley are all presently employed by or associated with Defendant RSI.

45. Defendant RSI is a direct competitor of Windrock and sells data collection products and software which perform similar functions to those sold by Windrock.

46. On or about December 2020, Windrock became aware that Defendant RSI was advertising its own software's ability to translate the data received from Windrock's portable analyzers and other Windrock products from the Windrock proprietary format.

47. In a video created by Defendant RSI and posted to Steve McNair's LinkedIn page, Defendant RSI demonstrates its own software's ability to translate the data received from Windrock's portable analyzers and other Windrock products.

48. There are only two possible explanations for Defendant RSI's software having this capability: (1) Defendant Kelley, utilizing a copy of Windrock MD improperly obtained from a Windrock customer, used his intimate knowledge of Windrock MD's source code and the proprietary C-structures to decode the data from the encoded binary format in violation of his agreements with Windrock, or (2) Defendant RSI unlawfully accessed and used the Windrock MD source code.

49. Defendant RSI claims its software's ability to import and decode the files that were in binary format from Windrock's portable analyzers and other Windrock products was done by a computer programmer determining what the various data fields in the binary format files meant.

50. Defendant RSI claims the computer programmer referenced in Paragraph 49 relied on a "properly licensed copy" of Windrock MD to generate the data files needed for the decoding.

51. Windrock has never sold, or otherwise provided, a copy of Windrock MD to Defendant RSI.

52. Accordingly, and on information and belief, Defendant Kelley first used a copy of Windrock MD purchased by one of Windrock's customers in order to generate the data files needed for the decoding in violation of the License Agreement, and then Defendant Kelley utilized his intimate knowledge of Windrock MD's proprietary C-structures to decode files from binary format in violation of his confidentiality obligations to Windrock.

53. In addition, potential customers in Windrock and Defendant RSI's industry are not easily identifiable through public sources of information.

54. On information and belief, Edward Flanagan, Paul Beam, Steve McNair, and Defendant Kelley have utilized the specific knowledge of Windrock's customers that they acquired while employed by Windrock, including the identity of key customer contacts as well as the specific needs and requirements of certain customers, to improperly steal those customers from Windrock for the benefit of Defendant RSI.

## COUNT ONE: VIOLATION OF THE DEFEND TRADE SECRETS ACT
### (AGAINST BOTH DEFENDANTS)

55. Windrock incorporates by reference Paragraphs 1-54 of this Complaint.

56. Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were all given access to trade secrets while employed by Windrock. They agreed to keep these trade secrets confidential.

57. One trade secret to which Windrock gave Defendant Kelley access was the Windrock MD source code, which includes the software's proprietary C-structures. The provision

9

of this source code to Defendant Kelley was required so that Defendant Kelley could perform the job for which he was employed and/or contracted. The agreements executed by Defendant Kelley required him not to disclose or use this source code.

58. Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were all given access to another trade secret: confidential customer information including customer lists with additional confidential information that could not be readily obtained via public information, such as the customers' key contacts, product purchases, specific needs, and requirements.

59. The trade secrets Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were given access to are exclusive to Windrock and not generally known.

60. Windrock's trade secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy. Windrock's trade secrets are not public and are only made available to key personnel on a need-to-know basis. Windrock takes reasonable measures to keep its confidential information secret.

61. Windrock's trade secrets, including its Windrock MD source code, which includes the software's proprietary C-structures, and specific customer information derive independent economic value by not being known or readily ascertainable by proper means to competitors.

62. Upon information and belief, Defendant Kelley disclosed and utilized and continues to disclose and utilize the Windrock MD software's proprietary C-structures to the detriment of Windrock and to the immediate, direct and wrongful benefit of his current employer, Defendant RSI, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*.

63. The wrongful disclosure of the Windrock MD software's proprietary C-structures by Defendant Kelley individually, and acting as an agent and/or employee of Defendant RSI and

10

to the benefit of Defendant RSI, constitutes misappropriation of same under 18 U.S.C. §§ 1836, 1839.

64.     Windrock did not consent to Defendant Kelley's wrongful disclosure or use of the Windrock MD software's proprietary C-structures.

65.     The wrongful acquisition and use of the Windrock MD software's proprietary C-structures by Defendant RSI constitutes misappropriation of same under 18 U.S.C. §§ 1836, 1839.

66.     Windrock did not consent to Defendant RSI's wrongful acquisition or use of the Windrock MD software's proprietary C-structures.

67.     The wrongful utilization of the specific knowledge of Windrock's customers and those customer relationships, including the customers' key contacts, specific needs, and requirements by Edward Flanagan, Paul Beam, Steve McNair, and Defendant Kelley for the benefit of Defendant RSI constitutes misappropriation of same under 18 U.S.C. §§ 1836, 1839.

68.     Defendants' misappropriation is related to a product or service used in, or intended for use in, interstate or foreign commerce, as both Windrock and Defendants have sold and continue to sell their products, including their software, throughout the United States.

69.     The misappropriation of Windrock's trade secrets has caused and will continue to cause Windrock irreparable and substantial injury and therefore cannot be fully redressed through damages alone.   An injunction prohibiting Defendants from further use or disclosure of Windrock's trade secrets and requiring Defendants to destroy any Windrock trade secret information is necessary to provide Windrock with complete relief.

70.     Defendants' misappropriation is willful and malicious and thereby entitles Windrock to an award of exemplary damages.

4831-5394-0980v1
2955770-000001 08/06/2021

71.     The wrongful misappropriation of Windrock's trade secrets, specifically Windrock MD software's proprietary C-structures, by both Defendants has caused and will continue to cause damages to Windrock, entitling Windrock to injunctive relief, compensatory damages, exemplary damages and attorney fees, all pursuant to 18 U.S.C. 1836.

## COUNT TWO: VIOLATION OF THE TENNESSEE UNIFORM TRADE SECRETS ACT
### (AGAINST BOTH DEFENDANTS)

72.     Windrock incorporates by reference Paragraphs 1-71 of this Complaint.

73.     Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were all given access to trade secrets while employed by Windrock.  They agreed to keep these trade secrets confidential.

74.     One trade secret to which Windrock gave Defendant Kelley access was the Windrock MD source code, which includes the software's proprietary C-structures.  The provision of this source code to Defendant Kelley was required so that Defendant Kelley could perform the job for which he was employed and/or contracted.  The agreements executed by Defendant Kelley required him not to disclose or use this source code.

75.     Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were all given access to another trade secret: confidential customer information including customer lists with additional confidential information that could not be readily obtained via public information, such as the customers' key contacts, product purchases, specific needs, and requirements.

76.     The trade secrets Defendant Kelley, Ed Flanagan, Steve McNair, and Paul Beam were given access to are exclusive to Windrock and not generally known.

77.     Windrock's trade secrets are the subject of efforts that were reasonable under the circumstances to maintain their secrecy.  Windrock's trade secrets are not public and are only made

12

available to key employees on a need-to-know basis. Windrock takes reasonable measures to keep its confidential information secret.

78.     Windrock's trade secrets, including its Windrock MD source code, which includes the software's proprietary C-structures, and specific customer information derive independent economic value by not being known or readily ascertainable by proper means to competitors.

79.     Upon information and belief, Defendant Kelley disclosed and utilized and continues to disclose and utilize the Windrock MD software's proprietary C-structures to the detriment of Windrock and to the immediate, direct and wrongful benefit of his current employer, Defendant RSI, in violation of the Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701, *et seq*.

80.     The wrongful disclosure and use of the Windrock MD software's proprietary C-structures by Defendant Kelley individually, and acting as an agent and/or employee of Defendant RSI and to the benefit of Defendant RSI, constitutes misappropriation of same under Tenn. Code Ann. § 47-25-1702.

81.     Windrock did not consent to Defendant Kelley's wrongful disclosure of the Windrock MD software's proprietary C-structures.

82.     The wrongful acquisition and use of the Windrock MD software's proprietary C-structures by Defendant RSI constitutes misappropriation of same under Tenn. Code Ann. § 47-25-1702.

83.     Windrock did not consent to Defendant RSI's wrongful acquisition or use of the Windrock MD software's proprietary C-structures.

84.     The wrongful utilization of the specific knowledge of Windrock's customers and those customer relationships, including the customers' key contacts, specific needs, and

13

requirements by Edward Flanagan, Paul Beam, Steve McNair, and Defendant Kelley for the benefit of Defendant RSI constitutes misappropriation of same under Tenn. Code Ann. § 47-25-1702.

85.     The misappropriation of Windrock's trade secrets has caused and will continue to cause Windrock irreparable and substantial injury and therefore cannot be fully redressed through damages alone.   An injunction prohibiting Defendants from further use or disclosure of Windrock's trade secrets and requiring Defendants to destroy any Windrock trade secret information is necessary to provide Windrock with complete relief.

86.     Defendants' misappropriation is willful and malicious and thereby entitles Windrock to an award of exemplary damages and attorneys' fees.

87.     The wrongful misappropriation of Windrock's trade secrets, specifically Windrock MD software's proprietary C-structures, by both Defendants has caused and will continue to cause damages to Windrock, entitling Windrock to injunctive relief, compensatory damages, exemplary damages and attorney fees, all pursuant to Tenn. Code Ann. §§ 47-25-1703 through 47-25-1705.

## COUNT THREE: STATUTORY PROCUREMENT OF BREACH OF CONTRACT
### (AGAINST BOTH DEFENDANTS)

88.     Windrock incorporates by reference Paragraphs 1-87 of this Complaint.

89.     Defendants Kelley and RSI used a copy of Windrock MD purchased by one of Windrock's customers in order to generate the files needed to decode the binary format files generated by Windrock's portable analyzers and other products.

90.     In order to install Windrock MD, the Windrock customer referenced in Paragraph 89 had to agree to the terms and conditions of the License Agreement.

91.     The License Agreement is a valid and binding contract between Windrock and the customer.

14

92.     Defendant RSI's owners, officers, and employees, specifically including Flanagan, McNair, Beam, and Defendant Kelley had knowledge of the existence of the License Agreement in place between Windrock and Windrock's customer.

93.     Upon information and belief, Defendant RSI and/or Defendant Kelley induced Windrock's customer to allow them to obtain and use the customer's copy of Windrock MD in violation of the License Agreement.

94.     The actions of Defendant RSI and Defendant Kelley were intentional and without legal justification.

95.     Defendant RSI and Defendant Kelley acted for the purpose of benefiting Defendant RSI at Windrock's expense.

96.     The actions taken by Defendant RSI and Defendant Kelley to induce Windrock's customer to breach the License Agreement were the proximate cause of the breach of the License Agreement by Windrock's customer.

97.     The inducement of Windrock's customer to breach the License Agreement by Defendant RSI and Defendant Kelley has caused Windrock to be damaged including damage by significant losses in revenue, and Windrock is entitled to compensatory and treble damages pursuant to Tenn. Code Ann. § 47-50-109.

**COUNT FOUR: STATUTORY PROCUREMENT OF BREACH OF CONTRACT**
**(AGAINST DEFENDANT RSI ONLY)**

98.     Windrock incorporates by reference Paragraph 1-97 of this Complaint.

99.     At the time Defendant Kelley obtained his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from Windrock's portable analyzers, the Retention Agreement and the NDA were valid and enforceable contracts between Windrock and Defendant Kelley.  Under both the Retention Agreement and the

15

NDA, Defendant Kelley agreed to keep this information and knowledge confidential, including not to disclose or use same.

100.    At the time Defendant Kelley utilized his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from Windrock's portable analyzers, Defendant RSI's owners, officers, and employees, specifically including Flanagan, McNair, and Beam knew of the existence of the Retention Agreement and the NDA.

101.    Despite knowledge of the existence of the Retention Agreement and the NDA, Defendant RSI induced Defendant Kelley to breach the terms of those agreements by his disclosure and use of Windrock's confidential information for the benefit of Defendant RSI.

102.    The actions of Defendant RSI were intentional and without legal justification.

103.    The actions taken by Defendant RSI to induce Defendant Kelley to breach the Retention Agreement and/or NDA were the proximate cause of Defendant Kelly's breach of the Retention Agreement and NDA.

104.    The inducement of Defendant Kelley to breach the Retention Agreement and/or NDA by Defendant RSI has caused Windrock to be damaged including damage by significant losses in revenue, and Windrock is entitled to compensatory and treble damages pursuant to Tenn. Code Ann. § 47-50-109.

## COUNT FIVE: INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (AGAINST DEFENDANT RSI ONLY)

105.    Windrock incorporates by reference Paragraph 1-104 of this Complaint.

106.    At the time Defendant Kelley obtained his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from

16

Windrock's portable analyzers, the Retention Agreement and the NDA were valid and enforceable contracts between Windrock and Defendant Kelley. Under both the Retention Agreement and the NDA, Defendant Kelley agreed to keep this information and knowledge confidential, including not to disclose or use same.

107. At the time Defendant Kelley utilized his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from Windrock's portable analyzers, Defendant RSI's owners, officers, and employees, specifically including Flanagan, McNair, and Beam knew of the existence of the Retention Agreement and the NDA.

108. Despite knowledge of the existence of the Retention Agreement and the NDA, Defendant RSI induced Defendant Kelley to breach the terms of those agreements by his disclosure and use of Windrock's confidential information for the benefit of Defendant RSI thereby intentionally interfering with the contractual relations between Defendant Kelley and Windrock.

109. The actions of Defendant RSI were intentional and without legal justification.

110. The actions taken by Defendant RSI to induce Defendant Kelley to breach the Retention Agreement and/or NDA were the proximate cause of Defendant Kelly's breach of the Retention Agreement and NDA.

111. The inducement of Defendant Kelley to breach the Retention Agreement and/or NDA by Defendant RSI has caused Windrock to be damaged including damage by significant losses in revenue.

## COUNT SIX: BREACH OF RETENTION AGREEMENT
### (AGAINST DEFENDANT KELLEY ONLY)

112. Windrock incorporates by reference Paragraphs 1-111 of this Complaint.

4831-5394-0980v1
2955770-000001 08/06/2021

113. The Retention Agreement is a valid and enforceable contract between Windrock and Defendant Kelley.

114. Pursuant to the Retention Agreement, Windrock provided Defendant Kelley with Confidential Information. He agreed not to disclose or use this Confidential Information as set forth in the Retention Agreement.

115. In disclosing and utilizing his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from Windrock's portable analyzers, Defendant Kelley breached the Retention Agreement.

116. In disclosing and utilizing his specific knowledge of Windrock's customers and those customer relationships, including the customers' specific needs and requirements, Defendant Kelley breached the Retention Agreement.

117. Windrock has suffered significant damages as a result of the breach of the Retention Agreement.

## COUNT SEVEN: BREACH OF THE NDA
### (AGAINST DEFENDANT KELLEY ONLY)

118. Windrock incorporates by reference Paragraphs 1-117 of this Complaint.

119. The NDA was a valid and enforceable contract between Windrock and Defendant Kelley.

120. Pursuant to the NDA, Windrock provided Defendant Kelley with certain Confidential Information. He agreed not to disclose or use this Confidential Information as set forth in the NDA.

121. In disclosing and utilizing his intimate knowledge of Windrock MD's proprietary C-structures to enable Defendant RSI's software to read encoded data received from Windrock's portable analyzers, Defendant Kelley breached the NDA.

18

122. In disclosing and utilizing his specific knowledge of Windrock's customers and those customer relationships, including the customers' specific needs and requirements, Defendant Kelley breached the NDA.

123. Windrock has suffered significant damages as a result of this breach of the Retention Agreement.

## COUNT EIGHT: INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (AGAINST BOTH DEFENDANTS)

124. Windrock incorporates by reference Paragraphs 1-123 of this Complaint.

125. Windrock enjoys and has enjoyed existing business relationships with many customers, specifically those customers that have purchased and lawfully use Windrock's portable analyzers and other products.

126. Based on their prior employment or association with Windrock, Defendant RSI's owners, officers, and employees, specifically including Flanagan, McNair, Beam, and Defendant Kelley, have specific knowledge of many of Windrock's customer relationships.

127. As a direct competitor of Windrock, Defendant RSI's owners, officers, and employees desired to take Windrock's customers and convert them into Defendant RSI's customers.

128. In the process of converting Windrock's customers into Defendant RSI's customers, Defendant RSI necessarily desired to cause the breach or termination of the business relationships between Windrock and its customers.

129. Defendant Kelley's breaches of contract, specifically the breach of the Retention Agreement and the NDA are improper means utilized to convert Windrock's customers into Defendant RSI customers.

19

130.     Windrock has suffered significant damages based on Defendants' tortious conduct.

### Prayer for Relief

**WHEREFORE**, Windrock requests that process issue and that this Court accept jurisdiction of this case and, after all due proceedings, issue a judgment in favor of Windrock and against Defendants:

A.     Declaring that Defendants have misappropriated Windrock's trade secret information pursuant to the Defend Trade Secrets Act and/or Tennessee Uniform Trade Secrets Act;

B.     Permanently enjoining Defendants and their respective officers, agents, servants, employees and attorneys, and all other persons in active concert or participation with them, from using Windrock's trade secrets, and from selling, offering for sale, marketing, or using products or services created with the aid of Windrock's trade secrets;

C.     Awarding compensatory, exemplary, punitive damages and treble damages and attorneys' fees;

D.     Awarding pre-judgment and post-judgment interest; and

E.     Awarding such further general, legal, or equitable relief to which Windrock is entitled.

Dated this 9th day of August 2021.

4831-5394-0980v1
2955770-000001 08/06/2021

Respectfully Submitted,

/s/ Kenneth A. Weber
Kenneth A. Weber, BPR No. 015730
Christopher J. Barrett, BPR No. 032978 *(pro hac vice application forthcoming)*
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN  37203
Telephone: (615) 726-7369
Facsimile: (615) 744-7369
Email: kweber@bakerdonelson.com
Email: cbarrett@bakerdonelson.com


Bradley E. Trammell, BPR No. 013980
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
165 Madison Avenue, Suite 2000
Memphis, TN  38103
Telephone: (901) 577-2121
Facsimile: (901) 577-2303
Email: btrammell@bakerdonelson.com

21