# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

CHAMPIONX, LLC f/k/a WINDROCK, INC., )
                                     )
        Plaintiff, )
v. )
                                     )
RESONANCE SYSTEMS, INC., et al. )     Case No.   3:21-CV-00288
                                     )
        Defendants. )
_____ )

RESONANCE SYSTEMS, INC. )
                                     )
        Counter-Plaintiff, )
                                     )
v. )
                                     )
CHAMPIONX, LLC f/k/a )
WINDROCK, INC., and )
CHAMPIONX CORPORATION )
                                     )
        Counter-Defendants )

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

7435053.24

**COME NOW** the Defendants Resonance Systems, Inc. ("RSI"), Viper Monitoring & Analysis, L.P., Viper Machinery Monitoring Corporation, Edward Flanagan ("Flanagan"), Paul Beam ("Beam"), Steve McNair ("McNair"), and Josh Kelley ("Kelley") (collectively "Defendants"), by and through the undersigned counsel, and submit this Memorandum of Law in support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

Plaintiff ChampionX, LLC, f/k/a Windrock, Inc. ("Plaintiff" or "Windrock") sued its competitor, RSI, and four of RSI's owners--Flanagan, Beam, McNair, and Kelley (together the "Individuals"), as well as Viper Monitoring & Analysis, L.P. ("Viper LP"), Viper Machinery Monitoring Corporation ("Viper Co." and, together with Viper L.P., "Viper") *(Dkt. 176.)*

Plaintiff filed this action on August 9, 2021 against only RSI and Kelley. (Dkt. 1.) Plaintiff is using the instant litigation in an effort to stop Defendants from competing with it in perpetuity despite the fact that Tennessee law does not permit perpetual non-compete provisions and any non-compete obligations the Individuals had expired prior to RSI ever beginning to actually compete with Plaintiff. (See Rice Decl. Ex. 30. Excerpts of the Transcript of the 2022 30(b)(6) Deposition of Windrock, Inc. Provided by Mary Chapman ("2022 Windrock (Chapman) 30(b)(6) Dep.") 160:19 – 161:6.) Plaintiff has continued its aggressive litigation strategy to squelch competition by RSI and, to that end, despite its awareness of Beam, Flanagan, and McNair and of much of the conduct alleged in Windrock's current (Fourth Amended) Complaint prior to the filing of its original Complaint in 2021, on August 16, 2023 Plaintiff added them as individual defendants to this action, raising many of the same allegations against them as alluded to in Plaintiff's original Complaint. (Dkt. 176.) (hereafter the "Complaint").

Defendants submit that Plaintiff's Complaint fails because Plaintiff cannot establish at least one element of each claim raised in its Complaint. Not only is Plaintiff unable to show a material

1

dispute of fact as to specific liability elements for each of its claims, but Plaintiff is also unable to establish the necessary element of proximate cause to support an award of damages as to any claim it has raised against the Defendants. Because Plaintiff, which bears the burden of proof as to all of its claims, cannot make a showing sufficient to establish the existence of at least one essential element of each of its claims, all Plaintiff's claims against the Defendants, i.e., Counts 1 through 9, and 12 through 15, should be dismissed with prejudice as a matter of law.

## I. STATEMENT OF FACTS

### A. The Main Parties

RSI is a small Knoxville company formed on March 25, 2020 that designs, manufactures, and sells equipment which allows its customers--businesses in the oil and gas industry--to monitor the health and performance of their reciprocating equipment, such as engines, fans, and compressors. (Declaration of Ed Flanagan ("Flanagan Decl.") ¶¶ 11, 14-15.) RSI's products include its analyzer (the Lenz) and a companion software (Rmonix). (Flanagan Decl. ¶ 15.) Viper was, at all times relevant to this matter, a company that provided repair and servicing of equipment (such as the analyzers sold by RSI and Plaintiff) to businesses in the oil and gas industry, using software it purchased from Plaintiff. (Flanagan Decl. ¶ 7.) Through Viper, which RSI acquired in 2020 and functions as a division of RSI, RSI provides equipment repair and analysis services to those same businesses. (Flanagan Decl. ¶¶ 11-12.) The Individuals are all former employees of Windrock. (Dtk. 176, ¶¶ 25, 33, 35, 36.) This lawsuit is a direct result of the Windrock's desire to prevent its former employees from ever competing with it, despite the fact that every employment agreement Windrock relies upon in this case provides only a 1 year non-compete period for former employees. Plaintiff's 30(b)(6) designee, Mary Chapman, testified that Plaintiff considers any contact by the Individuals with a Windrock customer a trade secret violation. (2022 Windrock (Chapman) Dep. 160:19 - 161:6.)

2

Windrock, which is a subsidiary of publicly traded global company ChampionX Corporation,[1] also designs, manufactures, and sells equipment (analyzers) and associated software (as pertinent to this case, software known as "Windrock MD") that allow its customers--also businesses in the oil and gas industry--to monitor the functional health of the customer's reciprocating equipment. (Dkt. 176 at ¶¶ 17-19.) Windrock's products include several versions of its analyzer, which include but are not limited to its portable analyzers, and the related Windrock MD software as well as remote and cloud-based monitoring systems.[2] (See Rice Decl. Ex. 32 – Excerpts of the Transcript of the Deposition of Mary Chapman ("Chapman Dep.") at 28:13-17.)

Windrock was purchased in 2007 by Dover Corporation ("Dover"). (See Rice Decl. Ex. 34 – Excerpts of the Transcript of the Deposition of Ed Flanagan ("E. Flanagan Dep.") 27:1-11). As of August 9, 2021, Windrock was wholly owned by Apergy, USA, Inc., which was wholly owned by ChampionX, Inc., a publicly traded company. (Dkt. 2.) In May 2023, Windrock, Inc. merged with ChampionX, LLC, which, in turn, is also a subsidiary of ChampionX Corporation, also a publicly traded entity. (Dkt. 176, ¶ 3; Rice Decl. Ex. 1 and 21). Windrock employed Kelley, as well as McNair, Flanagan, and Beam for several years. (Dkt 176 ¶¶ 25, 33, 35, 36).

Flanagan was a part-owner of Windrock and helped to design the original Windrock analyzer. (E. Flanagan Dep. 23:3-6; 25:7-14). After Dover acquired Windrock in 2007, Flanagan stayed on as Engineering Manager, and later became Windrock's General Manager. (E. Flanagan Dep. at 31:3-25). Flanagan entered into an Employment Agreement with Windrock in November 2007 (the "Flanagan Agreement"). (Dkt. 176-2). The Flanagan Agreement contained a noncompete clause that expired one (1) year after his separation from Windrock (*i.e.*, in the summer

---

[1] Declaration of Cheryl Rice ("Rice Decl.") at Exhibit 1.
[2] The "MD" in Windrock MD stands for machinery diagnostics. (See Rice Decl. Ex. 33 – Excerpts of the Deposition of Joshua Kelley ("Kelley Dep.") at p. 27.)

3

of 2018). *Id.* ¶ 5. Flanagan left Windrock voluntarily in 2017 and went to work for Viper LP, which performed analysis services work--using Windrock equipment and properly licensed Windrock MD software--for businesses operating gas compression machinery in the Marcellus shale region. (E. Flanagan Dep. at 40:1-2; Declaration of Ethan Clark ("Clark Decl.") at ¶¶ 18--19). Viper provided this service with Windrock's knowledge and consent. Clark Decl. ¶ 17). Flanagan acquired an interest in Viper when he went to work for Viper. (E. Flanagan Dep. 57:10-58:21; Flanagan Decl. at ¶ 4).

Beam was hired by Windrock in July 2006 as a Senior Engineer; he later served as its Engineering Manager until he resigned in October 2018. (Transcript of the Deposition of Paul Beam ("Beam Dep.") at 19, 41.) Beam first executed a retention agreement[3] containing noncompetition and confidentiality clauses in October 2017 (the "Beam Agreement"). (Beam Dep. at 53, 56, 61, Ex. 9.) The Beam Agreement's noncompetition provision expired in October 2019, one (1) year after Beam left the employment of Windrock. (Beam Dep. at 61:11-14).

Kelley was hired at Windrock in 2007 and worked in software development his entire tenure with the company, including the continued refinement of Windrock MD, which already existed when Kelley joined Windrock. (Kelley Dep. at pp. 20-21, 22; and Declaration of Josh Kelley ("Kelley Decl.") ¶ 2). At no point prior to October 4, 2017, was Kelley subject to a confidentiality, non-disclosure or non-competition agreement with Windrock. (Rice Decl. Ex. 2 at 9, 10). Kelley executed a retention agreement in October 2017, which included a noncompetition clause that expired in January 2019 (the "Retention Agreement"). (Dkt. 176-5). Kelley voluntarily left Windrock in January 2018 to pursue other opportunities for career growth,

---

[3] The retention agreements mentioned are with Dover Energy Automation. *See* Dkt. 176-3 and 176-5.

4

but he continued to do some programming work for Windrock on a limited, part-time, basis as an independent contractor through April 2019. (Kelley Dep. 21:3-11; Kelley Decl. ¶ 4). Kelley executed a nondisclosure agreement with Windrock in January 2018 (the "NDA") when he began his work as an independent contractor to Windrock, but, pursuant to its terms, any confidentiality obligations he owed Windrock under the NDA ceased in January 2021. (Dkt. 176-6). Even though Kelley worked on the development of Windrock MD during his tenure with the Plaintiff, he does not recall all of the source code, much less in detail.[4] (Kelley Dep. 39:24-40:1).

McNair joined Windrock in 2015 as its International Sales Manager. (See Rice Decl. Ex. 36 – Excerpts of the Transcript of the Deposition of Steve McNair ("McNair Dep.") 22:2-10). McNair signed an agreement with Cook Compression, containing noncompete and confidentiality provisions (the "McNair Agreement"). (Dkt. 176-4). McNair voluntarily left Windrock in 2018. (McNair Dep. 26:3-8). Regardless of Plaintiff's standing to enforce the McNair Agreement, the one-year non-competition provision of the McNair Agreement expired in July 2019. (Dkt. 176-4).

Each of the Individuals left Plaintiff's employment at separate times to pursue different opportunities. McNair went to work for an electric motor company in Virginia called In Motion as its director of sales until family concerns caused him to move back to Knoxville, Tennessee in the summer of 2019. (McNair Dep. 25:13-26:20, 26:13-27:4). Defendant Kelley worked for a company called Corgibytes as a lead software developer and also worked for Plaintiff on a limited basis as an independent contractor until April of 2019. (Kelley Dep. 21:7-11, 46:25-47:18). Beam pursued starting his own business and various contract jobs. (Beam Dep. 77:15-25). Shortly after leaving Windrock, Flanagan

---

[4] Source code (also referred to as source or code) is the version of software as it is originally written (i.e., typed into a computer) by a human in plain text (i.e., human readable alphanumeric characters). *Wikipedia, "Source Code", last accessed on January 1, 2024 at* https://en.wikipedia.org/wiki/Source_code#Definitions *citing The Linux Information Project. "Source Code Definition". Archived 3 October 2017 at the Wayback Machine.*

5

decided to join Viper. (E. Flanagan Dep. 57:12-59:12, 9:23-92:14).

## B. Windrock's Products

### 1. The Windrock Analyzers

Plaintiff has sold different models of its portable analyzer over the years. Plaintiff's analyzers gather data from its customer's equipment. As is relevant here, these models include the 6320 family of portable analyzers (the "6320") and the 6400 family of portable analyzers (the "6400") (collectively "the Analyzers"). (*See* Rice Decl. Ex. 37 – Excerpts of the Transcript of the Deposition of Paul Mahoney ("Mahoney Dep.") 25:15-26:6). Plaintiff first released the 6320 family of analyzers, its replacement for a predecessor analyzer known as the 6310, in or about 2009. (Rice Decl. Ex. 3). It released the 6400 family of analyzers in 2016. *Id.* Plaintiff has also developed and markets an online product, called Spotlight, which is designed to replace the Analyzers completely. (Flanagan Decl. at ¶ 12).

As early as 2017, Plaintiff had begun internally discussing a plan to sunset its Analyzers in favor of moving its customers to its online product, Spotlight. (Flanagan Decl. ¶ 14). By letter dated September 15, 2017, Plaintiff announced to the consuming public that it no longer intended to sell the 6320 as of September 1, 2017, advising that "the acquisition of specific parts [it] use[d] to manufacture [the] 6320 Portable Analyzer has developed into a serious issue" and stating it was "experiencing difficulty in obtaining necessary parts and in some cases, [its] vendors have discontinued critical components." (Dkt. 173-1). This letter further represented that despite Plaintiff's difficulties obtaining parts for the 6320, it would "honor, to the best of [its] ability", its product support plan through 2021. *Id.* However, by early 2020, Plaintiff had decided it would no longer provide ongoing support to the 6320, and, by April 1, 2020, Plaintiff had announced that, beginning September 30, 2020, it would no longer provide support or maintenance for the 6320. (Dkt. 173-2). In announcing this planned change in its services, Plaintiff stated that it would not support the 6320 beyond September 30, 2020 because it lacked the ability to obtain certain parts for the 6320. *Id.* Windrock planned these announcements to drive

6

customers to purchase its newer products.  (Mahoney Dep. 98:19-22; Flanagan Decl. 14).

### 2. Windrock MD

Windrock MD is Windrock's computer software product that helps its users analyze data that the Analyzers collect by displaying the data in various forms.  (Declaration of Jim Plank, Ph.D. ("Plank Decl.") ¶ 7).  Will Griffith was the original author of Windrock MD, (*see* 2023 Windrock (Chapman) 30(b)(6) Dep. 83:22-23), however, the only confidentiality agreement Windrock produced for Mr. Griffith was not with Windrock and did not start until after Mr. Griffith had left Windrock.  (Rice Decl. Ex. 57). Windrock MD applies several industry standard algorithms to data the analyzers' collect to assist with analysis of the equipment's health.  (Ed. Flanagan ¶ 16; 2023 Windrock (Chapman) 30(b)(6) Dep., 53:1-13). The data is initially collected from the user's equipment by the Analyzers, which then store the data in a series of files (the "data files").  (*See* Rice Dec. Ex. 38 Excerpts of Transcript of the Deposition of Mark Atkin ("Atkin Dep.") 54:24-55:6). The data files that Windrock MD uses may be packaged into a zip file (which Windrock names a .wrpm file) for sharing with others. (Atkin Dep. 55:24-56:5).

The Windrock MD data file is not encrypted or password protected (Atkin Dep. 58:18-20; See Rice Decl. Ex. 39 – Excerpts of the Transcript of the Rule 30(b)(6) Deposition of Windrock by Mark Atkin ("Windrock (Atkin) 30(b)(6) Dep.") 166:24-167:1; 168:11-12; Rice Decl. Ex. 40 – Excerpts of the Transcript of the Deposition of Marek Kos ("Kos Dep.") 85-86; Rice Decl. Ex. 2, Nos. 288).  Windrock does not take any steps to keep the data files confidential.  (Atkin Dep., 59:2-4).  The data files are owned by licensees of Windrock MD and not by Windrock.  Rice Decl. Ex. 2, No. 286. Also, there is no obligation of confidentiality applicable to the executable version of Windrock MD itself.  (176-1).  Windrock MD allows a user to display every aspect of the data file as well as change the data in the data file. (Plank Decl, ¶ 7; *see also* Rice Dec., Ex. 4: pg. 190-222 (Reports), 229-230 (Data Explorer)).

7

### 3. Windrock's Use of Protocol Buffers in Windrock MD

Protocol Buffers are a Google standard software mechanism for serializing structured data.[5] (Kelley Decl. ¶ 18). In 2012, Windrock first began using protocol buffers in Windrock MD to structure the setup data[6] for its customers' Analyzers. (Kelley Decl. ¶ 18). Because protocol buffers is a Google standard, publicly available tools exist that can inspect a software executable[7] and allow anyone to view the structure of the data stored in the Google protocol buffers format. (Kelley Decl. ¶ 18). Therefore, all setup data that Windrock MD stores using protocol buffers has been available to any customer of Windrock MD since Windrock MD started using protocol buffers in 2012. (Kelley Decl. ¶ 18).

### 4. Windrock MD License

The Windrock MD license agreement (the "License Agreement") is a "click-to-accept" agreement containing a provision requiring that the software product be used for the end user's "internal business purpose."[8] (Dkt. 176-1). Internal business purpose is not defined in the License Agreement but is a term of art in the area of software licensing. (H. Ward Classen, A Practical Guide to Software Licensing for Licensees and Licensors, 7th Edition p. 55). "The primary objective of this wording [internal business purposes only] is to limit the licensee's use of the licensed software to the licensee's specific business needs …". *Id. at 55.* The License Agreement also contains a provision that allows the licensee to make a copy of the licensed programs in machine readable form "to understand or modify the contents of such machine readable material" and a prohibition on "disclosure of any licensed program in any form to any person other than

---

[5] *See* https://protobuf.dev.

[6] Setup data is information about the customer's equipment. *See* Rice Decl. Ex. 4 Section 3.2.1.

[7] An executable is a product shipped to end users that can be executed on the end users' machine.

[8] There is no evidence regarding the formation of the Signet License Agreement in the record in this case, or proof that Signet accepted the terms of the Signet License Agreement, and no discovery has been conducted on that agreement to date.

8

Customer's or Suppliers employees without the prior written consent of Supplier." (Dkt. 176-1).

### C. Signet

Signet Monitoring and Analysis, Inc. ("Signet") was founded in 2008 by Ethan Clark and his wife. (Clark Decl. ¶ 3). Signet's business was originally two-fold: (1) data collection and analysis of that data for customers with reciprocating machinery located in Western Canada and (2) sales of Windrock products as a Windrock distributor in Western Canada under a Windrock distribution agreement. (*Id.* ¶ 4). In order to perform the data collection and analysis portion of the business, Signet purchased Windrock Analyzers, and the accompanying Windrock MD software, use of which was governed by a software license agreement (the "Signet License Agreement"). (*Id.* ¶ 5). Signet used the Windrock analyzers at Signet's customer sites to collect and analyze data from the customers' reciprocating equipment. (*Id.* ¶ 5). Signet's customers paid Signet for its data collection and analysis services on a contract basis. *Id.* This service was referred to as "contract analysis" by Windrock. (*Id.*)

### D. Viper

Viper was formed in early 2017 to provide machinery analysis of industrial engines/compressor in the gas gathering business in the Marcellus Shale region,[9] which stretches from New York, through Pennsylvania, West Virginia, Ohio, Michigan, and Kentucky. (E. Flanagan Dep. 92:3-14; 97:10-14). In early 2017, Ethan Clark approached Windrock about forming Viper, to ensure Windrock would not object to Clark's planned venture. (Clark Decl. ¶ 17). Windrock was not performing any contract analysis services in the Marcellus Shale region and agreed that starting a company in that area for contract analysis services made sense. (*Id.*). Viper performed analysis services work for gas compression users in the Marcellus Shale region using Windrock equipment and properly licensed Windrock MD software[10] with

---

[9] Marcellus Shale is a shale formation that produces natural gas. (E. Flanagan Dep. 92:12-14).
[10] The license agreement Viper accepted in order to use the Windrock MD software is referred to herein as the Viper License Agreement.

9

Windrock's knowledge and consent. (Flanagan Dep. 91:16-93:25). Viper also referred its customers to Plaintiff on multiple occasions to purchase new or updated Windrock equipment. (Flanagan Decl. ¶ 7). Viper built its business on a word-of-mouth basis and was soon doing significant work numerous for oil and gas companies, including ██████████████████████████████████, and other customers. (Flanagan Decl. at ¶ 5). Flanagan acquired an interest in Viper when he went to work for Viper. (E. Flanagan Dep. 57:10-58:21; Flanagan Decl. at ¶ 4; Clark Decl. ¶ 21).

### E. Windrock's Relationship with Viper and Signet Evolves

At the time Flanagan joined Viper, neither Plaintiff nor Viper considered the other a competitor because Plaintiff had no service presence in the Marcellus Shale region. (E. Flanagan Dep. 62:24-63:1, 91:16-93:25; Flanagan Decl. ¶ 6). In 2018, Windrock appointed Chris Heisler as a salesperson to the Marcellus Shale region. (Clark Decl. 22). At about the same time, Pierre Parisi of Apergy sent an email to Clark regarding the future relationship between Windrock and Viper. *Id.* Pierre requested that Viper give Windrock a right of first refusal on all contract analysis work that Viper generated, including work for Viper's already-existing customer base. *Id.* Viper declined this offer. *Id.* In 2019, Plaintiff took the ███████ account from Viper. (Flanagan Decl. ¶ 7).

In 2018, Signet owned eleven (11) Windrock analyzers that it used to provide contract analysis services to its customers in Western Canada. (Clark Decl. ¶ 6). At that time, Signet had twelve (12) employees: one salesperson, two administrative employees, and nine (9) analysts. (*Id.*) In 2018, Javaad Qasimi and Pierre Parisi of Apergy approached Signet on behalf of Windrock seeking to modify Signet's distributor agreement with Windrock so that Signet would commit to a minimum sales quantity of Windrock analyzers. (*Id.* ¶ 7). Under the proposal, if Signet did not meet the set minimum sales quantity, it would be penalized. (*Id.*) Signet did not think the minimum quantity of Windrock analyzers that Plaintiff proposed for Signet to sell was reasonable and declined to sign a new distributor agreement with Windrock. (*Id.* ¶ 8). As a result, Windrock

10

ended Signet's distributor relationship. (*Id.*) Signet continued providing contract analysis services to its customers using its 11 Windrock analyzers after the distributor agreement ended. (*Id.* ¶ 9).

For many years, Windrock had offered what it called "CARE", a paid support plan whereby it provided maintenance and software updates for the Windrock analyzers. (*Id.* ¶ 10). In the 2018-time frame, Windrock raised its rates for CARE and also notified Clark that Signet would have to buy new 6400 analyzers because Windrock would not support Signet's 6320 analyzers any longer, saying parts for the 6320 analyzers would not be available. (*Id.*). In the same timeframe, Mike Jones at Windrock advised Signet not to upgrade to Windrock's 6400 analyzer because of ongoing problems and customer complaints Windrock was experiencing with its 6400 analyzers. (*Id.* ¶ 11).

As a result of these developments, Signet started using Viper to repair its 6320 analyzers. (*Id.* ¶ 12). Several of the 6320 analyzers needed new parts, and Viper was able to supply those parts. (*Id.*). All of Signet's 6320 analyzers are still running today. (*Id.*). Prior to 2019, Signet paid Windrock to calibrate its 6320 analyzers annually. (*Id.* ¶ 13). Windrock's charge for this annual service increased from approximately US $3,500 to about US $10,000 per analyzer in 2019. (*Id.*) At that point, Signet turned to Viper which began providing Signet the annual calibration service in 2019 for approximately US $2,500 per analyzer. (*Id.*).

In addition, in 2017 and 2018, Signet realized its analysis work for its customers would be improved if the Windrock analyzers contained additional features. (*Id.* ¶ 14). For example, Signet wanted tortional analysis features and order identification (2nd, 3rd, 4th order, etc.) of its customers' vibration data to effectively analyze the data Signet collected from its customers. (*Id.* ¶ 15). It requested these features from Windrock, but, by 2018, a number of the employees knowledgeable about the 6320 analyzers had left Windrock, and those who remained at Windrock did not seem to understand Signet's feature requests. (*Id.* ¶ 14). Thus, Windrock was not

11

implementing the new features Signet desired in the Windrock Analyzers. (*Id.*). The Windrock 6320 and 6400 did not and still do not have those features. (*Id.* ¶ 28).

### F. Formation of RSI

Due to Windrock's price hikes, its resistance to adding new product features and its plan to discontinue support of the 6320 to force customers to the 6400 and other products as discussed above, in the fall of 2019, Beam, Kelley, McNair, and Flanagan started discussing the need for a new analyzer that would be fully supported and could provide the new features Signet needed for its customers. (Flanagan Decl. ¶ 10). Signet indicated that for a new analyzer to be of use to Signet, it would need to work with the customer data Signet already possessed from its regular collection of data from its customers' analyzers. (Clark Decl. ¶¶ 25-26).

In late 2019, Kelley, McNair, Flanagan, and Beam joined together to develop a portable analyzer which would ultimately compete in the reliability market against many competitors, of which Windrock is one. (Kelley Dep. at pp. 17-18, 76, 94.) The Individual's discussions and efforts ultimately resulted in the formation of RSI in March 2020, after their respective non-compete periods had ended. (McNair Dep. 33:15-34:5; Dkt. 176-2; Dkt 176-3; Dkt. 176-4; Dkt. 176-5; Dkt. 176-6). RSI was formed to develop and sell portable analyzers and related analytics software because Windrock was not supporting existing 6320 analyzers and was planning to move its customers to a cloud-based analytics solution. (Flanagan Decl. ¶¶ 13-14). Together with Defendant Ethan Clark, the Individuals own RSI. (Dkt. 176 ¶¶ 23, 32, 33, 35, 36). RSI acquired Viper LP as a part of the formation of RSI.[11]

On or about April 1, 2020, Windrock announced to the world that it would no longer be

---

[11] RSI owns 99.5% of Viper LP. Viper Machinery Monitoring Corporation owns the remaining 0.5% of Viper LP. The individual owners of RSI own Viper Machinery Monitoring Corporation in the same percentage as their ownership of RSI. (*See* Rice Decl., Exs. 5-6).

12

providing support for the 6320 after September 30, 2020. (Dkt 173-2). It did this in an effort to increase sales of its newer analyzer product (the 6400) and its cloud-based monitoring solution, both which the market found to be less desirable than Plaintiff's 6310 and 6320 portable analyzer products. (Mahoney Dep. 98:19-22; Flanagan Decl. 14; Rice. Decl., Ex. 19). RSI recognized this announcement by Windrock provided an opportunity for RSI to provide a needed service to companies with 6320s. (Flanagan Decl. ¶ 13). Thus, in early April 2020, RSI began advertising to customers in the oil and gas industry that it could provide service and support to Windrock 6320 analyzers, thus allowing businesses an alternative to purchasing Plaintiff's newer analyzer and cloud-based solution. (Rice Decl., Ex. 18).

RSI developed its own software, known as Rmonix, to read the data from the analyzer it was developing, named the Lenz. (Flanagan Decl. ¶ 15). Kelley began developing Rmonix in December of 2019 and worked on it part-time through May of 2020. (Kelley Decl. ¶ 5). After that point, Mr. Kelley continued working on Rmonix in a full-time capacity. (Kelley Decl. ¶ 5). As a part of RSI's development of Rmonix, it added a feature to the software which permits Rmonix to interpret the data file belonging to customers using Windrock-branded analyzers (the "Import Feature"). (Kelley Decl. ¶ 9). The Import Feature allows customers who move from Windrock Analyzers to RSI's analyzer the ability to use their historical monitoring data. (Kelley Decl. ¶ 9). When RSI was developing Rmonix, Signet gave Josh Kelley access to customer data that Signet had collected from its customers using its Windrock Analyzers so RSI could verify that the new analyzer it was developing could accurately handle the Signet customer data. (Clark Decl. ¶ 26). Part of the verification process was allowing Mr. Kelley to run Windrock MD on a Signet computer to view the Signet customer data. (*Id.*).

Mr. Kelley did not access or view Windrock source code after he finished contracting with

Windrock. (Kelley Decl. ¶ 16). In 2021, RSI introduced its competing portable analyzer to Plaintiff's, called the Lenz. (Flanagan Decl. ¶ 15). RSI's proprietary software to read data produced by the Lenz, named Rmonix, entered beta testing in July of 2020 and was officially launched in early 2021. (Kelley Decl. ¶ 5).

### G. Windrock's Reaction

In early April of 2020, upon learning Plaintiff had announced publicly that it would no longer support or service the 6320, RSI began actively soliciting companies it believed were using the 6320, advertising that it could provide them support and service for the 6320. (Flanagan Decl. at ¶ 11). Less than two weeks later, as early as April 14, 2020, Plaintiff had learned of RSI's entry into the market for service and support of the 6320 and begun investigating RSI, its principals, products, and services. (Rice Decl., Exs. 7-9). Plaintiff quickly reacted to RSI's entry into the service market, sending a letter to customers on April 20, 2020 acknowledging that after it had announced that it would no longer support or service the 6320, "other companies in the industry" had begun "claiming to be able to maintain" the 6320. (Dkt. 176-3). In this letter, Plaintiff informed customers that it was the Original Equipment Manufacturer ("OEM") for the 6320 and made several statements about itself as the OEM. (*Id.*). Thereby, Plaintiff implied to customers that any service or maintenance of the 6320 received from RSI or any other company besides Plaintiff would be of lesser quality, and even suggested that calibrations of the 6320 performed by other companies in the industry might not be accurate. *Id.* At the same time, Plaintiff also encouraged customers to take advantage of its "low cost trade in program that will allow customers to upgrade their analyzer to the latest model"; i.e., the 6400, and provided information on steps that companies interested in switching to the 6400 could take. (*Id.*). This communication was prepared specifically to respond to RSI's entry into the service and support market that Windrock had abandoned. (Rice Decl., Ex. 10).

14

Plaintiff continued to be concerned that RSI was competing with it. (*Id.*). Plaintiff's own employees and agents acknowledged that the 6400 had "issues" that Plaintiff needed to fix. (Rice Decl., Ex. 11). Plaintiff gathered information from its customers, who provided negative feedback about Plaintiff's Analyzers, specifically the 6400, and about Plaintiff's sales practices and the quality of Plaintiff's service. (Rice Decl., Ex. 12). Plaintiff's customers also reported that Plaintiff's newest product, an offering called Spotlight designed to replace the Analyzers, required "painful" installation, involved years of recurring hardware issues, and created potential safety hazards because of "lots of wires hanging around." (Rice Decl., Ex. 13). Plaintiff also learned that its "key customers" were "resistant" to purchasing Plaintiff's new products while at the same time, those customers were reporting that RSI's products, service, and sales practices compared favorably to Plaintiff's and, in some instances, were better than Plaintiff's. (*Id.*).

On April 16, 2021, Plaintiff sent a letter to McNair, Flanagan, Kelley, and Beam threatening legal action against them and RSI if they did not cease and desist from "unfairly competing" with Windrock. (Rice Decl., Ex. 14). Plaintiff's letter also stated that the act of marketing RSI's "capability to use, repair and/or calibrate the older version of Windrock's portable data collectors" were "unlawful activities" and asserted that Plaintiff was "losing substantial business opportunities to sell its recently-upgraded portable data collectors to its customers", demanding that RSI stop its service activities and stop marketing the Lenz and Rmonix as an alternative to "any of [Plaintiff's] products or services." (*Id.*). Mr. Mahoney, Windrock's President of technology and artificial lift business, (Mahoney Dep. 38:22-39:2), who was responsible for the cease-and-desist letter, when asked why supporting the 6320 was an unlawful activity could not articulate a reason. (Mahoney Dep. 95:18-23). When Mr. Mahoney was asked if the purpose of the letter to Windrock's customers announcing the end of support to the 6320 was to force its

15

customers to upgrade to the 6400 he responded: "I wouldn't use the word force, but migrating – end of life and migrating a product strategy is the normal course of business." (Mahoney Dep. 98:19-22).

Windrock first filed this action on August 9, 2021 against RSI and Kelley (Dkt. 1), in furtherance of its plan to eliminate its new competitor in the large and lucrative field of oil and gas monitoring, which it had dominated, though not without some competition, for some years. It amended its suit on August 16, 2023, to add claims against the remaining Individuals and the Viper entities.[12]

### H. Plaintiff's Factual Claims

#### 1. Claimed Technical Trade Secrets

Windrock claims that the Import Feature in Rmonix cannot be replicated without intimate knowledge of or access to Windrock's trade secret source code information because the data in the Windrock data file cannot be decoded without it. (Dkt. 176, ¶ 114). Windrock identifies its trade secret source code information required to decode the data file as eighteen (18) different data structures[13] contained within the Windrock MD source code.[14] (Rice Decl., Ex. 15). However, Plaintiff's source code expert, Mr. O'Donahue, examined RSI's Rmonix source code and the Windrock MD source code and opined that a total of three (3) of the data types contained in the 18 different data structures show Kelley's intimate familiarity with the Windrock MD source code.

---

[12] Signet and Ethan Clark were also named as defendants in Plaintiff's fifth iteration of its Complaint, but Plaintiff has since dismissed them. (Dkt. 209).

[13] A "data structure" is a collection of data values, the relationships among them, and the functions or operations that can be applied to the data, i.e., it is an algebraic structure about data. Wikipedia, "Data Structure" last accessed on January 1, 2024 at https://en.wikipedia.org/wiki/Data_structure#:~:text (=Data%20structures%20are%20generally%20based,and%20manipulated%20by%20the%20program).

[14] Windrock originally referred to its data structures as C-structures, which was a defined term. (*See e.g.,* Dkt. 18 ¶¶ 38-39, 41-44). However, in its Fourth Amended Complaint Windrock instead uses the term "data structures." (Dkt. 176 ¶¶ 110-11, 113-16).

16

(See Rice Decl. Ex. 41 – Excerpts of the Transcript of the Deposition of John O'Donahue ("O'Donahue Dep.") 70:10-71:10).  ███████████████████████████████████. (*Id.*).  The concept of ██████ is not unique to Windrock MD; it is used in other software applications.[15] (O'Donahue Dep. 96:18-97:7).  For example, ██████ are used in protocol buffers, which is a Google standard.  (O'Donahue Dep. 97:3-7).  The ██████ data type is commonly called "fixed point notation", which is also a known standard used in other applications.  (O'Donahue Dep. 51:16-52:24; https://en.wikipedia.org/wiki/Fixed-point_arithmetic).  The ██████ data type provides balancer data, which Rmonix does not support.  (*See* Ex. 1 to Plank Decl. Report of Jim Plank, Ph.D. ("Plank Report") at 127).  Importantly, Plaintiff's software expert, Mr. O'Donahue, did not examine the source code for the ████████ data type in Windrock MD and Rmonix and therefore cannot offer an opinion regarding RSI's use of ████████.  (O'Donahue Dep. 166:1-8).

Windrock also appears to claim that its use in Windrock MD of a data formatting construct known as "Big-endian" to store data is a Windrock "data type" that indicates a trade secret. O'Donahue Dep. 97:8-14.  Most data in any computer data file is stored in either Big-endian or Little-endian format.  (O'Donahue Dep., 97:15-98:15).  Numbers are stored in both formats in the Windrock data file.   The Big-endian and Little-endian formats are standards that have been used for over 40 years.  https://en.wikipedia.org/wiki/Endianness.

Plaintiff claims that it has taken reasonable efforts to maintain the secrecy of its trade secrets and that the trade secrets "are only made available to key personnel on a need-to-know basis."  (Doc. 176 at ¶¶ 170, 188.)

In contrast to Plaintiff's claim of secrecy, Windrock has conceded that it granted at least

---

[15] "I won't say you don't ever see ██████" (O'Donahue Dep. 96:9).

twenty-two (22) individuals access to the claimed trade secret C-structures in the Windrock MD source code, but the individuals identified below did not have a confidentiality agreement for all of their respective periods of employment with Windrock. (*See* Rice. Decl., Ex. 16; Plaintiff's Response ("Resp.") to RSI's Interrogatory ("ROG") No. 7).[16]

| Name of Employee | Dates of Employment[17] | Date of Obligation | Confidentiality Agreement |
|---|---|---|---|
| Mark Atkin | 6/18/2004 - Current | October 4, 2017 | Ex. 50 |
| Josh Kelley | 11/5/2007 – 1/13/2018 | October 4, 2017 | Dkt. 176-5, 176-6 |
| Tim Rolen | 6/2008 – 9/2009; 2/2012 – 10/2019 | October 17, 2019 | Ex. 51 |
| Geoff Verge | 9/9/2013 – 7/2018 | June 21, 2018 | Ex. 52 |
| Tom Greene | 10/29/2012 – Current | August 8, 2022 | Ex. 53 |
| Zachary Thompson | 12/1/2016 – 2/11/2022 | March 4, 2020 | Ex. 54 |
| Srinivasa Meda | 10/15/2018 - Current | Unsigned – No Agreement | Ex. 55 |
| Abdullah Mamun | 4/12/2021 – Current | Unsigned – No Agreement | Ex. 56 |
| William Griffith | 1996 – 10/2017 | March 3, 2014 (Cook Compression) | Ex. 57 |
| Ed Kelleher | 10/1/2010- 4/2020; 10/12/201 - Current | December 1, 2017 | Ex. 58, 59 |
| Mike Jones | 10/13/2005 – Current | October 9, 2017 | Ex. 60 |
| Bryan Blanchard | 2/24/2002 - Current | August 2, 2022 | Ex. 61 |

Windrock provided Kelley with access to its source code, source code repository, and the

---

[16] Additionally, Plaintiff states that two other persons, William Griffith and Steve Follmar "may have also had access to the source code and C-structures." (Rice. Decl., Ex. 16; Pltf. Resp. to RSI's ROG No. 7. However, Windrock has since admitted that William Griffith is the original author of the Windrock MD source code and thus he would have had access to the source code and C-structures. (*Id.*; 2023 Windrock (Chapman) 30(b)(6) Dep. 83:22-23).

[17] *See* Rice Decl., Ex. 20 Pltf. Resp. to RSI's ROG No. 15).

18

7435053.24

C-structures in its source code from his first employment in 2007 through October 3, 2017 without having Kelley sign any confidentiality or non-disclosure agreements. (Rice Decl., Ex. 2 Nos. 2-6, 9-10). Further, Plaintiff has no evidence that Kelley, McNair, Flanagan, or Beam ever signed the ChampionX Code of Conduct. (*Id.* Nos. 13, 14, 15, 16). Kelley had a version of the Windrock MD software on a personal computer at his home prior to October 3, 2017 that he used to work from home with permission from his managers. (Kelley Dep. at pp. 58, 60-61.) Mr. Mark Atkin, another Windrock employee, also had Windrock materials on his laptop computer, which he uses at his home. (Atkin Dep. 28:16-29:17). On August 14, 2018, Peter Flanagan, an employee of Apergy USA, Inc., gave Ed Flanagan permission to install version 5 of Windrock MD on a laptop and a desktop computer for the purpose of performing field service work for customers of Viper. (Rice Decl., Ex. 17)

### 2. Trade Secret Customer Information

As with its source code, Plaintiff claims that it takes reasonable measures to keep its claimed trade secret customer information secret. (Dkt. 176 ¶¶ 170, 188). Plaintiff has identified five (5) individuals who currently have or previously had access to Windrock's confidential customer information that rises to the level of a trade secret.[18] However, despite being provided access to Windrock's claimed trade secret customer information, two of those individuals (Mr. Blanchard and Mr. Jones) were given substantial access prior to ever executing a written confidentiality or non-disclosure agreement with Windrock or its parent entities, affiliates, or subsidiaries. (Rice Decl., Ex. 2 Nos. 23-25, 213, Exs. 60, 61).

Plaintiff's corporate representative could not identify any trade secret confidential

---

[18] Plaintiff identified Ed Flanagan, Mary Chapman, Ed Kelleher, Mike Jones, and Bryan Blanchard as individuals to whom it provided access to trade secret level customer information. (Rice Decl., Ex. 16, Int. No. 7; Rice Decl., Ex. 2, No. 56.)

19

7435053.24

information to which Beam or McNair had access to.  (2023 Windrock (Chapman) 30(b)(6) Dep. 68:20-70:9, 76:6-12).  Plaintiff also claims that Kelley and Beam, who worked in engineering, did not have as much "customer facing" access as Flanagan and McNair, but that Kelley and Beam did know who the Plaintiff's customers were.  (Chapman Dep., 60:5-11.)  And Plaintiff could not affirmatively state that Defendant Kelley had access to any of Windrock's trade secret customer information.  (2022 Windrock (Chapman) Dep., 54:14-55:6; Rice Decl., Ex. 2, Nos. 7-8).  Mr. Atkin testified he did not have access to confidential customer information and was not aware of any other Windrock developers that did, either.  (Atkin Dep. 81:5-10).

Despite Windrock's attempt to prevent the Individuals from using their remembered information about the identity of Windrock's customers, (*see* 2022 Windrock (Chapman) 30(b)(6) 160:19–161:6), the identity of Windrock's customers is publicly accessible through various trade groups and easily identified through other publicly-available sources.  (Kos Depo., 119:20-120:6).  And, Windrock's customers are under no confidentiality obligation with Windrock and are free to share the fact that they use Windrock Analyzers and any of their own business information with anyone they may choose.  (2022 Windrock (Chapman) Dep., 53:23-54:13; Chapman Dep. pp. 172:14-173:5.)

Plaintiff admitted it had no evidence that Defendants took any of Windrock's trade secret customer information with them when their employment with Windrock ended.  (2022 Windrock (Chapman) 30(b)(6) Dep. 160:3-18).  Instead, Windrock's representative stated that its claim against Defendants for wrongful use of Windrock trade secret customer information was based on McNair, Flanagan, Beam and Kelley using remembered knowledge of Windrock customer names and customer contact names and trading on their experience working with Windrock to solicit business from Windrock customers for RSI.  (*Id.*).

20

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.  R. Civ. P. 56(a).  Initially, the moving party must "inform[] the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which … demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party satisfies this burden by affirmatively producing evidence establishing that there is no genuine issue of material fact or by "showing … that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  Thus, summary judgment is mandated when the party who bears the burden of proof at trial cannot "make a showing sufficient to establish the existence of an element essential to that party's case."  *Id.* at 322.

In determining whether a genuine issue of material fact exists, "the court must draw all inferences in the light most favorable to the non-moving party."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir.  2008), *cert. denied*, 556 U.S. 1235 (2009).  If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and the court must grant summary judgment.  *Id.* at 389 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.  574, 587 (1986)).

## III.  LAW AND ARGUMENT

### A.  Misappropriation of Trade Secrets – Counts 1 and 2

Plaintiff has filed claims pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") as well as Tennessee's Uniform Trade Secrets Act, T.C.A. § 47-25-1701 *et seq.* ("TUTSA").  In support of its two trade secret claims, Plaintiff asserts Defendants Kelley, Beam, Flanagan and McNair each had access to Plaintiff's allegedly confidential customer

information, and that Kelley had access to Plaintiff's trade secret Windrock MD source code, which the individual Defendants allegedly disclosed and utilized to benefit RSI. (Dkt. 176 ¶¶ 37, 53 61, 75-76, 86-90). Plaintiff also asserts that Flanagan had access to certain confidential and proprietary data points and calculations which he disclosed and utilized to benefit RSI. (*Id.* ¶ 55). Plaintiff's claims fail because (i) Plaintiff cannot show any of the individual Defendants had access to or utilized Plaintiff's confidential and proprietary customer information and that any customer information the individual Defendants had was public and/or remembered information, (ii) Plaintiff cannot show the "data points" and "calculations" Flanagan allegedly disclosed and utilized were either proprietary or confidential, and (iii) the Windrock MD data file and data file format is not a trade secret.

### 1. Applicable Law.

While Windrock's claims under the DTSA and the UTSA are separate causes of action, this Court has previously observed that the "requirements for establishing a 'trade secret' under DTSA and TUTSA are similar." *Western Excelsior Corp. v. Propex Operating Co., LLC*, No. 1:16-cv-506, 2017 WL 11195421, at *2 (E.D. Tenn. Sep. 6, 2017). "Both [the TUTSA and DTSA] require the plaintiff to show (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *Id.* (*citing PartyLite Gifts v. Swiss Colony*, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006)).

Both statutes have similar definitions of a "trade secret." *See Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 3:17-cv-01095, 2020 WL 5797974, *3 (M.D. Tenn. Sept. 29, 2020); 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25-1702(4). Accordingly, under both statutes, "trade secrets" must have three (3) characteristics: (1) information or compilations of information that are important to the business of the party claiming the misappropriation, (2) reasonable efforts to keep the information secret, and (3) the independent economic value of the

22

information because the information is kept secret or not known by others who could use it. *See* 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25-1702(4).

Under Tennessee law, "remembered information" and "relationships with customers" are not trade secrets. *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973 (6th Cir. 2007) (citing *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 215 (Tenn. Ct. App. 2004)); *Knox Trailers, Inc. v. Maples*, 581 F. Supp. 3d 1000, 1013 (E.D. Tenn. 2022). *See PartyLite Gifts Inc. v. Swiss Colony Occasions*, No. 3:06-CV-170, 2006 WL 2370338, at *5 (E.D. Tenn. Aug. 15, 2006) ("personal knowledge of plaintiff's salespeople is widely known outside and within the business"); *B&L Corp.*, 162 S.W.3d at 214 (names of plaintiff's clients was not confidential information because it was available to the public); *Cam Int'l, L.P. v. Turner*, No. 01-A-01-9203CH00116, 1992 WL 74567, at *4 (Tenn. Ct. App. Apr. 15, 1992) ("[c]ustomer information readily ascertainable from public sources is not entitled to protection"). Information about the use of a company's products is also not protected confidential information. *See B&L Corp.*, 162 S.W.3d at 214 (evidence of customers' contract renewal dates and client representative identities is not confidential "simply because it can be difficult to obtain").

And, any information disclosed to the public cannot be considered a trade secret. "The property right in a trade secret ceases to exist after the secret has become public property through general disclosure." *Scharmer v. Carrollton Mfg.*, 525 F.2d 95, 100 (6th Cir. 1975). "The subject matter of a trade secret must be secret. Matters of public knowledge or general knowledge in the industry, or ideas which are well known or easily ascertainable cannot be secrets. ***Similarly, matters disclosed by a marketed product cannot be secret***." *Allis-Chalmer Mfg. v. Continental Aviation & Engineering Corp.*, 255 F. Supp. 645, 653 (E.D. Mich. 1966) (emphasis added). "But there was public disclosure of the alleged trade secret prior to the issuance of the patent. It occurred

23

when Scharmer's company, New Milford, in 1960 resold the units back to Carrollton. The alleged trade secret became ***plainly visible merely by looking at the units***. This was shown by uncontroverted evidence. It was no longer a secret." *Scharmer v. Carrollton Mfg.*, 525 F.2d 95, 100 (6th Cir. 1975) (noting "the fact that the alleged trade secret could be visually observed, 'seriously undermined' any viable claim of a trade secret.").

Tennessee courts have looked to several factors in making the determination of what constitutes a trade secret, the most important of which is whether the information has been publicly disclosed or is easily acquired or duplicated by others. *See Eagle Vision, Inc. v. Odyssey Med., Inc.*, 2002 WL 1925615, at *4 (Tenn. Ct. App. Aug. 14, 2002). "Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets. Similarly, matters disclosed by a marketed product cannot be secret." *Hickory Specialties, Inc. v. B&L Laboratories, Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979) (citation omitted); *see also* Restatement (Third) of Unfair Competition § 39 cmt. F (1995) ("[I]nformation readily ascertainable from an examination of a product ... is not a trade secret.").

### a.  Reasonable Steps

The owner of a trade secret must take reasonable steps to protect the trade secret. 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-25- 1702(4);  *See Ford Motor Co. v. Launch Tech Co., Ltd.*, No. 17-12906, 2018 WL 1089276, at *17 (E.D. Mich. Feb. 26, 2018) (reasonable steps to protect software include "utilizing encryption and obfuscation technology," licensing the software to third parties where the licenses require the data "be maintained in strict confidence and outlining steps to protect the secrecy of the data", and requiring purchasers of the software "to agree to a EULA prohibiting reverse engineering and use by another diagnostic toolmaker.").

### b.  Misappropriation

If information is a trade secret, there must be an act of misappropriation for there to be a

24

finding of trade secret misappropriation. The DTSA and the TUTSA have similar definitions of "misappropriation." *See* 18 U.S.C. § 1839(5); Tenn. Code Ann. § 47-25-1702(2). The TUTSA defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means . . .." Tenn. Code Ann. § 47-25-1702(1).

Thus, under both statutes, misappropriation occurs under two (2) scenarios. First, misappropriation occurs when a person acquires the trade secrets of another either knowing or having reason to know that it was acquired in breach of a duty to maintain the secrecy or limit the use of the trade secret. 18 U.S.C. § 1839(5)(A), (6); Tenn. Code Ann. § 47-25-1702(1), (2)(B). Second, misappropriation occurs when a person uses or discloses the trade secret of another, without its owner's consent, in violation of a duty to maintain the secrecy of the trade secret or limits on the use of the trade secret. *See* 18 U.S.C. § 1839(5)(B), (6); Tenn. Code Ann. § 47-25-1702(1), (2)(B). Misappropriation does not include reverse engineering. 18 U.S.C. § 1839(5)(B). The undisputed material facts demonstrate that Plaintiff cannot show that either the data file format (which it complains RSI should not have been able to read/use) or its customer information constitutes a trade secret under either statute.

 2. **Argument**

 a. **Plaintiff's Customer Information Is Not A Trade Secret.**

Plaintiff alleges that Kelley, Flanagan, Beam, and McNair "learned valuable confidential information about Windrock's customers while employed by, or otherwise providing services to, Windrock" and that Defendants have wrongfully utilized that information in violation of the DTSA and TUTSA. (Doc. 176 at ¶¶ 155, 172-82, 190-99.) In other words, the Complaint alleges that the remembered knowledge that Kelley, Flanagan, Beam and McNair retain of Windrock's customers is the trade secret being misappropriated, as Plaintiff's corporate representative testified

25

that Defendants' retained knowledge of Plaintiff's customers forms the basis of this claim. (2022 Windrock (Chapman) Dep., 160:19–161:6). It is well settled that the information which former employees retain is not a protectible trade secret. *PartyLite Gifts, Inc.*, 246 F. App'x at 973. The knowledge and remembered information that the Individuals have of Windrock's customers is not a protectible trade secret.

Moreover, Plaintiff's customers are not subject to a confidentiality agreement with Windrock and are thus not prohibited from disclosing the existence or the terms of their business relationship with Windrock to others, including Defendants. (Chapman Dep., 172:14-173:5). Similarly, information about Windrock customers' use of Windrock products is also not information that Windrock's customers are required to maintain confidential. *See B&L Corp.*, 162 S.W.3d at 214.

Plaintiff can present no evidence that it has taken reasonable steps to keep the customer information it claims in this case secret or confidential. *Cf. SEYI-America, Inc. v. Stamtec, Inc.*, 2015 WL 13647945, at *3 (E.D. Tenn. Jan. 30, 2015). Further, the identity of Windrock's customers could be obtained by attending industry conventions or through other publicly available sources of information. Chapman Depo 163:18 – 164:16; 168:8 – 25. Accordingly, this Court should determine that the customer information Plaintiff complains Defendants misused is not a trade secret as a matter of law.

### b. The Data File Format Is Not A Trade Secret.

There is also no dispute that the Windrock MD data file format is not a trade secret. The data file is not subject to an obligation of confidentiality or any effort by Plaintiff to keep it secret, such as encryption or password protection. (Atkin Depo. 58:18-20; Windrock (Atkin) 166:24-167:1; 168:11-12; Kos Depo. at pp. 85-86; Rice Ex. 2, Nos. 288, 299). The information in the data file is exposed in Windrock MD (Plank Decl, ¶ 7; *see also* Rice Dec., Ex. 4. pg. 190-222 (Reports),

26

229-230 (Data Explorer)).  Since the Windrock data file contains data taken from the customer's machinery, it is the customer's data and not Windrock's.  (Rice Decl. Ex. 2, 286).  Also, Windrock MD, the executable version of the software, is not subject to any confidentiality restriction, so the information exposed through Windrock MD cannot be a trade secret.  (Dkt. 176-1).  Furthermore, Windrock has taken no steps to protect its data file since it first raised this issue in its cease-and-desist letter to RSI in early 2021, which was almost three years ago.  If Windrock wanted to protect its data file it could have taken steps to encrypt the data file so it could not be read by Rmonix or any other program, but it has chosen not to do so in the face of its claimed concerns.

Since the Windrock MD data file itself is not a trade secret, Windrock claims that the only way for RSI to understand parts of the data file is through knowledge of information it claims is trade secret: the data structures and the data types within the data structures.  Windrock identifies its trade secret source code information required to decode the data file as eighteen (18) different data structures contained within the Windrock MD source code.  (Rice Decl., Ex. 15.)  The fact that Windrock chose to expose these data structures (i) in the data file, which is not confidential or protected through encryption or password, and (ii) through Windrock MD, should end the analysis.  But, Windrock claims that certain parts of the data structures are so difficult to figure out that RSI could not have reverse engineered the data file, as it claims to have done, and must have had improper access to trade secret information either by copying the Windrock MD source code or by recall and use of the confidential information in the Windrock MD source code. (Dkt. 176 ¶ 113).

However, Plaintiff's source code expert, Mr. O'Donahue, examined RSI's Rmonix source code and the Windrock MD source code and opined that a total of three (3) of the data types contained in the 18 different data structures show Kelley's intimate familiarity with the Windrock

MD source code.  (O'Donahue Dep. 70:10-71:10).  But Mr. O'Donahue admits that ▮▮▮▮▮▮

▮▮▮ are well known and/or often used in the industry.  (O'Donahue Dep. 51:16-52:24, 97:3-7).

And Mr. Kelley was able to figure out all of these data types through a standard reverse engineering

process.  (Kelley Decl., ¶¶ 9-12).  Defendants' source code expert, Dr. Plank, was also able to

demonstrate that the format of all three data types can be easily viewed, and ultimately reversed-

engineered, with access to the (public) data file and the Windrock MD executable code. (Plank

Decl. ¶ 13).  Mr. O'Donahue does not dispute Dr. Plank's finding.

```
        Q    Okay.  But you're not disagreeing with his
    opinion that with the CSV files, he was able to
    reverse engineer a lot of Windrock MD, are you?
        A    No, I've never disagreed with the fact
    that if you have access to Windrock MD or Windrock
    MD products, you can reverse engineer it, but he's
    claiming that you can do it without.  That's what I
    disagree with.
```

(O'Donahue Dep., 195:2-9).  Given that Mr. O'Donahue agrees that access to the (publicly

disclosed) Windrock MD executable is enough to understand the data file, and the data file itself

is not confidential, the data types exposed by Windrock MD and the data file cannot be a trade

secret.  Also, Dr. Plank's examination of the development of the Rmonix source code shows that

Kelley did not rely on Windrock source code.  (Plank Report at ¶ 16).  Specifically, Dr. Plank

shows, through an analysis of the history of the source code developed and Mr. Kelley's

correspondence related to the source code development, that Kelley used an iterative process to

determine the data structures in the publicly available data file.  *Id.*  Mr. O'Donahue did not

examine the source code development history of Rmonix and has no opinion regarding the

development process of the code that handles the three data types. (O'Donahue Dep. 161:19-22;

7435053.24

166:19-24). Thus, Dr. Plank's opinion in this respect stands unrefuted, and this Court must accept it as undisputed fact.

Furthermore, while Windrock claims that Kelley's intimate familiarity with the Windrock source code is access to a trade secret, no reasonable person would conclude that Kelley remembered each specific and necessary detail of the Windrock MD source code years later. Developers do not remember specifics of source code years later. Mr. O'Donahue could not remember a single function name or data field in software he worked on several years ago (O'Donahue Dep., 38:3-10), but he could remember in general what function the software performed. Mr. Atkin testified that intimate familiarity would mean memorization of all of the source code. (Atkin Dep, 79:19-22). Mr. Atkin also testified that Mr. Kelley could not have remembered all the information required to reverse engineer the data file. (Atkin Dep. 77:24-78:3; 79:12-22). And Windrock has exposed portions of the format of the data file to anyone with the Windrock MD executable through protocol buffers since 2012. (Kelley Decl. at 18-21; Plank Decl. ¶ 17). Therefore, there can be no dispute that the so-called Windrock trade secrets that RSI's creation of the Import Feature in Rmonix allegedly relies on are not trade secrets at all.

### c. The Source Code, To The Extent Applicable, Is Not A Trade Secret.

Even if Kelley had to access or remembered specific details of Plaintiff's Windrock MD source code to understand the data file format and thereby create the Import Feature in Rmonix (which he did not), it does not matter because Windrock's source code is not a trade secret. Under both the DTSA and the TUTSA, Plaintiff must take "reasonable efforts" or "reasonable measures" to keep the alleged trade secret confidential. *See* 18 U.S.C. § 1839(3); Tenn. Code Ann. § 47-15-1702(4)(B).

As set forth in the Statement of Facts *supra*, Plaintiff provided access to its claimed trade secrets to employees who were not bound by written confidentiality agreements or NDAs and in

29

some cases had no need for such information. (*See* Section I.H.1). Plaintiff cannot state whether other employees whom it permitted to access the claimed trade secrets were allowed access only after appropriate controls were put in place. (Rice Decl. Ex. 48, 41:17–42:4). The record shows that Plaintiff did not take reasonable steps to protect its Windrock MD source code. Because it did not take reasonable steps to keep its source code confidential, Plaintiff cannot show that the Windrock MD source code is a trade secret under the DTSA or TUTSA.

Additionally, Plaintiff's own copyright filings demonstrate that its source code is not a trade secret. The Copyright Office permits the depositing of source code containing trade secrets in redacted form, or by certain other alternatives, when a copyright applicant seeks to register a work of source code that contains trade secrets. *See* 37 C.F.R. 202.20(c)(vii)(A)(2). Specifically, source code containing trade secrets should be deposited with the Copyright Office in a specific manner. 37 C.F.R. § 202.20(c)(2)(vii)(A)(1)-(2). "Merely filing less than the complete source code--in and of itself--is not sufficient to maintain the applicant's trade secrets since that is the requirement for source code without trade secrets." *Third Party Verification, Inc. v. SignatureLink, Inc. et al.*, No. 6:06-cv-415-Orl-22DAB, 2007 WL 1288361, at *6 (M.D. Fla. May 2, 2007). "[T]he process is more elaborate for source code containing trade secrets" *id.* at *5 (citing 37 C.F.R. § 202.20(c)(2)(vii)(A)(2)), and it requires that an applicant "file either the first and last 25 pages of the source code with portions containing trade secrets blocked out; or the first and last 10 pages of the source code alone with no blocked out portions, or if less than 50 pages the entire source code with the trade secret portions blocked out." *Id.* at *6. Additionally, when submitting source code containing trade secrets, the applicant "must indicate in writing to the Office that the code contains trade secret material." Copyright Office Circular No. 61.

Windrock's deposits for the two registrations it sued under (the "'124 and the '585

Registrations") utterly fail to comply with these requirements. The deposits for those registrations do not contain any redactions, and the cover letter to the Copyright Office accompanying these deposits did not include any indication that the deposits contained trade secrets. (Rice Decl. Ex. 42, 43, 45, 46.) Instead, the deposits simply contain 50 pages of contiguous code each, with no copyright notices and no redactions. "The deposit of such materials without redaction vitiates a trade secret claim." *Capricorn Management Systems, Inc. v. Government Employees Insurance Co.*, No. 15-CV-2926 (DRH)(SIL), 2020 WL 1242616, at *9 (E.D.N.Y. Mar. 16, 2020) (appeal pending Oct. 6, 2023) (*citing PaySys Int'l, Inc. v. Atos Se*, 2016 WL 7116132, at *8 (S.D.N.Y. Dec. 5, 2016)). Put another way, failure to follow the Copyright Office's "specific procedures to protect trade secrets in computer programs for which registrations are sought…by, for instance, depositing copies without redaction—renders the deposited material publicly accessible and vitiates a trade secret claim." *PaySys* , 2016 WL 7116132 at *8. Even when the copyright deposit only contains a small portion of the code, "and would not enable replication of the system", the trade secret claim is still defeated when the plaintiff "is claiming the functionalities as trade secrets", rather than the entirety of the program or work at issue. *Capricorn at *9.* Accordingly, by Windrock's own submission to the Copyright Office, the Windrock MD source code is not a trade secret, and, therefore, its trade secret claim with regard to its source code and software fails.

### d. Plaintiff Cannot Show That Defendants Misappropriated Its Customer Information.

Plaintiff has no evidence that Defendants misappropriated its customer information as a matter of law. Even assuming that Windrock's customer information is a trade secret, which it is not, Plaintiff has no evidence that Defendants acquired any customer information or used or disclosed that information. Plaintiff admitted that Plaintiff has no evidence that Defendants/Resonance's principals took any of Windrock's trade secret customer information with

them when their employment with Windrock ended. (2022 Windrock (Chapman) Dep. 160:3-18; 2023 Windrock (Chapman(30(b)(6) Dep. 13:16–15:6). Kelley had no access to Windrock's customer information during the term of either the Retention Agreement or the NDA. (2022 Windrock (Chapman) Dep. 54:14-55:6); See also Rice Decl. Ex. 16, Response to ROG No. 7 (Identifying only 5 individuals with access to trade secret confidential information). Indeed, Plaintiff could not identify any trade secret confidential customer information that Beam or McNair had access to. (2023 Windrock (Chapman) Dep. 68:20-70:9, 76:6-12). In the absence of access to Windrock's customer information, the Individuals could not have acquired it or used or disclosed it, much less have done so knowing or having reason to know that it was acquired in breach of a duty to maintain the secrecy of it. Thus, Plaintiff also cannot show that Defendants misappropriated Windrock's customer information as a matter of law.

### e. Defendants Did Not Misappropriate The Windrock Data File or the Windrock MD Source Code.

As discussed above, there is no dispute that the Windrock data file is not a trade secret, so Defendants could not have misappropriated the data file. Even assuming that the Windrock MD source code is a trade secret, and assuming that the source code was needed to reverse engineer the Windrock data file, neither of which is the case, Plaintiff has no evidence that Defendants acquired the source code or used or disclosed the source code without Plaintiff's consent. Mr. Kos, Plaintiff's Director of Engineering, testified to his "belief" that Kelley had to look at the Windrock MD source code in order to decode the data file, but he admitted he has no knowledge that Kelley used the source code. (Kos Dep. 114:11-18). Nor does Plaintiff's expert, Mr. O'Donahue have any proof that Kelley misappropriated Plaintiff's source code. (O'Donahue Dep. 15:12-16:3). This "belief" falls far short of the level of proof required to establish an essential element of a claim of misappropriation. *See Celotex*, 477 U.S at 322; *Wood v. Jo-Ann Stores, LLC*,

32

2021 WL 262562, at *3, n.1 (E.D. Tenn. Jan. 26, 2021) ("summary judgment cannot be avoided merely because one holds a belief that is not supported by evidence") (citing *Anderson*, 477 U.S. at 252).

Thus, Plaintiff has no evidence that either its source code or the customer information it asserts Defendants misused are trade secrets, much less that Defendants acquired Windrock's customer information or its source code knowing or having reason to know that it was acquired in breach of a duty to maintain the secrecy. Therefore, Plaintiff cannot show that Defendants violated either the Defend Trade Secrets Act or the Tennessee Uniform Trade Secrets Act and Counts 1 and 2 should be dismissed as a matter of law.

### B. Statutory Procurement of Breach of Contract -- Counts 3 and 4

Plaintiff's Count 3 alleges that that "Defendants Flanagan, Beam, McNair, Kelley and/or Resonance induced Signet to allow them to obtain and use Signet's copy of Windrock MD in violation of the [software] License Agreement". Dkt. 176, at ¶ 205. Plaintiff's Count 4 alleges these same defendants induced Viper to allow them to obtain and use Viper's copy of Windrock MD in violation of the [software] License Agreement." Complaint, Dkt. 176, at ¶ 215. Plaintiff claims that Defendant Kelley's use of Viper's copy of the Windrock MD executable was outside the terms of the software License Agreement between Viper and Windrock. *Id.* at ¶¶ 212-215.

Plaintiff claims that the Individuals induced Viper and Signet, both Windrock MD software customers, to breach their respective License Agreements with Windrock by allowing Kelley to use their respective copies of Windrock MD. Section 47–50–109 of the Tennessee Code Annotated codifies the Tennessee common law claim for inducement to breach a contract, except to the extent that the statute permits an award of treble damages upon appropriate proof. *JIT Concepts, Inc. v. Shelby County Healthcare Corp.,* 358 F. Supp. 2d 678 (W.D. Tenn. 2005) (citations omitted).

33

To establish a claim for statutory inducement to breach a contract under Tenn. Code Ann. § 47–50–109, Plaintiff must establish that (1) a legal contract existed between itself and another party; (2) the Defendants were aware of the contract; (3) the Defendants intended to induce a breach of the contract; (4) the Defendants acted with malice in inducing a breach of the contract; (5) a breach of the contract occurred; (6) the breach was a proximate result of the Defendants' conduct; and (7) the breach caused injury to Plaintiff. *Givens v. Mullikin*, 75 S.W.3d 383, 405 (Tenn.2002). Importantly, recovery under Tennessee's statutory procurement of breach claim requires proof by a "clear showing" as to each element, which is higher than the typical burden of a preponderance of the evidence. *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.,* 13 S.W.3d 343, 359 (Tn. App. 1999).

However, in the case at bar Plaintiff cannot meet its burden to establish each element of Counts 3 and 4 by clear and convincing evidence. Nor can Plaintiff establish that either the Signet License Agreement or the Viper License Agreement were breached. And, even if Plaintiff could establish a breach of either license agreement, it has no clear and convincing evidence that its claimed losses flow directly and proximately from the alleged breaches. Moreover, RSI, Flanagan, McNair, Beam and Kelly are privileged from liability under Tennessee law as relates to the alleged procurement of breach of the Viper License Agreement by application of the unity of interest doctrine. The Court should dismiss Counts 3 and 4.

### 1. Privilege Precludes Liability.

Courts in Tennessee "have recognized a privilege against an interference-with-contract claim when there is a 'unity of interest between the interfering party and the breaching party." *Landers v. LoanCare*, LLC, No. 1:20-cv-284, 2021 WL 6340987, at *5 (E.D. Tenn. Sept. 29, 2021) (citing *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc., et al.*, 33 S.W.3d 779, 780 (Tenn. 2000)). In *Waste Conversion Systems*, the Tennessee Supreme Court held that "a parent

34

7435053.24

corporation has a privilege pursuant to which it can cause a wholly owned subsidiary to breach a contract without becoming liable for tortiously interfering with a contractual relationship.  33 S.W.3d at 780.  The Court noted "that Tennessee has recognized a privilege against an interference of contract claim when there is unity of interest between the interfering party and the breaching party.  *Id*. at 782 (citing *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994)).  The *Waste Conversion* Court also observed that the privilege was comparable to an analysis done by the United States Supreme Court in *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752 (1984) which discussed the relationship between a parent and subsidiary as follows:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.... [I]n reality a parent and a wholly owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Copperweld Corp*., 467 U.S. at 771–72.  The Waste Conversion Court stated that "Forrester also shows that the claim can be alleged successfully only when the interfering party is a third party not closely tied to the operations of the breaching corporation.  *Waste Conversion* at 782.  Courts have referred to this privilege as a unity of interest privilege.  The unity of interest privilege also applies to officers, directors, and employees of a corporation.  *See id.*  And, Tennessee applies the unity of interest privilege to individuals or entities working together as general partners.  *See Nelson v. Metric Realty*, No. M2000-03204-COA-R3-CV, 2002 WL 31126649, at *14-16 (Tenn. Ct. App. 2002); *see also Stockdale v. Helper*, No. 3:17-cv-00241, 2020 WL 887593, at *21 (M.D. Tenn. Feb. 24, 2020) (reversed in part on other grounds, 979 F.3d 498 (6th Cir. 2020)).

Defendants do not dispute that Viper entered into a license agreement with Plaintiff for use

35

of Plaintiff's software, Windrock MD, or that the Defendants were aware of the Viper License Agreement. But Viper was a part of the venture that became Resonance and, therefore, it was a part of the efforts the Defendants undertook to allegedly induce Viper to breach the Viper License Agreement. An interference with contract claim cannot stand when there is a unity of interest between the interfering party and the breaching party. *Landers v. LoanCare, LLC*, No. 1:20-cv-284, 2021 WL 6340987, at \*5 (E.D. Tenn. Sept. 29, 2021) (internal citations omitted).

Here, a unity of interest existed between both Defendant Kelley and Viper and between Defendant Resonance and Viper, providing privilege to both Defendants for the alleged conduct at issue. The record demonstrates that Viper was working alongside the Individuals to form Resonance. In late 2019 Viper, through Flanagan, was working together with Beam, Kelley, and McNair on the new business venture that became Resonance in late March of 2020. This joint venture, effectively a common law general partnership between the members of the group (see Tenn. Code Ann. § 61-1-202), continued until Resonance was organized and, soon after, was a fully formed corporation. As in *Forrester*, the Defendants were closely tied to the operations of Viper (see *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994)) -- and Viper was a party to the venture. This relationship created a unity of interest and provides a privilege defense to Plaintiff's procurement of breach of contract claim. *Id.*, and see *Stockdale v. Helper*, 2020 WL 887593, at \*21 (internal citations omitted). the Individuals, as members of the venture with Viper, are afforded the same unity of interest privilege in defense of Plaintiff's claim that they procured a breach of the Viper License Agreement.

The Individuals are also privileged with regard to their actions on behalf of Resonance, because as officers and employees of Resonance, the parent corporation of Viper, they are also entitled to benefit from the privilege afforded under applicable law to Resonance to interfere with

36

the Viper Agreement without becoming tortiously liable to Plaintiff for doing so. *See, Waste Conversion Systems, Inc., 33 S.W.3d* at 782. This unity of interest privilege immunizes the entire founding group, including Defendants Resonance, Flanagan, Beam, McNair and Kelley, from liability for procuring a breach of the Viper License Agreement at any point in time relevant to this matter and prevents Plaintiff from obtaining summary judgment against the Defendants on this claim.

      **2.**    **Plaintiff Also Cannot Establish Necessary Elements of its Claims of Statutory Procurement of Breach of Contract.**

Plaintiff cannot establish Defendants' intent to cause breach of the Viper License Agreement or of the Signet License Agreement, that the Defendants acted with malice, that Plaintiff's claimed damages were caused by a breach of the Viper License Agreement or the Signet License Agreement, or the Viper License Agreement or the Signet License was actually breached. Without any one of these necessary elements, Counts 3 and 4 must be dismissed.

### a. There Was No Intent to Cause Breach.

With respect to the third element of intentional interference with a contract, "[t]he required state of mind ... is 'the intent to cause the result,' i.e., the breach." *AmeriGas Propane, Inc. v. J.T. Crook*, 844 F.Supp. 379, 389 (M.D.Tenn.1993) (quoting Restatement (Second) of Torts § 766 cmt. h (1979)). "[A] defendant acts intentionally when he desires the act to cause the breach or when he is substantially certain that his acts will result in a breach." *Stephen W. Feldman, Tortious Interference with Contract in Tennessee: A Practitioner's Guide,* 31 U. MEM. L. REV. 281, 301 (2001). If a reasonable inquiry into the terms of the contract would not reveal that one's actions will cause a breach, then there is no intent to procure a breach. See *JIT Concepts, Inc.*, 358 F.Supp.2d at 687 ("had Stryker made an inquiry into the terms of the contract, it would not have known that the Med would be breaching the contract with JIT").

7435053.24

As set forth above, Kelley used a customer's (Viper and Signet's) data file extracted from Windrock MD to help create the Import Feature in Rmonix. Neither Kelley, nor RSI, nor the Individuals, to the extent Kelley acted on behalf of RSI or any of them, had any intention to procure a breach of the Viper License Agreement or the Signet License Agreement because Kelley's reasonable inquiry into the terms of the agreements did not reveal that his actions would cause its breach. *See JIT Concepts, Inc.*, 358 F.Supp.2d at 687. Kelley's understanding of the Viper License Agreement and the Signet License Agreement (which is undisputely identical to the Viper License Agreement) was that it restricted the installation of Windrock MD to a specific computer. (Kelley Dep. 205:1-20). The data file is information that belongs to the customer and is not part of the Windrock MD source code. And, there are no terms in the Viper License Agreement or the Signet License Agreement prohibiting reverse engineering of the Windrock MD data file, which is what Kelley used Windrock MD to do in creating the Import Feature. [Dkt. 176-1]. Kelley could not have intended to cause a breach by using information that was not protected by the License Agreement. Finally, Kelley engaged in no wrongful conduct such as misrepresentation or trying to conceal the alleged breaches. In fact, Defendant Kelley was very candid in his deposition about his access to Windrock MD and how he used it and did not attempt to hide his usage. (Kelley Dep. 148:5-11, 150:23-151:13, 152:2-19). Thus Kelley did not have the required intent to cause the breach of either of the license agreements at issue. See *AmeriGas Propane, Inc*., 844 F.Supp. at 389 (M.D.Tenn.1993) (quoting Restatement (Second) of Torts § 766 cmt. h (1979)).

### b. Plaintiff Cannot Establish the Element of Malice

Based on the same facts set forth in the previous section, because Kelley did not intend to procure a breach, Defendants did not commit "the willful violation of a known right," or act with malice. *Whalen*, 2014 WL 2949500, at *12-13. Tennessee courts have consistently held that in the context of an action for procurement of a breach of contract the next element, malice, is defined

38

as "the willful violation of a known right." *Whalen v. Bourgeois*, No. E2013-01703-COA-R3-CV, 2014 WL 2949500, at *12-13 (Tenn. Ct. App. Jun. 27, 2014). Because Kelley did not intend to procure a breach, Defendants did not commit "the willful violation of a known right," or act with malice. Whalen, 2014 WL 2949500, at *12-13.

### c. Proof of Causation is Also Fatally Lacking.

To prove proximate cause requires proof that the Defendants' interference with the Viper License Agreement or Signet License Agreement "was a substantial factor in causing the injury complained about, that there was no statute or policy that relieves the Defendants from liability, and that the harm caused was reasonably foreseeable by a person of ordinary intelligence and prudence." *Middle Tennessee Lumber Company, Inc. v. Door Components, LLC*, No. 3:12-0343, 2014 WL 12788840, at *9 (M.D. Tenn. May 2, 2014) (citing *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 771 (Tenn. 2006)). Damages "must be based on the direct and proximate result of the wrongful acts of the person procuring the breach of contract." *Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distributing Co.*¸ 734 S.W.2d 322, 324 (Tenn. 1987).

Plaintiff cannot establish causation. Plaintiff has no evidence that Kelley's use of the Windrock MD software under the Viper License Agreement and the Signet License Agreement in developing the Import Feature of Rmonix was the cause of, or even a substantial factor in, its alleged loss of business. Windrock claims the Defendants were the proximate cause of Viper's breach of the license agreement, but Windrock does not even attempt to show that the breach is the proximate cause of their damages which is what was required. (Dkt. 176 at ¶ 219). Plaintiff has no evidence that Rmonix was a "crucial component" for customers deciding to purchase service from RSI initially or, later, to purchase RSI's analyzer.

Rmonix was not required for RSI to service the Analyzers which Plaintiff. (Kelley Decl. at 12). Instead, the only evidence in the record supports that the reason customers purchased

39

support for their Analyzers from RSI was because Plaintiff distributed a letter to its customers and the consuming public announcing that it would no longer provide that support. (Rice Decl., Ex. 2). Plaintiff's bare assertion that its customers used Windrock Analyzers before moving certain business to Resonance, without more, does not establish any damage to Plaintiff causally flowing from the alleged wrongful development of Rmonix, or any specific feature of Rmonix (such as the Import Feature), the development of which was aided by Kelley's access to Viper's or Signet's copies of Windrock MD. ███████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ (Rice Decl., Ex. 7). Plaintiff's conclusory complaints regarding RSI's competing software do not establish Defendants' conduct caused harm to Plaintiff. Plaintiff may have lost business to RSI, but it has not shown any connection between those losses and the alleged procurement of breach of the Viper License Agreement or the Signet License Agreement.

### d. The License Agreements Were Not Breached.

Setting aside the fact that the privilege afforded to the Defendants pursuant to the unity of interest doctrine is sufficient to defeat Plaintiff's demand for judgment against them as to Plaintiff's claim of interference with the Viper License Agreement, and that Plaintiff cannot establish intent, malice or causation to the standard required, Plaintiff's claim also fails because it cannot establish the Viper License Agreement or the Signet License Agreement was actually breached.

Foundational to a claim of procurement of breach of contract under Tennessee statute is the requirement that the Defendants' conduct must have caused a breach of the contract in question, here the Viper License Agreement. *Polk and Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543-44 (1989). Defendants incorporate by reference here Section III.F.2 of this Memorandum in support of their motion to dismiss Counts 3 and 4.

40

### 3. Conclusion.

Thus, because Defendants are privileged and cannot be liable for procurement of breach of the Viper License Agreement, and because even if no privilege applies, Plaintiff cannot establish all of the essential elements of its claim that the Defendants procured the breach of the Viper License Agreement and of the Signet License Agreement, its statutory procurement of breach of contract claims found in Counts 3 and 4 of the Complaint should be dismissed with prejudice as a matter of law.

### C. Breach of Contract – Counts 5, 6, 7, 8, and 9

Plaintiff's Complaint alleges breach of contract claims against each of the Principals for violations of their respective non-competition or non-disclosure agreements: All of these claims fail because Windrock cannot show breaches of the various agreements and, even if Windrock can show a breach, it has not presented any evidence of damage to it that arises from these alleged breaches, or show damages caused by those specific breaches with reasonable or sufficient certainty as required by law. Accordingly, the Court should grant Defendants summary judgment on Counts 5, 6, 7, 8 and 9.

The contracts at issue are controlled by either Tennessee or Texas law.[19] A cause of action for breach of contract under either state's law requires a plaintiff to show similar, if not identical, elements. To establish a claim for breach of contract in Tennessee, the plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) a deficiency in the performance amounting to a breach; and (3) damages caused by the breach. *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011); *Highlands Physicians, Inc. v. Wellmont Health Sys.*, 625 S.W.3d 262, 303 (Tenn. Ct. App. 2020). In Texas, to prove breach of contract, a plaintiff must show "(1) a valid contract

---

[19] Flanagan's agreement is subject to Tennessee law, and Kelley, Beam and McNair's agreements are subject to Texas law.

existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach." *Atrium Medical Center, LP v. Houston Red C LLC*, 546 S.W.3d 305, 311 (Tex. Ct. App. 2017).

### 1. Plaintiff Has Not Shown That Kelley Breached His Confidentiality Obligations Under The Retention Agreement Or The NDA.

Pursuant to the Retention Agreement, Kelley agreed that he would not "divulge, disclose, or communicate to any person, entity, firm, corporation or any other third party, any Confidential Information, except as required in the performance of Employee's duties for Employer." (Dkt. 176-2 § 3.) Pursuant to the NDA, Kelley agreed that he would not "disclose any Confidential Information to any other person, except to such party's Representatives who need to know such Confidential Information in order to assist [Windrock] in connection with the [software development]." (Dkt. 176-3 at § 2.3.) Importantly, the confidentiality restrictions in the NDA expired by its terms within three years, or as of January 11, 2021, *see id.* at § 13, and, therefore is no longer an enforceable contract. *See Stevens-Bratton v. TruGreen, Inc.*, 2020 WL 4275262, at *4 (W.D. Tenn. Jul. 24, 2020) ("an expired contract has by its own terms released all its parties from their respective contractual obligations") (quoting *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 206 (1991)).

Even if Kelley's obligations under the Retention Agreement or the NDA are still in force, however, Defendants have already demonstrated that Kelley did not breach these agreements in their arguments regarding Plaintiff's trade secret claims, *supra*. Plaintiff admits that Kelley did not have access to Windrock's customer information. (2022 Windrock (Chapman) Dep., 54:14-55:6.) Also, there is no evidence that Kelley used or disclosed Windrock source code, only that Kelley had some knowledge of the source code. (Kos Dep. 114:11-18; O'Donahue Dep., 15:12-

42

16:3). Because Plaintiff cannot establish that he used or disclosed the Windrock MD source code or any customer information, Kelley did not breach the Retention Agreement or the NDA. Accordingly, Plaintiff cannot show that Kelley committed a breach of the Retention Agreement or NDA's confidentiality provisions and, therefore, its claims for breach of contract in Counts 5 and 6 fail.

### 2. Plaintiff has not shown that Flanagan breached his Employment Agreement.

Plaintiff alleges that Flanagan utilized or disclosed two types of information in violation of his Employment Agreement with Windrock (the "Flanagan Agreement"): (1) customer information and (2) "data points and calculations." Doc. 176, ¶¶ 54, 55, 235. For the customer information, Plaintiff has not demonstrated that Flanagan had access to any information about Plaintiff's customers that can be considered confidential. (*See* 2023 Chapman 30(b)(6) Depo. 13:16 – 15:6).

In addition to its inability to show any customer information Flanagan used other than remembered information, Plaintiff cannot say what "data points" and "calculations" Flanagan had access to, much less that they were confidential, or that Flanagan utilized or disclosed any confidential information, including but not limited to the "data points", "calculations" or customer information, in violation of his agreement with Plaintiff. In discovery, Flanagan asked Plaintiff to "[i]dentify all 'data points and calculations' that [it] claim[s] are confidential information." Flanagan Interrogatories to Windrock, Interrogatory No. 7 ("Flanagan ROG 7"). In response, Plaintiff identified only three documents to demonstrate Flanagan's knowledge or use of data points and calculations: RSI0022704, RSI0022731, and RSI0023114. *See Windrock's* Response to Flanagan ROG 7. When deposed however, Plaintiff's 30(b)(6) representative was unable to identify any confidential data points, calculations, or other confidential information contained in those documents. (*See* 2023 Windrock (Chapman) Dep., 24:15- 51:1). Also, none of the Windrock

7435053.24

calculations are confidential. (Flanagan Decl. ¶16). Additionally, Plaintiff's designated representative could not identify, during deposition, to any other data points or calculations that would constitute a trade secret. (2023 Windrock (Chapman) Dep., 43:14- 51:1).

Given that Plaintiff cannot establish any confidential data points or calculations that Flanagan utilized or disclosed, it cannot present satisfy an essential element of this claim and, therefore, the Court should grant summary judgment in Flanagan's favor on Count 7. All other information Flanagan allegedly utilized was public and/or remembered, such as names and contact information, or at least not confidential, such as pricing. (2022 Windrock (Chapman) Dep., 56:11-17; Kos Depo., 119:20-120:6). Plaintiff more recently developed a theory that Flanagan breached his employment agreement by working for Viper, but this argument also fails for lack of evidence. When Flanagan began his employment with Viper in 2017, Viper provided contract analysis services to customers in the Marcellus Shale region. (Flanagan Depo., 40:1-2; Clark Decl. ¶¶ 18-19). Viper did not perform service work for any Plaintiff's customers because Plaintiff had no service presence in the region. (Flanagan Dep. 62:24-63:1, 91:16-93:25; Flanagan Decl. ¶ 6). In fact, Viper used analyzers from Windrock. (Flanagan Dep. 91:16-93:25). Given Plaintiff's complete lack of evidentiary support for its assertion that Flanagan used disclosed confidential information while Flanagan was working for Viper or otherwise, Count 7 fails.

### 3. Plaintiff Has Not Shown That Beam Breached His Confidentiality Obligations Under The Retention Agreement.

Count 8 alleges that Defendant Beam breached his Retention Agreement with Dover Energy Automation, of which Windrock claims to be a beneficiary by misappropriating confidential information and competing with Windrock before his non-compete period expired on October 15, 2019. *See* Complaint, Dtk. 176 ¶¶ 241-45. It is undisputed that Beam's last day of employment with Windrock was October of 2018. (Dkt. 176, ¶ 35).

44

The Beam Agreement is governed by Texas law. (*See* Dkt. 176-3, ¶ 16.) When interpreting a contract pursuant to Texas law, a court's "primary objective is to ascertain and give effect to the parties' intent as expressed in the [contract]." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018). Courts "presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* (internal quotations omitted). To the extent ambiguities exist in a contract, such ambiguities are construed against the drafter. *See Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734 (Tex. 1990). Additionally, non-compete provisions must include certain terms that are no broader than necessary to protect the "legitimate business interests of the employer." *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. Ct. App. 1996).

Plaintiff's claims against Beam under Count 8 of the Complaint fail because Plaintiff has no proof that Beam accessed or improperly utilized any trade secret customer information belonging to Plaintiff or that he accessed or improperly utilized any of Plaintiff's Windrock MD source code. This claim also fails because Plaintiff has presented no evidence that the Beam Agreement itself supports Plaintiff's claims.

Plaintiff has conceded that its customers' names and contact information are not trade secrets or confidential. (2022 Windrock (Chapman) Dep., 55:19-56:5). Moreover, Plaintiff has conceded that none of the Individuals actually wrongfully accessed trade secret level customer information. (*Id.* at 160:3-18). And, Plaintiff has not presented any evidence that Beam misappropriated any of Windrock's confidential information. Accordingly, Plaintiff's claim for breach of the Beam Agreement's confidentiality provisions fails.

Count 8 also asserts Beam has breached the non-compete provisions of the Beam Agreement. Paragraph 4 of the Beam Agreement provides that Beam could not, "during, or for a

45

period of one (1) year after [his] termination of employment with the company . . .

> (1) engage in any activity…that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products;
>
> (2) engage in any activity, directly or indirectly, the performance of which any Confidential Information obtained is likely to be used or disclosed, notwithstanding your undertaking to the contrary; or
>
> (3) promote or market, directly or indirectly, any Competing Products to any Company Customer, or solicit…any company customers or purpose of selling Competing Product in any geographic area in which the Company rendered or sold services or products during such twelve (12) month period. *Notwithstanding the foregoing*, the restrictions in this Paragraph shall only restrict Employee's activities during the Post-Employment Restrictive Period within the Territory. "Territory" means *servicing any location in Tennessee*.

Dkt. 176-3, ¶ 4 (emphasis added). The final sentence of subpart three (3) delineates that the restrictions contained in Paragraph 4 during the post-employment period only apply within the "Territory", which is defined as "servicing any location in Tennessee." *Id.* This language restricts the entirety of Paragraph 4 of the Beam Agreement.

Plaintiff has not presented any evidence to show that Beam performed service within Tennessee. Since Resonance did not have a product or service during Beam's noncompetition period, Beam could not have provided service within Tennessee or elsewhere that competed with Windrock. There is no evidence demonstrating that Beam took any steps to actually compete with Plaintiff prior to the expiry of the non-compete provision in the Beam Agreement, much less any evidence that Beam provided services to any customer located in Tennessee during that time.

Additionally, Paragraph 4 of the Beam Agreement limits its prohibition on promoting or marketing "Competing Products" to those products which are "related in any way to **Asset Integrity Management hardware and software**…." Dkt. 176-3 at ¶ 4. Asset integrity management hardware and software are not defined in the Beam Agreement. Thus, Plaintiff cannot establish that Beam was promoting or marketing Competing Products as defined by the Beam

46

Agreement. And, even if Plaintiff could establish that Resonance's Lenz or its Rmonix are Competing Products as defined under Paragraph 4, Plaintiff has no evidence to support the assertion that Beam "promoted or marketed" either the Lenz or Rmonix prior to October 15, 2019, the end of the Non-Compete period specified in the Beam Agreement., because the Lenz and Rmonix did not exist then. (Kelley Decl. at 5, Flanagan Decl. at 15). Accordingly, Plaintiff does not have any evidence to support the breach element of its cause of action, and the Court should enter judgment in Beam's favor on Count 8.

### a. Paragraph 10 of The Beam Agreement Is Unenforceable.

To the extent Count 8 also relies upon Paragraph 10 of the Beam Agreement, it should be dismissed. *See Complaint* ¶¶ 69-70.[20] Paragraph 10 of the Beam Agreement provides that Beam "engage in any activities that reasonably could be anticipated to harm" Plaintiff's "reputation, operations, or relationships with current or prospective customers, suppliers or employees." (Dkt. 176-3). However, this provision is not enforceable under Texas law.

Texas law provides that "a covenant not to compete is enforceable if…it contains limitations as to time, geographical area, and scope of the activity that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise." TX BUS. & COM. CODE ANN. § 15.50. Texas courts have determined that if the limitations on any one of the elements of time, geographic area, or scope of the activity are absent or unreasonable, the covenant not to compete is unenforceable. *See APRM, Inc. v. Hartnett*, No. 01-01.00831-CV, 2002 WL 1435995, at *4 (Tex. App. 1st Jul. 3, 2002) (not designated for

---

[20] The Fourth Amended Complaint specifically quotes Paragraph 10 of the Beam Agreement in support of its causes of action. *See* Dkt. 176-3, ¶¶ 69-70. Windrock has since claimed that Paragraph 10 is not a non-competition agreement but has not explained how such a provision is not a non-compete agreement or how it would otherwise apply in this matter. *See* Dkt. 191, pp. 12-13.

7435053.24

publication). A noncompete provision that does not contain a geographic restriction is "unreasonable and unenforceable as written." *Tranter, Inc. v. Liss*, No. 02-13-001670CV, 2014 WL 1257278, at *5 (Tex. App. Mar. 27, 2014).

Under Texas law, when a court "holds that a noncompete is unreasonable for lack of a geographic restriction, it is required to reform it." *Id.* When a noncompete is unenforceable as written, however, a plaintiff employer is precluded from recovering damages for breach of such a provision. *Id.* A plaintiff is only entitled to permanent injunctive relief in such an instance. *Id.* at *6. Paragraph 10 of the Beam Retention Agreement does not contain a durational limit, which Plaintiff acknowledges in its Complaint at ¶ 70. Furthermore, Paragraph 10 contains no geographic limitation. *See* Dkt. 176-3, ¶ 10. Accordingly, this provision is not enforceable under Texas law, as it lacks two of the three elements required for a covenant not to compete to be enforceable. *See* TX BUS. & COM. CODE ANN. § 15.50; *APRM, Inc. v.* Hartnett, 2002 WL 1435995, at *4. This alone should be sufficient to dismiss Count 8 to the extent it alleges breach of Paragraph 10 of the Beam Agreement.

Even if the Court were to rewrite or reform Paragraph 10 to insert a durational period, the claim still fails because Windrock would not be entitled to damages. *See Tranter*, 2014 WL 1257278 at *5, citing Tex. Bus. & Com. Code Ann. § 15.51(c) (providing that a court may not award the promisee under a covenant not to compete which is unenforceable as written damages for a breach that occurred before the covenant's reformation). Given that damages are a necessary element of a breach of contract claim, *see Tolliver v. Tellico Village Prop. Owners. Ass'n.,* 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019); *Brooks v. Excellence Mortgage, Ltd.*, 486 S.W.3d 29, 36 (Tex.

App. 2015),[21] and Plaintiff cannot recover damages for a breach of Paragraph 10, Count 8, to the extent it relies upon Paragraph 10 of the Beam Agreement, also fails.[22]

### D. Breach of Agreement -- Count 9

Count Nine fails because Plaintiff has no standing to enforce McNair's agreement with Cook Compression (the "McNair Agreement") and because Plaintiff has no evidence that McNair had used or disclosed any technical trade secrets of the Plaintiff or that any of the customer information McNair had rose to the level of a trade secret.

### 1. Plaintiff Lacks Standing to Enforce McNair's Agreement.

McNair's Agreement was made with Cook Compression. Although Plaintiff claimed in its Fourth Amended Complaint that it "has standing" to enforce the McNair Agreement as "an intended beneficiary of its restrictions," *see* Complaint ¶ 249, Plaintiff has not produced any evidence showing that Windrock is a successor to Cook Compression or third-party beneficiary of the applicable provisions in the McNair Agreement. Accordingly, Plaintiff has failed to meet the threshold requirement of standing to enforce the McNair agreement.

Whether a plaintiff has standing to bring a claim is a question of law. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009); *see also Wolfe v. Devon Energy Production Co., LP*, 382 S.W.3d 434, 443 (Tex. 2012). This Court is not obligated to merely accept Windrock's bare, conclusory allegation of standing as true. *See In re Travel Agent Com'n Antitrust Litigation*, 583 F.3d 896, 903 (6th Cir. 2009) (internal quotations omitted).

Plaintiff apparently relies upon Windrock's alleged status as a "subordinate" entity at the

---

[21] The Complaint does not allege whether Windrock brings its breach of contract claim against Beam pursuant to Tennessee or Texas law. However, because damages are a required element of breach of contract claims under the law of both states, the claim fails regardless.

[22] Because there are no facts to support misappropriation of trade secrets, as demonstrated above regarding Counts One and Two, Count Eight also fails to state a claim for breach of the agreement for misappropriation of trade secrets. Accordingly, the Complaint fails to state a claim for breach of the Beam Agreement in any regard and Count 8 should be dismissed.

49

time the McNair Agreement was signed to support its standing to bring Count Nine. *See id.* ¶ 34. But this argument does not help Windrock. Windrock was not a party to the McNair Agreement and the agreement's language was not crafted to protect Windrock from the conduct alleged in Count Nine.[23] An examination of the McNair Agreement demonstrates that Plaintiff is not an intended third-party beneficiary of the McNair Agreement.

The McNair Agreement is controlled by Texas law. *See* Dkt. 176-4, § 12. As noted above, Texas law requires that a court's "primary objective is to ascertain and give effect to the parties' intent as expressed in the [contract]." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018). Texas courts "presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* And, to the extent ambiguities exist in a contract, such ambiguities are construed against the drafter. *See Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734 (Tex. 1990).

In order to establish third-party beneficiary status under Texas law, "[t]he contract must include a 'clear and unequivocal expression of the contracting parties' intent to directly benefit a third party,' and any implied intent to create a third-party beneficiary is insufficient." *Id.* (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). This necessary intent cannot be presumed by the court, rather, courts begin "'…with the presumption' that the parties contracted solely 'for themselves,' and only a clear expression of the intent to create a third-party beneficiary can overcome the presumption." *Id.* (quoting *Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975)). "If the contract's language leaves any doubt about the parties' intent, those 'doubts

---

[23] Also, The McNair agreement is not signed by anyone on behalf of Windrock or Cook Compression.

50

must be resolved against conferring third-party beneficiary status.'" *Id.* (quoting *Tawes*, 340 S.W.3d at 425).

The McNair Agreement only makes mention of Cook Compression's affiliates in Section 4, which provides that McNair, "for a period of twenty-four (24) consecutive months after termination…shall not, except in the course of his/her duties on behalf of Cook Compression, directly or indirectly induce or attempt to induce…any employee of Cook Compression, its parents, subsidiaries of affiliate companies to leave the employ of Cook Compression, its parents, subsidiaries, or affiliated companies, or to accept employment with any other person or entity." Dkt. 176-4, § 4. Section 1 of the McNair Agreement ("Non-Disclosure of Confidential Information"), Section 3 ("Covenant Not to Compete"), Section 5 ("Confidential Information of Others"), and Section 6 ("Disclosure and Assignment of Certain Information"), each lack any mention of Cook Compression's parents, subsidiaries, or affiliates and limit McNair's obligations to Cook Compression or the Employer (which, by the McNair Agreement's terms is defined only as Cook Compression and its successors and assigns). Had Cook Compression intended to expand the protection of the McNair Agreement to confidential information or non-competition of Cook Compression's affiliates, it could have done so by naming Windrock as a third-party beneficiary or at the very least including language regarding its parents, subsidiaries, and affiliates in Sections 1, 3, 5 and 6 of the McNair Agreement as it did in Section 4. It did not.

Furthermore, if Plaintiff were a successor to or an assign of Cook Compression, Plaintiff could and should have provided evidence of that fact in order to establish its standing to enforce the McNair Agreement. Accordingly, it stands to reason that Plaintiff cannot establish its standing to enforce the McNair Agreement and therefore cannot enforce either its non-compete or its non-disclosure provisions and Count 9 should be dismissed. Without a valid agreement with Windrock

51

preventing competition and disclosure of trade secrets, Counts 1 and 2 also fail as to McNair.

Even if Plaintiff has standing to attempt to enforce the McNair Agreement, however, McNair had no confidential technical information, and the customer information he had was remembered or publicly available and therefore and Plaintiff has not offered any evidence to the contrary. (2022 Windrock (Chapman) Dep., 160:3-18).

### E. Plaintiff Cannot Establish Damages.

Although Plaintiff asserts it has been damaged by the various breaches of contract supposedly committed by Defendants, it cannot establish the damages element of these claims. "The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005); *see also AKIB Construction, Inc. v. Shipwash*, 582 S.W.3d 791, 808 (Tex. Ct. App. 2019) ("[t]he normal measure of damages for breach of contract is the expectancy…measure, which seeks to restore the injured party to the economic position it would have occupied had the contract been fully performed."). In this case, the proper measure of damages in a breach of contract case under either Tennessee or Texas law is Plaintiff's lost profits which resulted from the breach. *Baker v. Hooper*, 50 S.W.3d 463, 470 (Tenn. Ct. App. 2001) ("the loss of profits which resulted from the breach of the non-compete clause…."). In Tennessee, such damages must be a "natural and proximate result" of the breach, see *Gibbons v. Bennett*, 2021 WL 423806, at *13 (Tenn. Ct. App. Feb. 8, 2021), and proven with reasonable certainty. *Dominion Enterprises v. Dataium, LLC*, 2013 WL 6858266, at *13 (Tenn. Ct. App. Dec. 27, 2013) (citing *Baker* at 470). Similarly, under Texas law, a court may award lost profits as damages for a breach of contract, *Parkway Dental Associates, P.A. v. Ho & Huang Properties, L.P.*, 391 S.W.3d 596, 607 (Tex. Ct. App. 2012), however, a party may not merely assert it has lost profits, but rather must show that "a loss of profits is the natural and

52

probably consequence of the act or omission complained of, and [the] amount is shown with sufficient certainty." *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 858 (Tex. 2017).

Plaintiff's corporate representative, Ms. Chapman, testified that Windrock is relying on the facts specified in the Outline Ms. Chapman brought to the deposition to explain its damages which simply refer to its damage expert, Mr. Perdue, for evidence of all damages. See Dkt. 242-2, Excerpts of the Transcript of the Reopened 30(b)(6) Deposition of Windrock, Inc. Provided by Mary Chapman ("2023 Reopened Windrock 30(b)(6) Dep.") 33:14 – 36:4). Ms. Chapman was also clear that Plaintiff is relying on Glenn Perdue's report for evidence of its damages for Counts 5, 6, 7, 8, and 9. (2022 Windrock (Chapman) Depo., 174:7-175:2; 2023 Reopened Windrock 30(b)(6) Dep. 35:14-22; 2023 Windrock (Chapman) Depo. 73:6-74:13; 79:14-80:2). But Mr. Perdue calculates Plaintiff's damages based upon RSI's sales to Windrock customers using an unjust enrichment measure. (Dkt. 244-1 at ¶¶ 8-9). Mr. Perdue states that "Windrock elected to pursue RSI's unjust enrichment as its method of recovery ..." (*Id.* at ¶ 65). Nowhere does Mr. Perdue calculate Plaintiff's lost profits as a result of the alleged breaches of contract. Rather, Mr. Perdue only calculated Defendants' supposed unjust enrichment arising from their alleged misconduct.

As noted above, however, ***lost profits, and not unjust enrichment, are the proper measure of damages for breach of contract***. Additionally, in Tennessee, unjust enrichment cannot stand as an alternative or substitute for a breach of contract action when a contract exists. *See Durkin v. MTown Construction, LLC*, 2018 WL 1304922, at *7 (Tenn. Ct. App. Mar. 13, 2018). Similarly, in Texas, "when an express contract covers the subject matter of the dispute, generally there can be no recovery under a quasi-contract theory such as unjust enrichment." *Moran v. Williamson*,

498 S.W.3d 85, 96 (Tex. Ct. App. 2016). Plaintiff's breach of contract causes of action are all based upon express contracts and therefore a quasi-contract theory of damages is not appropriate. *See* Compl., Exs. B-F (Dkt. 176-2 – 176-6). Accordingly, Plaintiff present no evidence of any damage it has sustained as a result of the breach of contract. Its breach of contract claims in Counts 5 through 9 should be dismissed.[24]

### F. Breach of License Agreement -- Count 12

#### 1. The Breach Of License Agreement Claim Is Preempted.

As pled, Plaintiff's breach of license agreement claim against Viper found in Count 12 of the Complaint implicates only the right of distribution of Windrock MD. Because the right of distribution of software falls under the Copyright Act, this breach of contract claim (Count 12) is preempted by Plaintiff's copyright claim (Count 14).

The Copyright Act, 17 U.S.C.A. § 101 *et seq.*, provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as defined by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103…are governed exclusively by this title." 17 U.S.C.A. § 301(a). As a consequence, "no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." *Id.* Count Twelve is Plaintiff's attempt to assert legal rights granted by the Copyright Act using a state law cause of action, and it must be dismissed as preempted.

Plaintiff alleges that Viper "was only permitted to use Windrock MD for Viper's 'internal

---

[24] Additionally, Windrock's corporate designee was clear in deposition that Plaintiff has not apportioned its damages to any specific breach of contract allegedly committed by any of the Individuals. (2023 Windrock (Chapman) Depo. 79:14-80:2). Therefore, Plaintiff has not only failed to offer evidence of the correct measure of damages for breach of contract, but it also cannot assert the damages amount for any particular breach of contract cause of action with reasonable certainty. More generally, this renders the damages for all of these counts merely speculative.

54

business purposes'", Complaint ¶ 279, and further alleges that by "permitting [Kelley or Resonance] to remotely access and use Viper's copy of Windrock MD, Viper breached the license agreement because [Kelley or Resonance]'s use was not for Viper's internal business purposes.'" *Id.* ¶ 280. Plaintiff also alleges that "Viper was not authorized to permit disclosure or use of Windrock MD in any form to any person other than Viper or Windrock's employees without the prior written consent of Windrock." *Id.* ¶ 281. In other words, Plaintiff claims that Viper breached the license agreement by distributing a copy of Windrock MD or otherwise providing Resonance with access to Windrock MD. Dkt. 176, ¶ 280-282. This cause of action implicates only the right of distribution, which falls under the Copyright Act and, therefore, Plaintiff's breach of contract claim against Viper is barred by preemption.

"[U]nder § 301, a state common law or statutory claim is preempted if: (1) the work is within the scope of the 'subject matter of copyright', as specified in 17 U.S.C. §§ 102, 103; and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Wrench v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). "The subject matter requirement of Section 301 is satisfied if a work fits within the general subject matter of Sections 102 and 103 of the Copyright Act." *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004). "Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights." *Wrench*, 256 F.3d at 456. "Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Id.*

It is undisputed that Windrock MD is a piece of computer software. Copyright protects

7435053.24

software, whether it is reduced to its source code or binary code. *Lexmark Intern., Inc. v. Static Control Components*, 387 F.3d 522, 533 (6th Cir. 2004). Accordingly, the subject matter prong of the *Wrench* test is met.

Under Sixth Circuit law, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Wrench*, 256 F.3d at 456. The Plaintiff does not claim any such extra element exists in the Windrock MD license agreement (the "License Agreement"), it only alleges that Windrock MD was improperly distributed or reproduced. *See* Complaint ¶ 279-280 In *Wrench,* the extra element was a promise to pay, *see Wrench*, 245 F. 3d at 457, but the Windrock MD license agreement contains no promise to pay. The mere existence of a contract between the parties, and, by extension, the elements of proving a contract, are not sufficient to automatically defeat preemption by the Copyright Act. *See Wrench*, 256 F.3d at 457. The only promise referenced in the License Agreement is the promise to not distribute to non-employees, which is not an extra element. *See id.* ("If the promise amounts only to a promise to refrain from reproducing, performing, distributing or displaying the work, then the contract claim is preempted."). Accordingly, Plaintiff has no "extra element" under the second prong of the *Wrench* test and its Breach of License claim against Viper must be dismissed.

### 2. Viper Did Not Breach The License Agreement

Even if Plaintiff's claim for breach is not preempted by the Copyright Claim, there was no breach by Viper. Because Viper and Signet both used their licenses to Windrock MD to provide services to others--which means internal business purpose cannot restrict the use to activities internal to the licensee. Instead, it simply means the licensee's business. Viper and Signet's internal business purpose is to provide contact analysis services to others through the use of an

56

analyzer.  (Clark Decl. ¶¶ 5, 18-19).

Also, the term "internal business purpose" in the Viper Agreement cannot mean that the agreement prohibits reverse engineering.  Plaintiff overlooks the fact that the Viper Agreement contains a provision allowing the licensee to make a copy of the licensed programs in machine-readable form "to understand or modify the contents of such machine readable material."  (Dkt. 173-1).  This is exactly what Defendants did -- they utilized Viper's copies of the Windrock MD software to read in data files and determine what certain data in the file represent; i.e., to understand the contents of the machine-readable material.  Plaintiff's contention that the internal business purpose language in the Viper Agreement prohibits reverse engineering of the data file is contrary to the clear text of the Viper Agreement. Resonance and Viper have the same purpose due to their unity of interest, as discussed in Section A.1 infra.

The Viper License Agreement also contains a prohibition on "disclosure of any licensed program in any form to any person other than Customer's or Suppliers [sic] employees without the prior written consent of Supplier."  (Dkt. 173-1).   In this context, Viper was the "Customer". Black's Law Dictionary defines "employee" as "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary, 8th ed. 2004 "employee".  Because Viper joined with Kelley and others in the venture of creating RSI and later became a wholly owned subsidiary of RSI with no employees of its own, Defendant Kelley's use of the software governed by the Viper Agreement was necessarily for the service of the founders' joint venture and the entity resulting from it--Resonance.  In doing so, Kelley was performing service for the benefit of Viper in the founders' joint venture, and later for the benefit of RSI which owned Viper, and he is rightfully considered an employee of Viper.

57

### G. Plaintiff's Lanham Act Claim -- Count 13

Plaintiff's claim under the Lanham Act (Count 13) centers around a series of emails sent by McNair in his capacity as an employee of RSI beginning on April 8, 2020, advertising RSI's services and products, each of which contained the same statements that Plaintiff clams are false or deceptive advertisements. Plaintiff asserts it is entitled to money damages for lost sales and reputational damage it sustained because of Defendants' false and deceptive statements. However, Plaintiff cannot establish the statements are statements of fact, that they are false or materially misleading, that any customer or potential customer was actually deceived, or that Plaintiff's claimed losses were proximately caused by the statements. Without proof of these essential elements, Plaintiff's Lanham Act claim fails.

### 1. Plaintiff's Lanham Act Claim Fail On Several Grounds

Section 43(a)(1)(B) of the Lanham Act seeks to prevent false or deceptive commercial advertising. 15 U.S.C. § 1125(a)(1)(B). Windrock's Lanham Act claim against Resonance and Mr. McNair is based on four (4) statements contained in sales e-mails sent by Steve McNair on behalf of RSI to various potential customers on April 8, 10, 14, 16, and 21, 2020. *See* Complaint (Doc. 176) at ¶¶ 285-29.

To establish a false advertising claim under the Lanham Act, Windrock must prove the following elements:

(1) the defendant has made a false or misleading statement of fact concerning his own product or another's;
(2) the statement actually deceives or tends to deceive a substantial portion of the intended audience;
(3) the statement is material in that it will likely influence the deceived customer's purchasing decisions;
(4) the statement was introduced into interstate commerce; and
(5) there is a causal link between the challenged statements and harm to the plaintiff.

*Louisiana-Pacific Corp. v. James Hardie Bldg. Prods., Inc.*, 335 F. Supp. 3d 1002, 1011 (M.D. Tenn. 2018), *aff'd* 928 F.3d 514 (6th Cir. 2019) (citing *Wysong Corp. v. APN, Inc.*, 889 F.3d 267,

58

270 (6th Cir. 2018)).

Defendants' allegedly false or misleading statements from the April 8, 2020 e-mail[25] are:

- "Resonance Systems … is made up of eight senior level people that used to be at Windrock."

- "We … designed all their software and hardware."

- "We have a new platform that is more advanced in capabilities and yet considerably more price friendly."

- "We also provide full support to all Windrock products (No one else is able to do this)."

*See* (Dkt. 176, ¶¶ ¶¶ 130, 286; Rice Decl., Ex. 18).

The foundation of a Lanham Act claim depends upon the statement complained of being a statement of fact. *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 614 (6th Cir. 1999) (A Lanham Act claim must be based upon a statement of fact, not of opinion). If the statement at issue is one of fact, then a plaintiff can establish the first element of a Lanham Act claim in one of two ways: by showing that the statement is literally false or by showing that the statement is true but deceptive. *Wysong*, 889 F.3d at 270-71; *Louisiana-Pacific*, 335 F. Supp. 3d at 1011. Whether a statement is too ambiguous to be literally false is a question of law to be decided by the court. *Id*. at 1012.

If a statement is not literally false, it may still violate the Lanham Act if it is "misleading." *Louisiana-Pacific*, 335 F. Supp. 3d at 1012; *ACT, Inc. v. Worldwide Interactive Network*, No. 3:18-cv-186, 2020 WL 12574239, at *32 (E.D. Tenn. Mar. 10, 2020); *see also Am. Council*, 185 F.3d at 614 ("[w]here statements are literally true, yet deceptive, or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception (*i.e.*, evidence that

---

[25] The April 10, 14, 16 and 21, 2020 emails contain the same statements but are directed to different customers.

individual consumers perceived the advertisement in a way that misled them about the plaintiff's product)").   Statements that are not literally false but could be either ambiguous or true but misleading must be shown to actually deceive a significant portion of reasonable consumers in order to support a violation of the Lanham Act.  *Louisiana-Pacific*, 335 F. Supp. 3d at 1012; *Wysong Corp.*, 889 F.3d at 271.  The claimant must present "evidence of some sort demonstrating that consumers were misled, showing how consumers actually do react rather than arguing how consumers *could* react."  *Louisiana-Pacific*, 928 F.3d at 518 (emphasis in original); *Am. Council*, 185 F.3d at 614.

### a.  Defendants' Statements Are Not Statements of Fact.

Plaintiff's claim that RSI is liable for false and deceptive advertising for its statements that the Resonance platform is "more advanced"; that "no one else is able to" provide full support to all Windrock products and that "[w]e … designed all their software and hardware" fails, because these statements are not statements of fact.  Statements of opinion are not actionable under the Lanham Act.  *Am. Council*, 185 F.3d at 614.  Puffery relies on subjective statements, which are based on opinion.  Puffery has been defined as "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely" including claims of general superiority, and are statements upon which a defendant cannot be held liable under the Lanham Act. *FedEx v. U.S. Postal Service*, 40 F. Supp. 2d 943 (W.D. Tenn. 1999).   "[R]easonable consumers know that marketing involves some level of exaggeration – what the law calls 'puffery.'" *Wysong Corp.*, 889 F.3d 271.  Puffery protects statements that reasonable consumers would not interpret as reliably factual. *Louisiana-Pacific*, 928 F.3d at 519.

Like the phrase "redesigned and improved", Defendants' statement that RSI's offerings are "more advanced" than Windrock's is merely a statement of opinion, and puffery, for which no Lanham Act claim may stand.  *See Interactive Products Corporation v. A2Z Mobile Office*

60

*Solutions, Inc., et al.,* 326 F.3d 687 (6th Cir. 2002) (Affirming district court's dismissal of a plaintiff's false or misleading advertising claim under the Lanham Act because an announcement describing a product offering as "redesigned and improved" version of Plaintiff's product "is mere puffery which is not actionable under the Lanham Act.")

Similarly, Plaintiff's claim that RSI's statement that "no one else is able to" provide full support to all Windrock products constitutes false and deceptive advertising also fails, as it is merely a statement of opinion. *See Ep Henry Corp. v. Cambridge Pavers, Inc.*, 383 F. Supp. 3d 343, 350 (D.N.J. 2019) (holding statement that a product is "a step above the rest" and that "nothing surpasses" are non-actionable under Section 43(a) of the Lanham Act because they represent statements of mere puffery pertaining to the defendants' own subjective opinion of its offering*); and see Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 649 F. Supp. 2d 702, 725 (N.D. Ohio 2009) (claim that product is "revolutionary" and "unique" is a general claim of superiority and nothing more than a statement of opinion or puffery); *and see LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1499 (D. Minn. 1996) (holding representations concerning the "exclusive" availability of products for which identical versions were available elsewhere, though under different names, were neither literally false nor true but misleading and instead were, at worst, exaggerated and overgeneralized puffery).

And, Plaintiff's claim that RSI's statement that the individuals associated with RSI were the ones who designed "all" Windrock's hardware and software is false and misleading in violation of the Lanham Act also fails because it is true or at worst this is the same "type of exaggerated statement regularly made by companies" upon which no reasonable consumer would rely. *Ep Henry Corp.,* at 350; *and see Cboss, Inc. v. Zerbonia, et al*., No. 4:09-CV-00168, 2010 WL 3835092 at * 5 (N.D. Ohio Sept. 29, 2010).

61

### b. Defendants' Statements Are Not Literally False And Are Not Deceptive

Plaintiff claims that each of RSI's accused statements is false[26], apparently seeking to rely upon the presumption of consumer deception under the Lanham Act that arises upon a showing of literal falsity. *Louisiana-Pacific Corp. v. Hardie Building Products*, Inc., 928 F.3d 514, 614 (6th Cir. 2019). A literally false statement "must be unambiguously deceptive to reasonable consumers." *Louisiana-Pacific*, 335 F. Supp. 3d at 1011 (citing *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 737 (6th Cir. 2012)). Only an unambiguously deceptive message can be found to be literally false. *Wysong Corp. v. APN, Inc. (17-1975)*, 889 F.3d 267 (6th Cir. 2018). In other words, if a statement is ambiguous, or if it is true but misleading, then it cannot be literally false, and the Plaintiff must prove actual deception of a "significant portion" of reasonable consumers. *Louisiana-Pacific*, 335 F. Supp. 3d at 1015; *Cboss, Inc. v. Zerbonia, et al.*, No. 4:09-CV-00168, 2010 WL 3835092 at * 5 (N.D. Ohio Sept. 29, 2010). None of the statements Plaintiff complains of in Counts 13 and 15 are literally false.[27]

### *Eight Senior People*

Plaintiff claims that the statement "Resonance Systems … is made up of eight senior level people that used to be at Windrock" is false because only seven (7) persons from Windrock were employees of RSI and because not all of those were "senior". (2023 Windrock (Chapman) Dep., 80:16-82:10). However, the facts are undisputed that eight (8) persons formerly associated with Windrock were associated with RSI in April 2020. (McNair Decl. ¶¶ 4-6).

Nor is the statement that these individuals were "senior level people" literally false. Each of them had either a manager or officer position, significant experience, or both. *Id.* Analogous

---

[26] *See* 2023 Windrock (Chapman) Dep., 80:12-85:13.
[27] Even those statements addressed in part i, immediately above, which Defendants claim are opinion and not fact, could not be deemed literally false if the Court found them factual.

to the statement about RSI being made up of eight "senior level people," the Sixth Circuit has held that using the term "partner" in a product development announcement would not be interpreted by a reasonable juror to mean "partner" in the legal sense, but rather in the context of a business associate. *Interactive Prod. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 699 (6th Cir. 2003). Similarly, "senior level" could be interpreted to mean any number of positions with substantial knowledge or responsibility. And, not unlike statements attributed to the defendants in *Cboss v. Zerbonia, et al.,* Defendants' statement that it was made up of "senior level people" who used to be at Windrock could be interpreted to mean they were of senior title, such as corporate officers, or management-level, but it also could mean that they possessed significant experience. This statement is true, and therefore cannot be literally false and is too general to be deceptive in context of the email in question.

### *RSI's Other Accused Statements*

Windrock claims falsity in RSI's assertions that (a) "no one else is able to" provide support for all Windrock products besides RSI; (b) RSI's platform is "more advanced" support its Lanham Act claim; and (c) the individuals who were associated with RSI in 2020 were the ones who designed "all [Windrock's] software and hardware. Dkt. 176 ¶ 130. While Defendants submit these statements are mere puffery and not actionable, even if the claims were subjected to the analysis of whether they were literally false (i.e., unambiguously deceptive (*see Wysong Corp. v. APN, Inc.*, at 267), Plaintiff's claim still fails.

An ambiguous statement cannot be literally false. *CBoss, Inc. v. Zerbonia, et al.,* 2010 WL 3835092 (N.D. Ohio, 2010), citing *Outdoor Techs., Inc. v. Vinyl Visions, LLC*, 2006 WL 2849782 at *7 (S.D. Ohio 2006). Nor could the claim that the Resonance platform is "more advanced" be literally false because it is demonstrably true. The record shows that RSI's platform has features

63

that Windrock's does not, and that RSI designed the platform in revolutionary manner. (Clark Decl. ¶ 28; McNair Decl. ¶ 9). Likewise, because Plaintiff had already announced to the consuming public that it had obsoleted some of its products and would no longer be providing support to others (Dkt. 173-2), there is no question that RSI's claim that it provides full support to all Windrock products and that "[n]o one else is able to do this" was unlikely to deceive customers or to cause harm to Windrock. And, Resonance was actually able to provide the support. (McNair Decl. ¶ 10).

In the case of *CBoss, Inc. v. Zerbonia, et al.,* the Northern District of Ohio evaluated marketing statements that were strikingly similar to several of those at issue here. In *Cboss,* the plaintiff challenged statements made by the defendants which were found in a project proposal submitted in bidding for a public contract and on defendant's website. One of the challenged statements, which asserted that defendant Zerbonia was "responsible for" the development of a large public charitable and regulatory gaming system and that Zerbonia "was the author of" that system. *CBoss, Inc. v. Zerbonia, et al.,* 2010 WL 3835092 (N.D. Ohio, 2010), at *4. The Court, after evaluating the statements in the context of their use, concluded that at worst the statements were ambiguous or a best it was true but misleading, holding the statements "cannot be literally false". *Id.* at *7. The Court should find the same here.

### c. Plaintiff Has No Evidence of Deception

Where a statement is not literally false, the presumption of actual deception does not attach, and the claimant must prove that a 'significant portion' of reasonable consumers were *actually deceived* by the defendant's messaging. *Louisiana-Pacific*, 335 F. Supp. 3d at 1015. The deception, or tendency to deceive, must reach "a substantial portion of the intended audience." *ACT, Inc.*, 2020 WL 12574239, at *33 (quoting *Am. Council*, 185 F.3d at 613)). Plaintiffs usually meet this element by presenting evidence of consumer surveys to show that a "significant portion"

64

of the consumer population was deceived. *Am. Council*, 185 F.3d at 616. Windrock has presented no evidence that any customers were actually deceived by the challenged statements contained in McNair's e-mails. And Windrock may not rely simply on "common sense" as a substitute for proof of actual consumer deception. *Id.* at 617.

Instead, in order to be actionable, Windrock must establish that RSI's statements, even if false or misleading (which they are not) were material, i.e., that the statements likely influenced a deceived consumer's purchasing decisions. *Louisiana-Pacific*, 335 F. Supp. 3d at 1015, n.2. Alternatively stated, this element of the asserted claim considers whether a defendant's misstatements caused the consumer to be deceived. *Am. Council*, 185 F.3d at 613. Windrock has presented no evidence that the challenged statements by McNair and RSI were material to any consumer's purchasing decision, much less that a "substantial portion" of the intended audience was actually deceived by the statements. (2023 Windrock (Chapman) Dep., 90:12-91:16). Because Windrock cannot establish the statements were materially misleading to a significant portion of reasonable consumers, Windrock's Lanham Act claim fails.

### d. Windrock Has No Evidence of Causation

The final element of a Lanham Act claim asks whether the defendant's deception of the consumer caused harm to the plaintiff. *Am. Council*, 185 F.3d at 613-614. Plaintiff cannot recover for injury to its lost sales, lost profits, or goodwill in the absence of some indication that these injuries actually occurred ***and were caused by Defendants' statements***. *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 694 (6th Cir. 2000).

Even if the statements that Plaintiff complains of were ambiguous or true but deceptive, and material, Plaintiff has presented no proof tying the actual deception of customers to its claimed losses. Plaintiff has disclosed no customers who expressed that they were misled by the challenged statements and has conducted no market surveys to establish the challenged statements were

65

generally deceptive. (2023 Windrock (Chapman) Dep., 90:12-91:16). Most importantly, Plaintiff has admitted it has no knowledge of any actual damage to its reputation caused by the complained-of statements (nor has Plaintiff submitted any claim for loss of goodwill). *Id.* Plaintiff also has failed to point to any specific sales it lost as a proximate result of Defendants' alleged false and deceptive statements. Instead, Plaintiff claims that its damages were generally caused by Defendants, as opposed to proximately caused by the statements in question. *Id.*

### H. Copyright Infringement / Contributory Copyright Infringement -- Count 14

Count Fourteen of the Complaint alleges that Viper, Resonance, and Kelley have committed copyright infringement or contributory copyright infringement.[28] However, Windrock cannot meet the requirements for either element of a copyright infringement claim. Windrock's cause of action fails for numerous reasons, the first and foremost being that it does not have a valid copyright in either Win6310 or Windrock MD 5.0.1. Windrock's copyright registrations do not name the authors of the work or correctly acknowledge previous published versions which renders the registrations invalid. However, the Court need not await the Copyright Office's determination on this issue, because, even if the copyrights are valid, this cause of action fails (1) because Windrock fails to show that the works at issue in this case are the works it has a registered copyright in; (2) Windrock's copyrights are limited to its deposits, which do not encompass the source code defendants are accused of infringing; and (3) there is no evidence of infringement presented.

#### 1. Facts

The Complaint identifies Windrock's *copyrighted* works as Windrock MD 5.0.1 ("MD 5.0.1"), registered as TX 8-958-124 (the "MD Registration"), and Win6310 2.9 ("Win6310"), registered as TX 8-966-582 (the "Win6310 Registration"). *See* Comp. ¶ 295. Windrock attempted

---

[28] The Complaint also alleged Signet infringed Windrock's copyright, but Signet has since been dismissed. *See* Dkt. 209.

66

to register these works on March 12, 2021. *Id.* The copyright registration certificate for the MD Registration and Win6310 Registration are attached as Exhibits 44 and 47 to the Rice Decl. The deposit copies submitted with the MD Registration and the Win6310 Registration are attached as Exhibits 43 and 46 to the Rice Decl. Windrock accuses the Defendants of committing infringement by copying elements of these works. However, the deposits for these works are not sufficient to demonstrate MD 5.0.1 or Win6310 because the deposits do not comply with the requirements for copyrighting source code. Additionally, Windrock has failed to produce copies of the works it says were copied. Accordingly, it cannot show any evidence that defendants copied those works.

### 2. Law

To prove copyright infringement, Windrock must show "(1) that it owns valid copyrights in the work *at issue*, and (2) that the defendant encroaches upon [the plaintiff's] exclusive rights as a copyright holder." *Microsoft Corp. v. Sellers*, 411 F. Supp.2d 913, 918 (E.D. Tenn. 2006) (emphasis added) (citing 17 U.S.C. § 501); *Frist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991)).[29]

"The Copyright Act…requires copyright holders to register their works before suing for copyright infringement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010); 17 U.S.C. § 411(a). In order to obtain registration, the copyright holder must submit a deposit copy of the work, the application and the fee. 17 U.S.C. § 408(a). The deposit copy must be a complete copy of the work. 17 U.S.C. § 408(b). For computer programs, whether published or unpublished, an applicant must submit "identifying portions" of the program at issue. 37 C.F.R. § 202.20(c)(2)(vii)(A).

---

[29] Defendants have explained why Windrock's deposit does not comply with 37 C.F.R. § 202.20(c)(2)(vii)(A)(2) for registering source code containing trade secrets in this brief. *See* Section III.A.2.iii, *supra*.

If the copyright holder is making a claim to computer screen displays then the deposit must also consist of "Visual reproductions of the copyrightable expression in the form of printouts, photographs, or drawings …" 37 C.F.R. § 202.20(c)(2)(vii)(C).  Windrock's deposits for either registration do not comply with any of the requirements of 37 C.F.R. § 202.20(c)(2)(vii)(A).

"Substantial similarity between the copyrighted work and the allegedly infringing work is assessed by comparing the protected elements of the plaintiff's work as a whole against the defendant's work." *Airframe Systems, Inc. v. L-3 Communications Corp.*, 658 F.3d 100, 106 (1st Cir. 2011).  "However, before the foregoing comparison can take place, the plaintiff must necessarily establish the content of the copyrighted work that it contends was infringed." *Id.*  When a plaintiff cannot present "sufficient evidence to prove the content of its registered source code...[it] cannot show that any of its registered works is substantially similar to the allegedly infringing…program" and will therefore not survive a motion for summary judgment.  *Id.* at 107.

### 3.  Argument

Windrock's deposit copy of source code is deficient.  There are two ways to register source code: (1) register identifying portions - the first 25 and last 25 pages of (or equivalent units) of the entire program; or (2) produce the entire program if the entire program's source code is less than 50 pages.  *Id.*  If the registered work is a revision of a previous version and the revisions occur in the first and last 25 pages, then a deposit containing only the first and last 25 pages is sufficient. *Id.*  If the revisions are not located in the first and last 25 pages, the deposit must contain a copyright notice and any 50 pages of source code representative of the revised material.  Windrock's submissions do not comply with these requirements.

The submission for Win6310 is the original work upon which Windrock bases its copyright infringement claims.  (2023 Windrock (Chapman) Dep., 111:16-115:8; Rice Decl. Ex. 24).  The deposit for the Win6310 Registration does not contain the first 25 and last 25 pages of the Win6310

68

source code. Win6310 is also not a program that is limited to 50 pages of source code or less. Accordingly, it does not comply with the requirements of 37 C.F.R. § 202.20(c)(2)(vii)(A)(1) and cannot represent the entire work encompassed by Win6310.

The deposit for MD 5.0.1 is similarly deficient. MD 5.0.1 is a revision of Win6310. (2023 Windrock (Chapman) Dep.,111:16-115:8; Rice Dec. Ex. 24). Accordingly, the deposit accompany the MD Registration should contain the first and last 25 pages of MD 5.0.1. Plaintiff has not produced any evidence that the submission is representative of the revised material. Plank Dec. ¶ 18. Additionally, the submission does not demonstrate any revisions from the Win6310 deposit. Rice Decl. Ex. 46. On the contrary, the MD 5.0.1 deposit is merely a self-contained file entitled DynamicPlot.cpp. (*See* Plank Dec. ¶ 18). Accordingly, the MD Registration's deposit does not meet the deposit requirements to register source code, and it cannot be representative of either MD 5.0.1 or Win6310.

Windrock's failings are nearly identical to the plaintiff's failings in *Airframe Systems*. On summary judgment, L-3 argued that Airframe had failed to "produce sufficient evidence to support a prima facie case of copyright infringement." *Id.* at 104. In response, Airframe claimed that it was undisputed that L-3 "had unauthorized access to some unspecified version of the ARMS source code on its computer system…". *Id.* Airframe also offered a declaration from the principal ARMS designer, which stated that he had compared the allegedly infringing code to the 2009 version of the ARMS code. *Id.* L-3 argued this was insufficient "because the ARMS source code version which Rosen compared" to L-3's code, "which was the only version that Airframe produced during discovery…was an updated version of the ARMS program created in 2009." *Id.* On this basis, L-3 argued that "Airframe could not prove there was 'substantial similarity' between" L-3's code and "the registered source code that was allegedly infringed." *Id.* The district

69

court agreed and granted summary judgment. *Id.*

The First Circuit affirmed on appeal because Airframe did not compare L-3's allegedly infringing code to any of the versions of the ARMS software that Airframes had registered. *See id.* at 106. Airframe admitted that the 2009 version of its software was not the same as its registered version because it had been updated, and, therefore, the *Airframes* Court concluded that "Airframe cannot show that any of its registered works is substantially similar to the alleged infringing" work. *Id.* at 107. The Court also observed that this holding was sound even if there was proof of substantial copying of the work that was not registered with the copyright office. *See id.* (citing *Unistrut Corp. v. Power*, 208 F.2d 18 (1st Cir. 1960); *see also Bridgmon v. Array Systems Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).

Windrock's claim fails because it has not established the content of either MD 5.0.1 or Win6310. Windrock has not produced any source code that represents the work registered under the Win6310 Registration or the MD Registration, even though the RSI Defendants requested that Plaintiff do so in Requests for Production 109 and 110. (Rice Decl., Ex. 23). Windrock objected to these requests and did not produce the registered source code. *Id.*

Unable to obtain the registered works from Plaintiff itself, Defendants then subpoenaed Robinson IP Law, PLLC ("Robinson"), which Windrock used to submit its copyright applications to the copyright office, for the deposit copies of the software at issue. Robinson produced the applications, registration certificates, and deposit copies of the registered works. (Rice Decl. Exs 42 – 47). The deposit copies were examined by Dr. Plank, and he determined that the deposit copy for the MD Registration contained 50 pages of source code from a file called DynamicPlot.cpp. (Plank Decl. ¶ 18). Dr. Plank also observed that the deposit copy for the Win6310 Registration contains 50 pages of contiguous source code. (Plank Decl. ¶ 20). Dr. Plank also determined that

7435053.24

the code in both deposit copies is not code used for the reading or writing of the Windrock MD data file (Plank Decl. ¶ 20).

Accordingly, Windrock cannot show that any defendant copied its *copyrighted* works because it has not presented any evidence about the contents of the works it claims are copyrighted. Even Plaintiff's expert, John O'Donahue, did not attempt to compare the source code registered with the copyright office to the Rmonix source code. The deposit copy for the MD Registration, which consists of source code from ███████████ is not referred to by Plaintiff's expert in his report. The only source code comparison that Plaintiff's expert does perform is for nine (9) lines of code in the ██████ function in a file called "████████" and six (6) lines of code in ██████ function in ████████. (O'Donahue Dep. 155:7-10, 162:17-23, 166:1-22). These comparisons of fifteen (15) lines of code in ████████ are not comparing the Rmonix code to code registered with the copyright office.

Accordingly, not only has Windrock not produced the registered copyrighted code such that a comparison could be made, but its expert has not analyzed whether the copyrighted code was substantially copied by defendants. Therefore, Windrock has not only failed to offer the contents of the copyrighted works at issue, but also has failed to make a substantial similarity comparison between its copyrighted works and defendants' allegedly infringing works; in other words, Windrock has failed to present necessary evidence of copyright violation.

Even if Windrock's expert is somehow making comparisons using registered copyright code, Mr. O'Donahue concludes that the source code in Rmonix is logically different than the code in Windrock MD. (O'Donahue Dep. 157:23 – 158:2). Mr. O'Donahue's opinion is that the Windrock code and Rmonix code for ████ are functionally equivalent. (O'Donahue Dep. 159:23–160:5). Copyright protection does not extend to the functionality of a work. 17 U.S.C.

102(b); *and see Digital Commc'ns Assocs., Inc. v. Softklone Distrib. Corp.*, 659 F. Supp. 449, 458 (N.D. Ga. 1987). Dr. Plank also analyzed the ████████, and ██████████ functions and concluded that the functions are not the same in Rmonix and Windrock MD. (Plank Decl.¶ 14). Dr. Plank also noted that no other parts of the Rmonix and Windrock MD source code are similar. (Plank Decl. ¶ 15). Mr. O'Donahue does not refute this finding.

Mr. O'Donahue also compares some screen shots from Rmonix and Windrock MD. (O'Donahue Dep. 147:23 – 149:8). But, Windrock has not registered any screen shots as a part of its registration as required by the regulations. 37 C.F.R. § 202.20(c)(2)(vii)(C). Therefore, Windrock cannot have a claim for copyright infringement of any of its visual elements.

Dr. Plank and Mr. O'Donahue are the only testifying individuals that are allowed to look at both Windrock and Resonance source code pursuant to the protective order entered by this Court. Since neither one of them has found evidence of misappropriation, Plaintiff cannot establish the source code or visual elements of Windrock MD were misappropriated by Resonance or Kelley and Plaintiff cannot show substantial copying.

Similarly, to the extent Plaintiff is claiming copyright infringement or contributory infringement based upon alleged usage of the Windrock MD software licensed to Signet and Viper, there is no evidence that the code registered with the copyright office is the code licensed to Viper or Signet. As stated above, Windrock's expert did not compare the code registered with the copyright office to the code licensed to Viper and Signet to show it is the same. Since, the only code registered with the copyright office is one 50-page file, which cannot represent the entirety of the MD 5.0.1 program, Plaintiff does not and cannot show similarity between any code licensed to Viper or Signet and Plaintiff's allegedly copyrighted source code. Moreover, Plaintiff has made no attempt to make such a showing, as its expert has not reviewed or compared the MD 5.0.1

72

source code that was deposited to the software that was licensed to Viper and Signet. Therefore, there is no evidence that any of the Defendants used registered copyright software outside the scope of the license.

## I.   Plaintiff's TCPA Claim (Count 15) Also Fails

Windrock claims that RSI and McNair violated the TCPA (§47-18-104(b)(5) and/or §47-18-104(b)(7)) which prohibit"[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;" TCPA (§47-18-104(b)(5); and "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" TCPA § 47-18-104(b)(7).

"In order to recover under the TCPA, a plaintiff must prove that (1) the defendant engaged in an unfair or deceptive act and (2) the defendant's conduct caused an ascertainable loss of money or property. As to the second element, the alleged unfair or deceptive act or practice must in fact cause the damages of which the plaintiff complains." *Am. Addiction Ctrs., Inc. v. Nat'l Ass'n Addiction Treatment Providers*, 515 F. Supp. 3d 820, 852 (M.D. Tenn. 2021) (citation omitted). Claims for "violations of the TCPA…are subject to Rule 9(b)'s heightened pleading standard." *Davin v. Resolution Management consultants, Inc.,* No. 3:18-cv-346-TAV-HBG, 2019 WL 2476738, at *3 (E.D. Tenn. Jun. 13, 2019)).

Windrock claims that the four statements sent to customers in emails in April of 2020 violate the TCPA because they allege that RSI is "representing that its goods and services had certain characteristics, uses, and qualities as compared to Windrock's offerings – when it knew that such statements were untrue." (Dkt. 176. ¶ 314). The first two statements that "Resonance Systems … is made up of eight senior level people that used to be at Windrock" and "We …

73

designed all their software and hardware" do not relate to "characteristics, uses, or qualities" of the products and therefore do not form the basis of a TCPA claim.[30]  The second two statements are related to Resonance's products and services.  Those statements are: "We have a new platform that is more advanced in capabilities and yet considerably more price friendly" and "We also provide full support to all Windrock products (No one else is able to do this)."  These statements are not misleading or deceptive as shown in Section 0 above.

Even if the Court finds that any of the four statements are false or misleading regarding the "characteristics, uses, or qualities" of Resonance's products or services, Windrock cannot show that the statements caused any damages as was addressed above in Section III.G.1.d.  Therefore, Windrock's TCPA claim in Count 15 should be dismissed.

### J.  Movants Should Be Granted Their Attorney's Fees.

The TCPA provides that "[i]n any private action…upon a finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, include reasonable attorney's fees and costs."  Tenn. Code Ann. § 47-18-109(e)(2).  Under this section, the party seeking attorney's fees "must do more than merely allege that the plaintiffs' claims were ultimately unsuccessful, or did not emerge from discovery with sufficient support to defeat a motion for summary judgment."  *DeMoss v. Kretz*, No. 3:07-0405, 2009 WL 596060, at *5 (M.D. Tenn. Mar. 6, 2009).

In this instance, Windrock filed its original complaint on August 9, 2021.  *See* Dkt. 1.  Windrock filed its latest Complaint on August 16, 2023, *see* Dkt. 176, meaning it had the benefit of over two years of litigation before filing this fifth iteration of its complaint.  Despite this,

---

[30] Also, these statements are not deceptive as shown in Section G.

Windrock provides no factual support for a claim under the TCPA, much less with the particularity required by Tennessee law. Accordingly, Windrock's claim pursuant to the TCPA has no factual or legal basis. Windrock's lack of assertion of factual basis for its TCPA claim demonstrates that this cause of action is frivolous, without merit, and was brought for the purpose of harassment. Accordingly, Defendant Resonance should be awarded its reasonable attorney's fees and costs pursuant to Tennessee Code Annotated Section 47-18-109(e)(2). *See Nature Conservancy*, 2008 WL 336744, at *8; *see also Demoss*, 2009 WL 596060, at *5 (citing *Shaw v. Merritt-Chapman & Scott Corp.*, 554 F.2d 786 (6th Cir. 1977)).

## IV. CONCLUSION

For all the reasons set forth herein and in Defendants' Motion, Plaintiff fails to establish necessary elements of each of its claims and summary judgment is appropriate.

**RESPECTFULLY SUBMITTED** this 5th day of January, 2024.

> **RESONANCE SYSTEMS, INC., VIPER MONITORING & ANALYSIS, L.P., VIPER MACHINERY MONITORING CORPORATION, EDWARD FLANAGAN, PAUL BEAM, STEVE MCNAIR, AND JOSH KELLEY**
>
> By*: /s/ Cheryl G. Rice, Esq.*
> **CHERYL G. RICE, ESQ., BPR#021145**
> **JOHN L. WOOD, ESQ., BPR#027642**
> **RAMEEN J. NASROLLAHI, ESQ., BPR#033458**
> EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
> 900 S. Gay Street, Suite 1400
> Knoxville, TN 37902
> (865) 546-0500 (phone)
> (865) 525-5293 (facsimile)
> crice@emlaw.com
> jwood@emlaw.com
> rjn@emlaw.com
> *Attorneys for Defendants Resonance Systems, Inc., Viper Monitoring & Analysis, L.P., Viper Machinery Monitoring Corporation, Edward Flanagan, Paul Beam, Steve McNair, and Josh Kelley*

76