UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| CHAMPIONX, LLC, | ) | |
| f/k/a Windrock, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.:  3:21-CV-288-TAV-JEM |
| | ) | |
| RESONANCE SYSTEMS, INC., | ) | |
| JOSH KELLEY, VIPER MONITORING | ) | |
| AND ANALYSIS, LP, VIPER | ) | |
| MACHINERY MONITORING | ) | |
| CORPORATION, | ) | |
| EDWARD FLANAGAN, | ) | |
| PAUL BEAM, and STEVE MCNAIR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are defendants' motion to partially dismiss the Fourth Amended Complaint [Doc. 183] and plaintiff's motion to dismiss the amended countercomplaint [Doc. 177]. These motions have been fully briefed [Docs. 191, 192, 215, 221 (relating to defendant's motion); Docs. 185, 189 (relating to plaintiff's motion)] and are now ripe for resolution. For the reasons set forth in this memorandum opinion and order, defendants' motion [Doc. 183] will be **GRANTED in part** and **DENIED in part** and plaintiff's motion [Doc. 177] will be **GRANTED**.

# I.    BACKGROUND

## A.    Fourth Amended Complaint

Plaintiff[1] is a Tennessee corporation that "designs and manufactures data acquisition products and online systems . . . ." [Doc. 176 ¶¶ 1, 17].  Plaintiff sells devices called portable analyzers, which assess and provide output data regarding machine conditions [*Id.* ¶ 18].  Plaintiff also sells software, known as "Windrock MD" that allows users to read this otherwise-unreadable output data [*Id.* at 19–20, 110].  Windrock MD translates the encoded data into readable reports by using proprietary data structures and data indexing, which enable Windrock MD to decode and translate the data received from Windrock's portable analyzers and other Windrock products [*Id.* ¶ 110].  Only a computer programmer familiar with plaintiff's data structures and data indexing scheme or with access to plaintiff's source code can decode the unreadable output data [*Id.* ¶ 111, 113].

Resonance Systems, Inc. ("RSI") is a Tennessee corporation and direct competitor of plaintiff [*Id.* ¶¶ 4, 22].

Viper Monitoring & Analysis, L.P. and Viper Machinery Monitoring Corporation (which the Fourth Amended Complaint refers to collectively as "Viper" or the "Viper defendants") and Signet Monitoring and Analysis, Inc. ("Signet") are self-described service companies that use portable analyzers to collect data on customers' machinery and

---

[1] The corporation formerly known as Windrock, Inc. is now known as ChampionX, LLC, as a result of a merger [Doc. 176 ¶ 3].  Although ChampionX is now the proper plaintiff, for clarity, and for consistency with the parties' briefs, the Court will refer to plaintiff as "Windrock" in this memorandum opinion and order.

2

provide analysis of that data, usually in the form of reports [*Id.* ¶¶ 5–7, 21]. Ethan Clark is the President of Signet and is involved in Viper [*Id.* ¶¶ 12, 23]. Viper possessed two Windrock 6320 analyzers and two copies of Windrock MD [*Id.* ¶ 28]. Signet first "rented" and then eventually transferred one of these Windrock 6320 analyzers and its associated copy of Windrock MD to Viper, without obtaining Windrock's written consent [*Id.* ¶¶ 29–30]. Viper later purchased another Windrock 6320 analyzer and its associated copy of Windrock MD from a salvage dealer [*Id.* ¶ 31].

Edward Flanagan worked at Windrock first as an Engineering Manager, and subsequently as a General Manager from 1996 to 2017 [*Id.* ¶¶ 8, 25]. After his retirement from Windrock, Flanagan began working for Viper, and in that role, he visited worksites of customers and collected data using a Windrock 6320 analyzer and Windrock MD software [*Id.* ¶ 26–27]. Flanagan is now employed by, and maintains an ownership interest in, RSI [*Id.* ¶ 32]. In 2007, Flanagan entered into an "Employment Agreement" with Windrock ("Flanagan Agreement"), which, in relevant part, prohibited the disclosure of confidential information relating to Windrock [*Id.* ¶¶ 49–50]. While employed at Windrock, Flanagan learned confidential information regarding Windrock's customers and involving Windrock's products [*Id.* ¶¶ 51–55].

Paul Beam worked at Windrock first as a Senior Engineer and then an Engineering Manager from 2006 to 2018 [*Id.* ¶¶ 9, 35]. Beam is now employed by, and maintains an ownership interest in, RSI [*Id.* ¶ 35]. In 2017, Beam entered into a "Retention Agreement" with Windrock ("Beam Agreement") [*Id.* ¶ 58]. Paragraph 3 of the Beam Agreement

3

prohibited the disclosure of Confidential Information [*Id.* ¶ 59]. Beam received confidential information while employed by Windrock, including information regarding Windrock's customers and Windrock's products [*Id.* ¶¶ 60–64]. Paragraph 4 of the Beam Agreement sets forth a one-year non-compete term [*Id.* ¶¶ 67–68]. Further, Paragraph 10 of the Beam Agreement prohibited Beam from engaging in any activity that reasonably could be anticipated to harm Windrock's reputation or relationships with customers [*Id.* ¶ 69].

Steve McNair worked at Windrock first as an International Sales Manager and then as a Product Manager from 2015 to 2018 [*Id.* ¶¶ 11, 33]. McNair is now employed by, and maintains an ownership interest in, RSI [*Id.* ¶ 33]. In 2015, McNair entered into an "Agreement Concerning Inventions, Patent Rights, Trade Secrets, Confidential Information and Noncompetition" ("McNair Agreement") with "Cook Compression, A Dover Company, and its successors and assigns" [*Id.* ¶ 71]. As of November 3, 2015, Windrock was subordinate to Cook Compression within their parent company's corporate structure [*Id.* ¶ 72]. The McNair Agreement prohibits the disclosure of confidential information [*Id.* ¶ 74]. McNair received confidential information while employed by Windrock, including information regarding Windrock's customers and Windrock's products [*Id.* ¶¶ 75–79].

Josh Kelley served as a software developer for plaintiff from 2007 until 2018 and an independent contractor for plaintiff from 2018 until 2019 [*Id.* ¶ 36]. Kelley is now employed by, and maintains an ownership interest in, RSI [*Id.*]. Kelley executed two

4

pertinent agreements with plaintiff. First, in 2017, Kelley entered into a Retention Agreement with Windrock, in which he agreed not to disclose confidential information [*Id.* ¶¶ 82–85]. Second, when Kelley transitioned from employee to independent contractor of plaintiff, Kelley signed a "Mutual Confidentiality and Non-Disclosure Agreement," in which he agreed to restrictions on the use of confidential information [*Id.* ¶¶ 92–94, 99–101]. Due to his former employment by Windrock, Kelley was intimately familiar with Windrock MD's source code [*Id.* ¶ 116].

To install Windrock MD, a user must accept Windrock's Software License Agreement ("License Agreement"), which prohibits the assigning, sublicensing, or transferring of the program without prior written consent as well as the disclosure of the program to anyone other than the customer's or supplier's employees without written consent [*Id.* ¶¶ 42, 45–46]. The License Agreement also provides that the licensed programs "are confidential and proprietary property" of Windrock and the user "agrees to receive and maintain same as a confidential disclosure" [*Id.* ¶ 48].

Plaintiff alleges that in December 2018, after Beam's employment with Windrock ended, Beam emailed Kelley, who was still working for Windrock as a contractor, and informed Kelley that he was considering developing a new portable analyzer to compete with Windrock [*Id.* ¶¶ 117–18]. Beam asked Kelley to think about how to develop a competing software, and Kelley responded that he would end his contracting work for Windrock [*Id.* ¶¶ 119, 121]. In collaboration with Beam, Kelley began to develop the source code for RSI's competing software, "Rmonix," through 2019 and 2020 [*Id.* ¶ 124].

5

Beam and Kelley later added Flanagan and McNair to these discussions and the four communicated on a regular basis throughout the remainder of 2019 and into 2020 to advance their plans to form a company to compete with Windrock [*Id.* ¶¶ 125, 127]. On or about March 25, 2020, Beam and McNair formed RSI [*Id.* ¶ 128].

On April 2, 2020, Flanagan attempted to reach a Windrock customer by telephone, after which he emailed Beam, McNair, and Kelley, stating "[t]he time to strike is now" [*Id.* ¶ 129]. On April 8, 2020, McNair launched an email campaign targeted at Windrock's customers that contained several false statements [*Id.* ¶ 130].

In December 2020, RSI demonstrated and advertised its ability to decode and translate the output data from Windrock analyzers [*Id.* ¶¶ 134–35]. Plaintiff asserts that there are only two possible explanations for RSI's software having the capability to read data from Windrock's products: (1) Kelley utilized a copy of Windrock MD that was unlawfully obtained from a Windrock customer and used his knowledge of Windrock MD's source code to decode and translate the encoded binary data from Windrock's data files, or (2) Kelley unlawfully accessed and/or used portions of the Windrock MD source code [*Id.*]. Per the complaint, defendants admit that Kelley designed the ability of Rmonix software to translate the binary data created by Windrock's portable analyzers and claim that Kelley "reverse engineered" a setup file contained in Windrock's data files [*Id.* ¶¶ 137–38]. Plaintiff contends that this was only possible due to a confidential vulnerability in Windrock MD, which Kelley knew about during his employment with Windrock and which he made recommendations regarding [*Id.* ¶¶ 139–43]. Plaintiff also

6

states that defendants admit that Kelley used: (1) a copy of Windrock MD software originally licensed to Signet but later transferred to Viper; and (2) a copy of Windrock MD purchased by Viper from a salvage dealer [*Id.* ¶ 144].

Kelley also used copies of Windrock MD to "check" his work, and Clark eventually set up a Signet computer with Windrock MD installed on it and allowed Kelley to remotely access this computer (and the Windrock MD software) at his convenience [*Id.* ¶¶ 145–49]. Flanagan also allowed Kelley to access Viper's copies of Windrock MD, during a time when Kelley was not employed by Viper, and Viper was operating as a separate company from RSI [*Id.* ¶ 152]. Moreover, RSI copied the "look and feel" of Windrock MD when creating Rmonix [*Id.* ¶ 153].

Plaintiff alleges that Flanagan, Beam, McNair, and Kelley all learned valuable confidential information about Windrock's customers while employed by Windrock and used this information to unlawfully poach customers from Windrock for the benefit of RSI [*Id.* ¶¶ 155–64].

Plaintiff thus filed the Fourth Amended Complaint which asserts 15 causes of action:

(1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, against RSI, Flanagan, Beam, McNair, and Kelley (Count 1);

(2) violation of the Tennessee Uniform Trade Secrets Act ("TUTSA"), Tenn. Code Ann. § 47-25-1701, *et seq.*, against RSI, Flanagan, Beam, McNair, and Kelley (Count 2);

(3) statutory procurement of breach of Signet's contract, in violation of Tenn. Code Ann. § 47-50-109, against RSI, Flanagan, Beam, McNair, and Kelley (Count 3);

7

(4) statutory procurement of breach of Viper's contract, in violation of Tenn. Code Ann. § 47-50-109, against RSI, Flanagan, Beam, McNair, and Kelley (Count 4);

(5) breach of the Retention Agreement against Kelley (Count 5);

(6) breach of the Non-Disclosure Agreement against Kelley (Count 6);

(7) breach of the employment agreement against Flanagan (Count 7);

(8) breach of the retention agreement against Beam (Count 8);

(9) breach of agreement against McNair (Count 9);

(10) breach of Non-Disclosure Agreement against Signet (Count 10);

(11) breach of License Agreement against Signet (Count 11);

(12) breach of License Agreement against Viper (Count 12);

(13) false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), against RSI and McNair (Count 13);

(14) copyright infringement and contributory copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.*, against Viper, Signet, RSI, and Kelley (Count 14); and

(15) violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104, *et seq.*, against RSI (Count 15)

[*Id.* at 27–49]. All claims against Signet, including Counts 10 and 11 in their entirety, have been dismissed [Doc. 236]. Currently, defendants move to dismiss plaintiff's claims in Counts 1 and 2 as to Flanagan, Beam, and McNair, in Counts 3 and 4 against Flanagan, Beam, McNair, and Kelley, and Counts 7, 8, 9, 12, 13, and 15 in their entirety [Doc. 183].

### B. Amended Counterclaim

RSI filed a counterclaim against Windrock alleging that it tortiously interfered with RSI's current and prospective business relations [Doc. 168, p. 1]. RSI alleges that,

8

on September 15, 2017, Windrock informed its customers that it no longer intended to sell its model 6320 analyzer due to difficulty in obtaining necessary parts [*Id.* ¶ 20]. On or before April 1, 2020, Windrock announced that, beginning September 30, 2020, Windrock would no longer provide support or maintenance for the 6320 analyzer [*Id.* ¶¶ 22–23]. RSI alleges that Windrock's primary purpose in ending support for the 6320 analyzer was to force its customers to purchase its newer 6400 analyzer [*Id.* ¶ 24]. Upon learning that Windrock had informed customers that it would no longer support or service the 6320 analyzer, RSI began soliciting customers using the 6320 analyzer, advertising that it could provide support and service for the 6320 model [*Id.* ¶ 25].

RSI alleges that, since 2020, it has competed with Windrock for multiple customers, including customers it identifies as "W," "K," "E," and "Y" [*Id.* ¶ 26]. Sometime in April 2020, Windrock sent a letter to its customers acknowledging that "other companies in the industry" had begun "claiming to be able to maintain" the 6320 analyzer [*Id.* ¶ 28]. In that letter, Windrock implied that any service customers received from companies other than Windrock would be of a lesser quality and suggested that calibrations of the 6320 analyzers performed by other companies may not be accurate [*Id.* ¶ 29]. RSI alleges that the intent of this letter was to falsely state to customers that RSI could not support the 6320 analyzer and thereby prevent RSI from selling its support services to prospective customers [*Id.* ¶ 34]. As of September 30, 2020, however, RSI was not in competition with Windrock for business supporting and maintaining the 6320 analyzers, because Windrock had already

9

announced its intention to no longer service the 6320 analyzers and ceased support of that model [*Id.* ¶ 35].

In 2020, RSI began communicating with W's employees about offering a service plan for maintaining W's existing monitoring equipment, but RSI's point of contact regarding such services stopped communicating with RSI entirely beginning in 2020 and into 2021 [*Id.* ¶¶ 46–47]. RSI alleges that Windrock learned of RSI's attempted sales of support services to W during its investigation of RSI in 2020, and the April 2020 letter to Windrock's customers, and other false or misleading statements, caused W to cease communication with RSI [*Id.* ¶¶ 48–49]. W's refusal to communicate with RSI resulted in RSI's inability to sell its support services to W for the next two years, resulting in significant lost revenues [*Id.* ¶¶ 50–51]. RSI also alleges that, at some point, Windrock employees or agents informed W that RSI had received a cease-and-desist letter from Windrock's counsel regarding RSI's business [*Id.* ¶ 55]. Nonetheless, on August 5, 2021, W issued a purchase order to RSI for the purchase of one of RSI's portable analyzers [*Id.* ¶ 56]. RSI alleges that Windrock's statements to W were made with the intent to dissuade W from purchasing or continuing to use RSI products and services, and in an attempt to damage RSI's business relationship with W [*Id.* ¶¶ 67–68].

In the spring of 2022, RSI and Windrock were in competition to sell competing products to E [*Id.* ¶ 70]. RSI alleges that, before E decided which product to purchase, Windrock learned that RSI had offered to sell its maintenance plan or its own analyzer to E [*Id.* ¶ 72]. Subsequently, E issued a purchase order to Windrock dated May 10, 2022,

10

for purchase of an upgrade from the 6320 analyzer to the 6400 analyzer, a decision that was based on misrepresentations by Windrock about RSI's products' capabilities and Windrock's lawsuit against RSI [*Id.* ¶¶ 72–73]. RSI alleges that Windrock made representations with the intent to terminate RSI's prospective business relationships with E, including the misrepresentation that RSI was not able to maintain the 6320 analyzer [*Id.* ¶¶ 74–75]. Windrock's interference led to RSI's loss of a sale of its support services or analyzer, resulting in significant loss revenues [*Id.* ¶ 76].

In July 2022, Y issued a purchase order to RSI for RSI's Compressor Kit which included its portable analyzer and other accessories [*Id.* ¶¶ 77–78]. RSI alleges that Windrock was aware of the discussions between RSI and Y regarding the Y purchase order and/or the existence of the Y purchase order [*Id.* ¶ 79]. Thereafter, Windrock informed Y, through a representative, about the instant lawsuit and indicated that due to the existence of this lawsuit, Y should not do any business with RSI because it would be risky to Y [*Id.* ¶ 83]. RSI alleges that Windrock made these misrepresentations to cause Y to cancel the Y purchase order, and Y ultimately cancelled the purchase order, and upgraded its 6320 analyzer to the 6400 analyzer instead [*Id.* ¶¶ 84–85]. Y chose this course of action specifically due to Windrock's "threats" [*Id.* ¶ 86]. RSI alleges that Windrock also falsely claimed to Y that RSI was unable to support Y's 6320 analyzer [*Id.* ¶ 87]. The cancellation of the Y purchase order resulted in lost revenues to RSI [*Id.* ¶ 88].

11

## II.    STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that pleads facts "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Finally, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 663.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief."  *Bishop v. Lucent Techs., Inc.*, 520 F.3d

12

516, 519 (6th Cir. 2008). However, the Court need not accept legal conclusions or unwarranted factual inferences as true. *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

A court may consider exhibits attached to the complaint when ruling on a motion to dismiss. *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). However, if an exhibit contradicts the complaint, courts should disregard the allegations in the complaint in favor of the information in the exhibit. *Williams*, 498 F. App'x at 536.

## III.    ANALYSIS

### A.    Defendants' Motion to Partially Dismiss

As an initial matter, in its response, plaintiff contends that the Court should disregard several of defendants' arguments because, while the parties met and conferred, defendants did not raise all of the arguments contained in their motion to dismiss at that conference [Doc. 191, p. 2].

However, the Court notes that "[t]he requirement to meet and confer prior to filing a motion to dismiss is akin to a local rule, and the Court has 'broad discretion to overlook violations.'" *Jones v. Wright*, E.D. Tenn. CM/ECF No. 2:23-cv-29, Doc. 108, p. 18 (report & recommendation dated Sept. 6, 2023) (quoting *SmartBank v. Cartron*, No. 4:19-cv-62, 2020 WL 1897168, *4 (E.D. Tenn. Apr. 16, 2020) (internal citations omitted)), adopted in

13

*Jones v. Wright*, No. 2:23-cv-29, 2024 WL 94663 (E.D. Tenn. Mar. 5, 2024). Moreover, the Court notes the strong preference for adjudications of matters on the merits. *See Mann v. Mohr*, 802 F. App'x 871, 877 (6th Cir. 2020) (noting "the strong policy favoring adjudication on the merits." (quotation marks omitted)); *Rose v. Social Security Administration*, 202 F.3d 270 (table), No. 98-6491, 1999 WL 1253074, at *1 (6th Cir. Dec. 17, 1999) ("[T]his court prefers that claims be adjudicated on their merits."); *Coburn v. L.J. Ross Associates, Inc.*, No. 14-CV-11080, 2015 WL 1926398, at *4 (E.D. Mich. April 28, 2015) ("There is a strong preference for adjudicating cases on the merits[.]"). Accordingly, the Court will address the merits of the parties' arguments and declines plaintiff's invitation to reject portions of defendants' arguments based solely on the meet and confer requirement.

### 1.      Counts 1 and 2 – Individual Liability on DTSA/TUTSA Claims

Defendants argue that Counts 1 and 2 of the Fourth Amended Complaint should be dismissed as to Beam, Flanagan, and McNair because Windrock alleges no facts that would establish their individual liability [Doc. 184, p. 5]. First, defendants contend that the Sixth Circuit has held that "remembered information" and "relationships with customers" are not trade secrets. Next, defendants state that the complaint fails to identify any confidential customer information specific to a particular customer that Beam, Flanagan, or McNair misappropriated, much less a specific customer that they poached [*Id.*]. Defendants state that, while the complaint alleges that these defendants learned information at Windrock, it does not allege that they took any of the allegedly confidential customer information [*Id.*

14

at 6].  Finally, defendants argue that McNair did not have an agreement with Windrock that restricted his use of confidential information [*Id.*].

Plaintiff responds that defendants do not cite any legal authority requiring a plaintiff to plead customers' names and contact information in order to adequately allege that defendants took confidential customer information [Doc. 191, pp. 2–3].  Plaintiff also contends that this argument is disingenuous because defendants have marked every document they have produced in discovery containing customer information as "Attorney's Eyes Only," thereby withholding this information from plaintiff [*Id.* at 3].  Moreover, plaintiff states that its allegations on "the specific information that was allegedly used" and "specific customer that was allegedly contacted" are sufficiently detailed, pointing to the "time to strike" email, and its allegations regarding McNair's email campaign, including dates and numerous quotations from the emails which were sent to specific Windrock customers, making them easily identifiable [*Id.*].

Plaintiff contends that defendants rely on the false premise that the only reasonable inference arising from the allegations is that the defendants used remembered information [*Id.* at 4].  But the complaint contains specific allegations regarding the email campaign McNair began on April 8, 2020, and that McNair was clearly not using "remembered information" in these solicitations [*Id.*].  Plaintiff further argues that "remembered information" can constitute a trade secret, citing *SDC Financial, LLC v. Bremer*, No. 3:19-cv-525, 2019 WL 4393543 (M.D. Tenn. Sept. 13, 2019) [*Id.* at 5].  Plaintiff contends that defendants' citation to *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x

15

969 (6th Cir. 2007) does not establish that "remembered information" of the type involved in this case cannot constitute a trade secret, but instead, only addressed the limited question of whether the names of a company's own sales consultants that a departing employee remembered and had personal relationships with qualified as trade secrets [*Id.* at 5–6].

Defendants reply that the complaint only alleges that McNair contacted certain Windrock customers, while claiming in a conclusory fashion that defendants somehow "used" the confidential information [Doc. 192, p. 3]. They contend that plaintiff's argument that McNair was not using remembered information is simply unsupported by any allegation in the complaint. Further, defendants state that Windrock has not explained how the remembered sales consultants in *PartyLite* are distinguishable from remembering the identity and contact information of Windrock customers [*Id.*]. And plaintiff's allegations fail to support even an inference that defendants used information similar to that in *SDC* when they contacted Windrock's customers [*Id.* at 4]. Defendants contend that the allegations, at best, demonstrate that defendants knew the identity of certain Windrock customers, but the identity of a customer is not a trade secret. Additionally, defendants argue that Windrock's argument about the designation of discovery as for "Attorney's Eyes Only" is a red herring, as Windrock's counsel can properly view these documents and allege facts from such in the complaint. Moreover, the Sixth Circuit has rejected the notion that insufficient pleading may be excused because specific facts are solely in the possession of the defendant [*Id.* (citing *Ashley Furniture Indus., Inc. v. American Signature Inc.*, No. 2:11-cv-427, 2015 WL 12999664 (S.D. Ohio Mar. 12, 2015))]. Finally, defendants argue

16

that Windrock cites no support for its claim that its insufficient pleading should be excused because defendants have actual knowledge of the facts, and such is not supported by caselaw [*Id.* at 4–5].

### a. Pleading Requirements

Before addressing whether Windrock has adequately pled claims under the DTSA and TUTSA as to Beam, Flanagan, and McNair, the Court will address Windrock's arguments in which it appears to ask the Court to excuse any failure to adequately plead such claims.

First, Windrock argues that it has been unable to learn specific customer information because defendants have marked all discovery responses that include such customer information as for "Attorney's Eyes Only" [Doc. 191, p. 3]. But "[s]ince *Iqbal*, the Sixth Circuit Court of Appeals has flatly rejected the notion that insufficient pleading may be excused because the specific facts are solely in the possession of that defendant." *Ashley Furniture*, 2015 WL 12999664, at *8; *see also New Albany Tractor, Inc. v. Louisville Tractor Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (stating that "plaintiff must allege specific facts of" the relevant claim "even if those facts are only within the head or hands of the defendants. The plaintiff may not use the discovery process to obtain these facts after filing suit."). Accordingly, the Court finds that any difficulty plaintiff has encountered in obtaining the relevant customer information through discovery is not an appropriate consideration in determining whether Windrock has adequately pled its claims under the DTSA and TUTSA.

17

Second, Windrock appears to argue that specificity is not necessary because defendants already know the customers that they "poached" from Windrock [Doc. 191, p. 3]. However, plaintiff cites no support for the proposition that a defendant's knowledge of its own actions would somehow mitigate the need for the plaintiff to comply with the standards of notice pleading. "The purpose of notice pleading is not to create pitfalls for the inartful plaintiff" but rather to "inform Defendant of the substance of his claims." *Welty v. Honda of Am. Mfg., Inc.*, 411 F. Supp. 2d 824, 830 (S.D. Ohio 2005). But the question before the Court at the Rule 12(b)(6) stage is not whether defendants have actual knowledge of the actions that underlie the complaint, but whether the complaint provides defendants with sufficient written notice of the facts supporting the claims therein. The Court will thus address whether the specific allegations in the Fourth Amended Complaint adequately state a claim for relief under the DTSA and TUTSA with this notice requirement in mind, as well as the standards set forth in *Iqbal*, *Twombly*, and their progeny.

### b. DTSA/TUTSA

In Counts 1 and 2 of the Fourth Amended Complaint, plaintiff alleges violations of the DTSA and the TUTSA, respectively [Doc. 176 ¶¶ 165–99]. Plaintiff alleges these counts against RSI, Flanagan, Beam, McNair, and Kelley [*Id.*]. At issue before the Court is whether plaintiff has stated a claim against Flanagan, Beam, and McNair only.

"The elements of a DTSA claim are 'largely the same' as the elements of a TUTSA claim." *BNA Assoc., LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 602 F. Supp.

18

3d 1059, 1065 (M.D. Tenn. 2022) (quoting *Care Servs. Mgmt., LLC v. Premier Mobile Dentistry of VA, LLC*, No. 3:17-cv-1095, 2020 WL 5797974, at *4 (M.D. Tenn. Sept. 29, 2020)).  Accordingly, "courts often consolidate the analyses of the two schemes." *Prichard v. Thompson*, No. 22-cv-2838, 2023 WL 5817658, at *8 (W.D. Tenn. Aug. 3, 2023).  The Court will therefore consolidate its analysis of whether Windrock has stated a claim under the DTSA and TUTSA.

"Under the TUTSA, 'the elements for a misappropriation of trade secrets claim are: (1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff.'" *BNA Assoc.*, 602 F. Supp. at 1064 (quoting *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, No. 3:06-cv-170, 2006 WL 2370338, at *3 (E.D. Tenn. Aug. 15, 2006)).  Defendants appear to contest whether plaintiff has adequately alleged the first and second elements as to Beam, Flanagan, and McNair.

### i.    Trade Secret

To qualify as a "trade secret" under the TUTSA, the information must: (1) derive independent economic value from not being generally known to persons who can obtain economic value from its disclosure or use, and (2) must be the subject of efforts that are reasonable under the circumstances to maintain its secrecy.  *Id.* (citing Tenn. Code Ann. § 47-25-1702).  Factors to be considered in determining whether information is a "trade secret" include:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business

19

and to its competitors; (5) the amount of money or effort expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001) (citation omitted)).  However, Tennessee courts have held that, absent evidence to the contrary, the following types of information are not confidential: (1) remembered information as to a business's prices; (2) specific needs and business habits of certain customers; and (3) an employee's personality and relationship that he has established with certain customers.  *Id.* (citing *B&L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 215 (Tenn. Ct. App. 2004)).

The parties cite to *PartyLite Gifts* and *SDC Financial*, respectively, in support of their arguments regarding whether remembered information and/or relationships with customers can constitute trade secrets.  In *PartyLite Gifts*, the alleged trade secret was described as "the names, contact information and specific organizational, sales and recruiting details about the salesforce" which the plaintiff argued was developed at great expense and of value to competitors "because of the nature of the direct sales business." *Id.* at *4.  However, the defendant responded that plaintiff publicized members of its salesforce through business cards, literature, and webpages, and also compiled that information in its own magazine, which is distributed to plaintiff's salesforce and available to the public for purchase on eBay.  *Id.*

In denying a preliminary injunction, this Court held that personal knowledge of particular salespeople is not a trade secret under the TUTSA.  *Id.* at *5.  The Court

20

specifically noted that plaintiff did not make any effort to keep the identities of its salespeople a secret, as such would interfere with its ability to solicit customers, and one could readily access the identities, status, and locations of specific salespeople through plaintiff's own promotional activities, literature, and website, in addition to other open sources. *Id.* The Court further stated that even though this information might have value in the unique context of the direct sales industry, because such information is so widely available, it could not be deemed a trade secret. *Id.*

The Sixth Circuit affirmed this Court's denial of a preliminary injunction, stating that "[g]iven the apparent widespread distribution of the PartyLite magazine and lack of any confidentiality protections noted on it, combined with the relative ease in locating sales consultants via web searches, we cannot say the district court abused its discretion in concluding the names are not a trade secret." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 974 (6th Cir. 2007).

In *SDC Financial*, the Middle District of Tennessee addressed whether "business plans, marketing and promotional strategies, consumer and market information, performance information . . . operation and workflow at . . . retail stores, stores, pricing information, financing options and strategies, and competitive business information" were "trade secrets" when this was allegedly "remembered information." *SDC Financial*, 2019 WL 4393543, at *5–6. That court "reject[ed] the defendant's argument that 'remembered information, *per se*, is never protectible as a trade secret," noting that the Sixth Circuit's decision in *PartyLite* was specifically based on "the critical factor [of] the extent to which

21

the information was publicly available." *Id.* That court also found that *B&L*, the Tennessee case on which *PartyLite* relied, does not stand for the principle that remembered information can never constitute a trade secret, but again, relied on the fact that the information was readily ascertainable and general knowledge within the industry. *Id.* at *5. The Middle District opined that "if someone with a photographic memory has access to Coca-Cola's formula and improperly uses his recollection of the formula, that would not necessarily make the formula less of a trade secret." *Id.* at *6.

The Tennessee Court of Appeals has held that the identities of a company's customers are not "confidential information" within the context of an employment agreement "because such information was generally available in the trade." *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 645 (Tenn. Ct. App. 1999). The court "reasoned that 'confidential information' is analogous to 'trade secret' and that, because customer identities are not secret, they cannot be considered confidential." *Id.* However, that court has also held that information that could have been developed by independent means may still be a protectible trade secret "if the former employee does not develop it by independent [means] but in fact obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer." *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-00936-COA-RD-CV, 2010 WL 323057, at *15 (Tenn. Ct. App. Jan. 28, 2010) (internal quotation marks omitted) (alterations in original).

In *SDC Financial*, the court declined to dismiss the plaintiff's TUTSA claim on a Rule 12(b)(6) motion, noting that "even if remembered information could not be protectible

22


as trade secrets, the plaintiffs and the court have *no way to ascertain at this juncture* what [defendant] actually remembered and to what extent he might have relied on documentation." *SDC Financial*, 2019 WL 4393543 at *6 (emphasis added). The Middle District of Tennessee similarly denied a motion to dismiss a TUTSA claim in another case, which the defendant argued was based on "remembered information," stating that "the Court has no way of determining from the pleading what [the individual] did or did not remember when he went to work for [defendant]." *ProductiveMD, LLC, v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011).

Windrock's allegations of violations of the DTSA and TUTSA involve two sets of alleged trade secrets: (1) the Windrock MD source code; and (2) confidential customer information [Doc. 176 ¶¶ 167–68, 185–86]. However, it appears that the Fourth Amended Complaint only asserts that Kelley was given access to the Windrock MD source code, and the claims against Flanagan, Beam, and McNair are limited to the allegedly confidential customer information [*Id.*].

Windrock specifically alleges that Flanagan, Beam, and McNair were given access to confidential customer information, including:

> [K]nowledge of the Windrock product(s) each customer has used/is using, the quantity of Windrock products purchased and utilized by each customer, the types of assets/engines each customer uses, the manner in which each customer monitors their assets/engines (including what reading the customer takes), the relative amount of revenue attributable to each customer, as well as knowledge of the specific changes customers have previously requested to Windrock's products, as well as the identity of Windrock's customers and appropriate customer contacts.

23

[*Id.* ¶¶ 156, 168, 186].  Elsewhere, the Fourth Amended Complaint specifies that Flanagan, Beam, and McNair learned valuable confidential information about Windrock's customers and its relationship with those customers, including the customers' specific product and service needs and requirements [*Id.* ¶¶ 52, 61, 76].  Moreover, Windrock alleges that, while employed by Windrock, Flanagan, Beam, and McNair learned who the key contacts were with Windrock's customers, what type of assets the customers used, how many of such assets the customers used, as well as the customers' procurement processes and buying habits [*Id.* ¶¶ 53, 62, 77].

Windrock alleges that this customer information could only be known by someone employed or contracted by Windrock and cannot be learned through publicly available means [*Id.* ¶ 157].  Moreover, Windrock alleges that this information is valuable because:

> [U]tilization of this information provides a way to target specific needs of specific Windrock customers.  Knowing and using confidential information such as a potential customer's exact needs, equipment, operations, and preferences provides an unfair advantage that allows for a decidedly more efficient and targeted sales presentation, which will result in sales that would not have occurred otherwise . . . This customer information also provides knowledge of the possible repair, replacement, and upgrade needs of the customer.  Knowing when a potential customer is likely due to replace or upgrade its equipment makes potential sales inquiries more efficient, easy, and timely, which also leads to an increased probability of success, all at the expense of Windrock.

[*Id.* ¶ 158].  Windrock further alleges that, in its industry, potential customers and appropriate contacts "are extremely difficult to identify through publicly available sources of information" and therefore, defendants' access to such information about Windrock's customer relationships "gave them an unfair competitive advantage over Windrock that

24

they would not have but for their access to and use of this confidential information [*Id.* ¶ 159].

Despite these more extensive allegations regarding the customer information that is allegedly confidential, as in *PartyLite Gifts*, such allegations are "disconnected from the scope of information defendant[s] . . . actually used." *PartyLite Gifts*, 2006 WL 2370338, at *5. As discussed further, *infra*, the Fourth Amended Complaint only alleges, at best, that some defendants "used" customer's names and contact information to reach out to them in an attempt to steal their business from Windrock. Because the information alleged to have been used is limited only to the customers' names and contact information, the Court's analysis will be limited to whether this specific information can constitute a trade secret.

The Court finds that defendants' arguments contain two key questions: (1) whether "remembered information" can constitute a trade secret; and (2) whether customer information, even if not "remembered information," can constitute a trade secret.

As to the first question, given the case law explained *supra*, the Court finds that "remembered information" may constitute a trade secret, depending on the particular circumstances of each case. Certainly, the Court agrees with the *SDC Financial* court's hypothetical that if a former employee of Coca-Cola somehow remembered the famed secret formula, it would not make the formula less of a trade secret. *See SDC Financial*, 2019 WL 4393543 at *6. And, ultimately, the Court need not determine whether the allegedly "remembered information" of Windrock's customers and their contact

25

information would constitute a trade secret under the circumstances at this phase of this litigation. The Fourth Amended Complaint does not specifically allege whether or not the defendants "remembered" this information, and the allegations create a reasonable inference that Beam, Flanagan, and McNair specifically took this customer information from Windrock, rather than simply remembering all of this information, including contact names and email address for a number of customers. Accordingly, the Court cannot determine whether Windrock's DTSA and TUTSA claims rely solely on remembered information at this juncture. *See SDC Financial*, 2019 WL 4393543 at *6 (denying a Rule 12(b)(6) motion when the court had no way to ascertain at the pleading stage what information was remembered and what was based on documentation); *ProductiveMD*, 821 F. Supp. 2d at 962 (same).

Whether Windrock's customers' names and contact information can constitute a trade secret, regardless of whether such information was "remembered" or taken through documentation, is a trickier question. While courts have rejected arguments that such customer information can constitute a trade secret under the TUTSA, the reasoning in these cases has been based on the public availability of the information from sources outside the plaintiff company. *See Vantage Tech.*, 17 S.W.3d at 645; *PartyLite Gifts*, 2006 WL 2370338, at *5. But here, the allegations in the Fourth Amended Complaint, which the Court must accept as true, are that "in Windrock and Defendant RSI's industry, potential customers, and the appropriate customer contacts, are extremely difficult to identify through publicly available sources of information" [Doc. 176 ¶ 159]. Given this allegation,

26

there is at least a reasonable inference that Windrock's customers' names and contact information is not publicly available, and therefore, that the facts of this case are distinguishable from the cases holding that customer information cannot constitute a trade secret. Accordingly, the Court finds, at this stage of the litigation, plaintiff has stated a plausible claim of a trade secret.

### ii. Misappropriation

The TUTSA defines "misappropriation" as

(A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:

> (i) Used improper means to acquire knowledge of the trade secret; or
>
> (ii) At the time of disclosure of use, knew or had reason to know that the person's knowledge of the trade secret was:
>
> (a) Derived from or through a person who had utilized improper means to acquire it;
>
> (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

Tenn. Code Ann. § 47-25-1702(2).

27

"[P]roving misappropriation requires only evidence of acquisition by improper means. It does not require proof that the trade secret has actually been used. Nor does the TUTSA require proof of detriment outside the misappropriation or disclosure itself." *Williams-Sonoma Direct, Inc. v. Arhaus, LLC*, 109 F. Supp. 3d 1009, 1018 (W.D. Tenn. 2015) (citations omitted).

Windrock alleges that Flanagan, Beam, and McNair "used" the information regarding Windrock's customers to "unlawfully poach customers from Windrock for the benefit of Defendant RSI" [Doc. 176 ¶ 160]. Specifically, Windrock alleges that McNair used the name and contact information of key customers in the course of an email campaign he launched on April 8, 2020, in which McNair allegedly sent Windrock customers emails containing "several false statements" [*Id.* ¶¶ 130–31, 161]. In some of these emails, McNair stated "I believe that our paths crossed a while back at one of my previous companies," which included Windrock [*Id.* ¶ 162]. In some emails, McNair referenced that Flanagan "suggested" that McNair email the recipient, in which case, Flanagan supplied the customer contact information to McNair [*Id.* ¶ 163]. Windrock alleges that "[i]n these and other marketing efforts, Defendant RSI used the confidential customer information that Defendants Beam, Flanagan, McNair, and Kelley learned while employed by Windrock to target Windrock's customers" [*Id.* ¶ 164].

Notably, Windrock's allegations do not appear to center on any theory that Beam, Flanagan, or McNair obtained this customer information via improper means. Instead, Windrock acknowledges that these defendants obtained this customer information through

28

the normal course of their employment with Windrock [*Id.* ¶ 155]. Accordingly, it appears that Windrock's allegations are that Beam, Flanagan, and McNair misappropriated Windrock's customer information under § 47-25-1702(2)(ii)(b) or (c), that is that they disclosed the information knowing that the knowledge of the customer information was "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" or "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]" *See* Tenn. Code Ann. § 47-25-1702(2)(ii)(b), (c). Specifically, it appears that Windrock alleges that Beam, Flanagan, and McNair had a duty to maintain the secrecy of limit the use of this customer information based on the Beam Agreement, Flanagan Agreement, and McNair Agreement, respectively.

Ultimately, given the allegations set forth above, the Court finds that Windrock has adequately pled that McNair[2] and Flanagan used the trade secrets regarding Windrock's customer information to reach out to Windrock customers and solicit their business [Doc. 176 ¶¶ 162–63]. Assuming, as the Court must at this stage, that the allegations set forth in the Fourth Amended Complaint are true, plaintiff has set forth allegations that both McNair and Flanagan entered into agreements, that is, the McNair Agreement and Flanagan

---

[2] The Court notes, as discussed in detail *infra*, defendants assert that plaintiff cannot bring a claim under the McNair Agreement, because it was not an intended third-party beneficiary of that agreement. The Court finds it is not clear that a lack of capacity to sue under the McNair Agreement would necessarily prevent Windrock from maintaining a claim under the DTSA and TUTSA against McNair. And while defendants generally allege that, if plaintiff lacks capacity to sue under the McNair Agreement, plaintiff cannot maintain Counts 1 and 2 against McNair, defendants have provided no legal citations or analysis on whether a lack of capacity to sue under a contract would necessarily preclude a plaintiff from suing under the DTSA or TUTSA when plaintiff has alleged that an otherwise enforceable contract regarding the disclosure of the trade secrets at issue exists.

29

Agreement, respectively, in which they agreed not to disclose confidential information [Doc. 176 ¶¶ 49–57, 71–81]. Based on these allegations, plaintiff has set forth a plausible claim that McNair and Flanagan had a duty to maintain the secrecy and limit the use of the customer information, which the Court assumes, for purposes of this motion, constituted a trade secret. Moreover, plaintiff has set forth a plausible claim that McNair and Flanagan nonetheless used this information to contact Windrock's customers for the purpose of competing with Windrock. The Court will thus deny the motion to dismiss Counts 1 and 2 as to Flanagan and McNair.

However, while the Fourth Amended Complaint also alleges that Beam entered into an agreement not to disclose Windrock's confidential information [Doc. 176 ¶¶ 58–70], it provides no specific allegations regarding Beam's alleged use or disclosure of customer information. Accordingly, the Court cannot find that plaintiff has set forth a plausible claim that Beam misappropriated the purported trade secrets. Therefore, the Court will grant the motion to dismiss Windrock's TUTSA and DTSA claims as to Beam only.

For these reasons, defendants' motion is granted in part and denied in part as to Counts 1 and 2. Counts 1 and 2 will be dismissed as to Beam but will proceed as to all other defendants.

### 2. Counts 3 and 4 – Individual Liability for Procurement of a Breach of Contract

Similarly, defendants argue that Counts 3 and 4 should be dismissed as to Beam, Flanagan, McNair, and Kelley because they do not allege facts showing those individuals' liability [Doc. 184, p. 6]. Defendants state that these claims "utterly fail" to allege facts

30

showing how Beam, Flanagan or McNair procured the breach of either the Signet License Agreement or the Viper License Agreement [*Id.* at 7–8]. Furthermore, defendants contend that these counts ascribe actions taken on behalf of RSI, namely, the use of a copy of Windrock MD for RSI's benefit, to its agents and employees [*Id.* at 8]. But, defendants contend, plaintiffs have not set forth any allegations that would merit piercing the corporate veil [*Id.* at 8–9].

Plaintiff responds that the complaint includes allegations showing the roles each of these individuals played in procuring the breaches at issue [Doc. 191, p. 6]. Specifically, Windrock alleges that Flanagan allowed Kelley to access Viper's licensed copies of Windrock MD, knowing that Kelley's use of such was for RSI's internal use [*Id.* at 6–7]. Additionally, it alleges that Beam, Kelley, Flanagan, and McNair communicated on a regular basis in 2019 and 2020 and were working in concert at that time [*Id.* at 7]. The complaint also contains numerous allegations regarding Kelley's role in the development of RSI's source code and that Beam provided input to this process, leaving the reasonable inference that these defendants worked together to procure these breaches of contract. Plaintiff also notes that defendants have described their relationship at this time as a "joint venture" and all members of a joint venture can be held responsible for the actions of the others [*Id.*]. Moreover, plaintiff contends that defendants' piercing the corporate veil argument is inapplicable because Windrock alleges that the tortious conduct at issue began prior to RSI's formation and a corporation is not liable for torts committed by its promoters or incorporators before the corporation came into existence [*Id.* at 8].

31

Defendants reply that Windrock asserts for the first time that defendants were working as members of a joint venture, but improperly relies on matters outside the pleadings by incorporating a statement made in an opposition filing [Doc. 192, p. 5]. Plaintiff makes no allegation in the complaint that give rise to the inference that there was a joint venture for which any of the defendants took action, and indeed, the allegations, which must be taken as true, allege the opposite [*Id.* at 5–6]. Defendants note that plaintiff did not address the argument that the complaint lacks allegations sufficient to impose liability upon the individual defendants for actions taken on behalf of RSI [*Id.* at 6].

In Counts 3 and 4, Windrock alleges claims of statutory procurement of Signet's and Viper's breach of the License Agreement, respectively, against RSI, Flanagan, Beam, McNair, and Kelley [Doc. 176 ¶¶ 200–19].

### a.     Piercing the Corporate Veil

"The separate legal status given to a corporation 'protects its shareholders from direct responsibility for the corporation's debts and other liabilities, except in rare circumstances when a plaintiff is successful in persuading a court to disregard the separate corporate entity, also referred to as 'piercing the corporate veil.'" *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 436–37 (Tenn. Ct. App. 2008). "Piercing the corporate veil is an equitable doctrine applied in extreme circumstances to prevent the use of a corporate entity to defraud or perform illegal acts." *Id.* at 437. The party wishing to pierce the corporate veil bears the burden of establishing that it is entitled to this relief. *Id.*

32

The parties have cited no cases addressing whether the piercing-the-veil doctrine would apply in the case of pre-incorporation tortious conduct done for the benefit of the later-formed corporation. However, in addressing pre-incorporation contracts, courts have held that "the promoter of a proposed entity cannot bind that entity to an agreement before the entity itself exists to grant him the authority to do so." *Clinical Solutions, LLC v. Physicians Plan Rx, LLC*, No. 3:16-cv-196, 2016 WL 6249222, at *4 (M.D. Tenn. Oct. 26, 2016). Logically, it follows that a corporation would not be liable for the allegedly tortious pre-incorporation actions of its promoters, even if such allegedly tortious action was taken on the future corporation's behalf. This leads to the conclusion that, if the allegedly tortious actions were taken prior to RSI's formation, as plaintiff alleges, the Court need not pierce the corporate veil to find potential liability on behalf of the individual defendants.

The Court, however, does not find that the Fourth Amended Complaint adequately alleges that any of the defendants' allegedly tortious actions occurred prior to the formation of RSI. Plaintiff alleges that RSI was formed "[o]n or about March 25, 2020" [Doc. 176 ¶ 128]. The complaint does not provide specific dates for the entire time frame when Kelley is alleged to have used Signet and Viper's copies of Windrock MD, purportedly causing Signet and Viper to breach their respective License Agreements. However, by way of one example, plaintiff alleges that "in August 2020, Defendant Kelley emailed Defendant Clark . . . to request that either Defendant Flanagan or Defendant Clark send him data . . ." [*Id.* ¶¶ 146–47]. Moreover, plaintiff alleges that "[d]uring the period of time that Flanagan allowed Defendant Kelley to access Viper's copies of Windrock MD . . .

33

Viper was operating as a separate company from RSI" [*Id.* ¶ 152], implying that RSI had been formed as a separate company at this time.

Given that all of the specific allegations in the Fourth Amended Complaint regarding actions taken to purportedly induce or procure Signet and Viper's alleged breaches of the License Agreement appear, on the face of the complaint, to have occurred after the formation of RSI, the Court finds that plaintiff has not adequately established that the individual plaintiffs—Beam, Flanagan, McNair, and Kelley—may be held responsible for any allegedly tortious actions taken on behalf of RSI. The Fourth Amended Complaint contains no specific allegations regarding piercing the corporate veil, nor does it contain any allegations that would support the application of such equitable remedy in this case. Accordingly, the Court concludes that plaintiff has not pled a plausible claim for procurement of a breach of contract for which Beam, Flanagan, McNair, and Kelley could be held liable in their individual capacities. Counts 3 and 4 will therefore be dismissed as to Beam, Flanagan, McNair, and Kelley.

### b. Procurement

In the alternative, however, defendants also argue that the Fourth Amended Complaint does not contain enough factual allegations to adequately state a claim for relief as to Counts 3 and 4.

Section 47-50-109 of the Tennessee Code states:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failing to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the persons so procuring

34

or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109. The elements of a claim for statutory procurement of a breach of contract are: (1) a legal contract; (2) the wrongdoer had sufficient knowledge of the contract; (3) the wrongdoer intended to induce its breach; (4) the wrongdoer acted maliciously; (5) the contract was breached; (6) the alleged act was the proximate cause of the breach; and (7) damages resulted from that breach. *Baker v. Hooper*, 50 S.W.3d 4633,468 (Tenn. Ct. App. 2001). "A complaint for tortious interference with contract must do more than simply parrot the legal elements of the cause of action." *Lee v. State Volunteer Mut. Ins. Co.*, No. E200203127COAR3CV, 2005 WL 123492, at *10 (Tenn. Ct. App. Jan. 21, 2005).

Here, defendants' arguments largely center around the sixth element: whether their actions were the proximate cause of Signet and Viper's breaches of the License Agreement.

Windrock alleges that Kelley used copies of Windrock MD purchased by Signet and Viper to generate the files needed to decode and translate the binary format files generated by Windrock's portable analyzers and other products [Doc. 176 ¶¶ 201, 211]. But, when Signet and Viper installed Windrock MD, they were required to agree to the terms and conditions of the License Agreement [*Id.* ¶¶ 202, 212]. Windrock alleges that the License Agreement contains the following relevant provisions:

(1) "Customer accepts, a personal, non-transferable and non-exclusive license to use the licensed software programs (hereinafter referred to as licensed programs) subject to the following terms and conditions,"

35

(2)     "The licensed programs are supplied by Supplier solely for Customer's internal business purposes,"

(3)     "Neither the licensed programs nor this Agreement may be assigned, sublicensed or otherwise transferred by Customer without prior written consent from Supplier,"

(4)     "Customer shall not permit disclosure of any licensed program in any form, to any person other than Customer's or Suppliers [sic] employees without the prior written consent of Supplier,"

(5)     "Customer shall take all reasonable steps to safeguard the licensed programs so as to ensure that no unauthorized person shall have access to any of them," and

(6)     "Customer expressly acknowledges that the licensed programs are confidential and proprietary property of Supplier and hereby agree to receive and maintain same as a confidential disclosure"

[Doc. 176 ¶¶ 43–48; Doc. 176-1, p. 2].

Windrock alleges that, to create RSI's software, Kelley "relied on a 'properly licensed copy' of Windrock MD to decode and translate Windrock data files" [Doc. 176 ¶¶ 143–44]. Specifically, Kelley used "(1) a copy of Windrock MD software originally licensed to Signet but later unlawfully transferred to Viper in violation of the License Agreement," and "(2) a copy of the Windrock MD software purchased by Viper from a salvage dealer in violation of the License Agreement" [*Id.* ¶ 144]. Windrock specifically alleges that, in August 2020, Kelley emailed Clark about questions he had regarding a Windrock MD feature and requested that either Flanagan or Clark send him "data from a machine with daily offsets with descriptions of each day's offset, thereby allowing [him] to compare that information to the Windrock data file so he could see how the offsets were represented in the file [*Id.* ¶ 147]. Kelley also asked whether Clark could obtain a "spare"

36

Windrock MD license for Kelley to use in the future, and, in response, Clark set up a Signet computer with Windrock MD installed that he allowed Kelley to remotely access to use Signet's licensed copy of Windrock MD [*Id.* ¶¶ 148–49]. Moreover, Windrock alleges that Flanagan permitted Kelley to unlawfully access Viper's copies of Windrock MD, and Flanagan knew that Kelley's use of Viper's Windrock MD copies were for RSI's internal use rather than Viper's internal use [*Id.* ¶¶ 151–52].

Windrock generally alleges that Flanagan, Beam, McNair, Kelley, "and/or" RSI intentionally induced Signet and Viper to allow them to obtain and use Signet and Viper's copies of Windrock MD in violation of the License Agreement, for the purpose of benefitting RSI, and their actions were the proximate cause of Signet and Viper's breaches of the License Agreement [*Id.* ¶¶ 205–08, 215–18].

The reasonable inference from the allegations in the complaint is that Signet and Viper both breached the License Agreement by providing Kelley with access to copies of the Windrock MD software while he was working to create RSI's competing software, and, in the case of Signet, transferring a copy of Windrock MD to Viper without authorization. But the complaint provides little by way of allegation as to how exactly any individual defendant procured those breaches. Rather, plaintiff largely relies on its conclusory allegation that the defendants procured these breaches without more. But a formulaic and conclusory recitation of the elements of the claim of procurement of a breach of contract is insufficient to adequately plead a claim for relief. *See Iqbal*, 556 U.S. at 678.

The only specific factual allegations contained in the Fourth Amended Complaint relating to Counts 3 and 4 involve actions by Flanagan and Kelley. As to Kelley, the Court finds that the complaint adequately alleges that he took actions to procure Signet and/or Viper's breaches of the License Agreement.[3] As to Flanagan, however, the complaint merely alleges that, while employed at Viper, Flanagan allowed Kelley to access Viper's copy of Windrock MD [Doc. 176 ¶¶ 151–52]. But this allegation does not appear to support a theory that Flanagan *procured* Viper's breach of the License Agreement, but rather, that he was the Viper employee who actively breached the License Agreement. Accordingly, on this alternative ground, the Court finds that plaintiff has not alleged a plausible claim for relief as to Counts 3 and 4 against Beam, Flanagan, or McNair.

### 3. Count 7 – Flanagan Agreement

Next, defendants argue that Count 7 should be dismissed because it does not allege facts demonstrating that Flanagan breached his confidentiality obligations [Doc. 184, p. 9]. Specifically, defendants contend that plaintiff failed to (1) show that Flanagan used the "data points" and "calculations" he had access to or (2) allege that Flanagan utilized or disclosed any confidential information, including the "data points," "calculations," or customer information, in violation of the Flanagan Agreement. Instead, plaintiff "makes only the barest of conclusory allegations" [*Id.*].

---

[3] Notably, all of defendants' arguments in this regard appear limited to Beam, Flanagan, and McNair regardless.

38

Plaintiff responds that it specifically alleged that when disclosing and utilizing his knowledge of Windrock MD's confidential information "including, for example, data points and calculations," Flanagan breached his employment agreement [Doc. 191, p. 9]. It argues that the complaint alleges more than a reasonable inference that Flanagan shared Windrock's confidential information, including data points and calculations in Windrock MD, with Kelley while Kelley was creating RSI's Rmonix software [*Id.*]. Furthermore, plaintiff contends that the complaint plainly alleges that Flanagan utilized or disclosed its confidential customer information [*Id.* at 9–10].

Defendant replies that there is nothing in the complaint to demonstrate that either Windrock MD or Rmonix relies on or utilizes the knowledge of the data points and calculations Flanagan is alleged to have had access to and misappropriated [Doc. 192, p. 7]. Instead, the allegations regarding data points appear only in Paragraphs 55 and 235. Moreover, the allegation that Flanagan permitted Kelley to access copies of Windrock MD has no relation to the alleged use of customer information and there is no reasonable inference that permitting access to a copy of Windrock MD is somehow utilizing customer information. Defendant also contends that other paragraphs of the complaint Windrock relies on are either conclusory or simply do not show misappropriation of confidential information [*Id.*].[4]

---

[4] In a supplemental response, plaintiff alleges that defendants recently produced a document containing evidence regarding Flanagan that, if defendants had produced when initially requested, would have resulted in plaintiff including additional allegations in its complaint [Doc. 215, p. 2]. Defendants reply that the supplemental response fails to comply with this Court's local

39

In Count 7, the Fourth Amended Complaint alleges that Flanagan violated the Flanagan Agreement by (1) "disclosing and utilizing his intimate knowledge of Windrock MD's confidential information, including, for example, data points and calculations" and (2) "disclosing and utilizing his specific knowledge of Windrock's valuable and confidential customer information" [Doc. 176 ¶¶ 235–36].

The Court finds that Windrock has stated a claim for breach of contract against Flanagan that is plausible on its face. Windrock alleges that Paragraph 5(c) of the Flanagan Agreement prohibits the disclosure of "any knowledge or information of any type whatsoever of a confidential nature relating to the business of the Company or any of its subsidiaries or affiliates, including without limitation all types of trade secrets[.]" [*Id.* ¶ 50; Doc. 176-2 ¶ 5(c)].[5]

---

rules, because it does not allege developments occurring after the final brief, but rather, states facts that were already known to plaintiff [Doc. 221, p. 1].

Regardless of whether plaintiff's supplemental response complies with the Court's local rules, the Court finds that consideration of that response is not necessary to deny defendants' motion to dismiss as to Count 7. Accordingly, the Court will not opine on whether the supplemental response was properly filed.

[5] A review of the attached copy of the Flanagan Agreement confirms that Paragraph 5(c) states in full:

> <u>Confidentiality</u>. Employee agrees that he will not divulge to anyone (other than the Company or any persons employed or designated by the Company) any knowledge or information of any type whatsoever of a confidential nature relating to the business of the Company or any of its subsidiaries or affiliates, including without limitation all types of trade secrets (unless readily ascertainable from public or published information or trade sources). Employee further agrees not to at any time disclose, publish, or make use of any such knowledge or information of a confidential nature without the prior written consent of the Company.

[Doc. 176-2, p. 4].

40

Windrock alleges that Flanagan received confidential information regarding its customers and relationship with those customers, including the customers' specific product and service needs and requirements, including, specifically "who the key contacts were with Windrock's customers, what type of assets the customers used, how many of such assets the customers used, as well as the customers' procurement processes and buying habits" [Doc. 176 ¶¶ 52–53]. Windrock also alleges that Flanagan received confidential information regarding Windrock products, including its hardware and software, as well as its product development and marketing plans [*Id.* ¶ 54]. Specifically, Windrock alleges that Flanagan learned "the designs for Windrock's various portable analyzers, including both the 6320 and 6400 analyzers, as well as the various formulas, data points, and calculations used by Windrock MD when assessing the health of its customers' assets" [*Id.* ¶ 55].

As to Flanagan's specific actions regarding the use or disclosure of confidential customer information, Windrock alleges that, on April 2, 2020, Flanagan "attempted to reach a Windrock customer by telephone" [*Id.* ¶ 129]. Further, Windrock alleges that Flanagan supplied customer contact information to McNair for purposes of several emails in which McNair referenced that Flanagan had "suggested" McNair send the email to the recipient [*Id.* ¶ 163]. And, regarding use or disclosure of Windrock MD's source code, Windrock alleges that Flanagan disclosed Windrock's confidential information to assist Kelley in developing the ability of RSI's software to decode and translate Windrock data files by permitting Kelley to unlawfully access Viper's copies of Windrock MD [*Id.* ¶ 151].

41

Although the specific allegations regarding Flanagan's actions are somewhat limited, the Court finds that these allegations are specific enough to meet the *Twombly/Iqbal* standard and place Flanagan on notice of the claims against him both as to Windrock's claims regarding Windrock MD's source code, and Windrock's confidential customer information. As to Windrock's customer information, for all the reasons that the Court explained regarding Counts 1 and 2, the Court likewise finds that plaintiff has alleged a claim for breach of the Flanagan Agreement that is plausible on its face. And, while a closer call, regarding Windrock MD's source code, accepting the allegations in the Fourth Amended Complaint as true, and drawing all reasonable inferences, plaintiff has at least arguably pled a claim for breach of the Flanagan Agreement based on the use or disclosure of Windrock MD-related proprietary information. Accordingly, defendants' motion to dismiss will be denied as to Count 7.

### 4. Count 8 – Beam Agreement

Defendants argue that Count 8 should also be dismissed because it lacks facts demonstrating that Beam violated any obligation to Windrock [Doc. 184, p. 10]. Specifically, they argue that (1) this count does not allege misappropriation of any confidential information in violation of the Beam Agreement; (2) Paragraph 4 of the Beam Agreement only prevents Beam from performing service in Tennessee on "Asset Integrity Management hardware and software" during the 12-month non-compete period, which the complaint does not allege; and (3) Paragraph 10 of the Beam Agreement is unenforceable under Texas law [*Id.* at 11, 13].

42

In Count 8, the Fourth Amended Complaint generally alleges that Beam violated the Beam Agreement by (1) "disclosing and utilizing his knowledge of Windrock's confidential information, including business operations, product information, and customers" and (2) "disclosing and utilizing his specific knowledge of Windrock's valuable and confidential customer information" [Doc. 176 ¶¶ 241–42]. Additionally, Windrock alleges that Beam violated the Beam Agreement by conceiving of RSI and acting on that conception to make RSI a reality [*Id.* ¶¶ 243–44].

### a.   Misappropriation Allegations

First, defendants claim that Count 8 does not allege misappropriation of any confidential information beyond mere conclusory suggestions that wrongdoing took place [Doc. 184, p. 11]. Defendants note that no factual assertions are made regarding when, where, or to whom the alleged confidential information was disclosed or how Beam allegedly utilized the information, much less what specific information was utilized or disclosed [*Id.*].

Plaintiff responds that it alleges in detail the confidential information Beam received while employed by Windrock [Doc. 191, p. 10]. It also alleges that, in December 2018, Beam and Kelley communicated about creating a competing business that later became RSI. The reasonable inference from the complaint is that Beam utilized Windrock's confidential information while collaborating with Kelley to create Rmonix. It also alleges that Beam shared insights with Kelley, McNair, and Flanagan regarding the "look and feel" of Rmonix and designing it to have the features that Windrock's customers would expect

43

to see in the software [*Id.*].  Furthermore, plaintiff states that the complaint includes numerous allegations that Beam received confidential customer information and then improperly utilized it as a member of the joint venture that preceded the formation of RSI [*Id.* at 10–11].

Defendants reply that it does not argue that Windrock has not identified certain types of information as confidential or that Beam received that information, but rather, that it does not allege sufficient facts to show that Beam *misappropriated* the information [Doc. 192, p. 9 (emphasis in original)].  The allegations in the complaint only plead that Beam discussed opening a business (which does not constitute competition), worked with Kelley to develop RSI's software (without alleging that he used any confidential information in doing so), and discussed the presentation and features of Windrock's software (which Windrock does not claim as confidential information and which, because its software is user-facing, could not be confidential in any event) [*Id.*].  The complaint never alleges that Beam had knowledge of or access to Windrock MD's source code or inner workings but alleges only that he had "knowledge" of Windrock's products "including software," which does not reasonably support an inference that he had knowledge of Windrock MD's inner workings or source code so as to aid in the development of competing software [*Id.* at 10].  Therefore, it is not reasonable to infer that Beam's alleged collaboration with Kelley utilized any specific knowledge of source code or confidential information.  Furthermore, defendants contend that none of the allegations even suggest that Beam used confidential

customer information, other than the complaint's conclusory allegation that he "used confidential customer information" [*Id.*].

According to the complaint, Paragraph 3 of the Beam Agreement prohibits the disclosure of confidential information [Doc. 176 ¶¶ 59, 65]. A review of the copy of the Beam Agreement attached to the Fourth Amended Complaint confirms that Paragraph 3 states:

<u>Non-Disclosure of Confidential Information</u>.

Employee recognizes that Employer has made significant investments of time and resources in establishing substantial relationships with its existing and prospective clients and developing Employer's reputation and goodwill. Employee further recognizes that the protection of Employer's proprietary business information, trade secrets, and other Confidential Information (defined below) is of value to Employer and vital to Employer's interests and success and worthy of the protection provided by Employee in his/her promises made in this Agreement. In exchange for Employee's promises made in this Agreement, Employer has provided and will continue to: (a) provide Employee access to Confidential Information relating to Employer's business, clients, and prospects, as may be relevant to Employee's position with the company and (b) make available to Employee the benefit of Employer's client and other business relationships, as well as their support, training, goodwill, and reputation within their industry. Employee acknowledges that all Confidential Information is confidential, proprietary, not known outside of Employer's business, valuable, special and/or a unique asset of Employer which belongs to Employer. Employee further acknowledges that if this Confidential Information were disclosed to third parties or used by third parties and/or Employee, such disclosure or use would seriously and irreparably damage Employer and cause the loss of certain competitive advantages. In exchange of Employer's promises made in this Agreement, Employee covenants and agrees that Employee will not, during employment with Employer and at any time after termination of Employee's employment with Employer, for any reason, directly or indirectly, in any form or manner, divulge, disclose, or communicate to any person, entity, firm, corporation or any other third party, any Confidential Information, except as required in the performance of Employee's duties for Employer. In exchange for Employer's promise to provide Employee with

45

Confidential Information, Employee covenants and agrees that he/she will only access, disclose, transmit, use, store, and/or dispose of Confidential Information for appropriate business purposes for the benefit of Employer, and never for the benefit of Employee or any other person or entity or any other inappropriate purpose.

[Doc. 176-3, p. 3].

The complaint alleges that Beam received confidential information regarding Windrock's customers and relationship with those customers, including the customers' specific product and service needs and requirements, including, specifically "who the key contacts were with Windrock's customers, what type of assets the customers used, how many of such assets the customers used, as well as the customers' procurement processes and buying habits" [Doc. 176 ¶¶ 61–62]. Windrock also alleges that Beam received confidential information regarding Windrock products, including its hardware and software, as well as its product development and marketing plans [*Id.* ¶ 63]. Specifically, Windrock alleges that Beam learned "the designs for Windrock's various portable analyzers, including both the 6320 and 6400 analyzers, as well as the various formulas and calculations used by Windrock MD when assessing the health of customers' assets" [*Id.* ¶ 64].

As to Beam's use or disclosure of confidential information, Windrock alleges that in December 2018, Beam emailed Kelley and informed him that Beam was thinking about developing a new portable analyzer to compete with Windrock [*Id.* ¶¶ 117–18]. Beam allegedly asked Kelley to think about how to develop competing software without investing as much effort as Windrock has invested in Windrock MD [*Id.* ¶ 119]. Kelley then began

46

developing the source code for Rmonix "[i]n collaboration with Defendant Beam" through 2019 and into 2020 [*Id.* ¶ 124]. Windrock also alleges that throughout 2019 and 2020, Beam communicated with Kelley, Flanagan, and McNair regularly to advance the plans to form a company to compete with Windrock, and on March 25, 2020, Beam and McNair formed RSI [*Id.* ¶¶ 127–28]. Windrock further alleges that, in a November 2019 email, Beam "shared his thoughts on the 'look and feel' of the new software and suggested that Rmonix display information in a 'tree view' because that was how Windrock MD displays information to its users" [*Id.* ¶ 153].

The parties appear to agree, at least for purposes of this motion to dismiss, that plaintiff has adequately alleged that Paragraph 3 of the Beam Agreement (1) prohibited the use or disclosure of confidential information, and (2) Beam learned confidential information in the course of his employment with Windrock. The question before ethe Court at present, then, is whether plaintiff has adequately alleged that Beam used or disclosed such confidential information in violation of Paragraph 3 of the Beam Agreement.

As to confidential customer information, as the Court explained with regard to Counts 1 and 2, plaintiff has not alleged any actions Beam took that would constitute the use or disclosure of any confidential customer information. Therefore, to the extent that plaintiff seeks to rely on any alleged use or disclosure of customer information to support this claim, the Court finds that plaintiff has not stated a plausible claim for relief.

47

As to confidential information regarding Windrock products and software, there are only two allegations in the complaint regarding Beam's actions: (1) that Kelley's development of the source code for Rmonix was done "in collaboration with" Beam [Doc. 176 ¶ 124]; and (2) Beam shared his thoughts on the "look and feel" of Rmonix as compared to Windrock MD during its development [*Id.* ¶ 153]. But neither of these allegations are sufficient to state a plausible claim that Beam used or disclosed confidential information. First, the allegation that Kelley's development of Rmonix was done "in collaboration with" Beam says nothing about what actions Beam took in the development of Rmonix. And this allegation is simply too vague and conclusory for the Court to reasonably infer that Beam used any confidential information about Windrock's products or software when "collaborating" with Kelley. Moreover, as to sharing his thoughts on the "look and feel" of Rmonix, Windrock does not specifically allege that the "look and feel" of the Windrock MD software is confidential, nor could is plausibly allege such, as any person who purchased and used a copy of Windrock MD would be familiar with the "look and feel" of that software, and could theoretically attempt to replicate that "look and feel" to compete with Windrock. *See Confidential Information*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "confidential information" as "[k]nowledge or facts not in the public domain").

Accordingly, the Court finds that plaintiff has not stated a plausible claim for breach of the Beam Agreement under Paragraph 3 of that agreement, and therefore, defendants'

motion to dismiss will be granted to the extent that this portion of Count 8 will be dismissed.

### b. Paragraph 4 Restrictions

Second, defendants argue that Paragraph 4 of the Beam Agreement only prevented Beam from performing service in Tennessee on "Asset Integrity Management hardware and software" during the 12-month non-compete period [Doc. 184, p. 11]. Specifically, they state that the final sentence of subpart three of this paragraph delineates that the restrictions contained therein only apply within the "Territory" which is defined as "servicing any location in Tennessee" [*Id.* at 12]. However, the complaint does not allege any facts that Beam involved himself with a "Competing Product" or conducted competition within the "Territory," and instead, makes generalized statements that do not constitute true competition. Moreover, it does not even attempt to plead how Beam serviced a location in Tennessee during the non-compete period [*Id.*]. Furthermore, Paragraph 4 limits its prohibition on promoting or marketing "Competing Products" to those products "related in any way to Asset Integrity Management hardware and software," which is not defined [*Id.* at 13]. But the complaint does not allege any facts that could reasonably be inferred to demonstrate that Beam's alleged wrongful conduct was in any way in connection with "Asset Integrity Management hardware and software" [*Id.*].

Plaintiff responds that the alleged conduct of collaborating to develop the source code for RSI's competing software absolutely involves a product, process, or service related to "Asset Integrity Management hardware and software" [Doc. 191, p. 12].

49

Moreover, plaintiff argues it is disingenuous for defendant to argue otherwise given that Beam admitted in an email that this restriction applied to his work for RSI [*Id.* (citing Doc. 176 ¶ 125 (recounting an email from Beam stating that "[u]ntil yesterday, I needed to keep a low profile because of my noncompete . . . ."))].  Plaintiff further argues that defendants are "twist[ing] the words of the definition of "Territory" in the agreement to mean that the noncompetition restriction only applies to "servicing" customers.  Plaintiff argues this is a "tortured reading" of the definition, and contends that, at best, the restriction limits the noncompetition provision to competition occurring in Tennessee [*Id.*].

Defendants reply that plaintiff has not explained how the Court can reasonably infer the definition of "Asset Integrity Management software and hardware" or pointed to allegations wherein Beam promoted or marketed such products [Doc. 192, p. 11].  Given the lack of contractual definition of this term and the lack of allegations in the complaint about what was meant by this term, the Beam Agreement is ambiguous, and such ambiguity should be construed strictly against the drafter [*Id.*].  By extension, it is ambiguous whether this definition would encompass RSI's products, or the work Beam performed to help develop those products [*Id.* at 11–12].  Further, defendants argue that accepting plaintiff's construction of the definition of "Territory" in the agreement requires the Court to either delete or ignore the word "servicing" from the definition [*Id.* at 12].  An ordinary reading of the phrase "servicing any location in Tennessee" renders the commonsense interpretation that this phrase is not only a geographic limitation but also limits its scope to the activity of "servicing" [*Id.*].  And the complaint does not allege that Beam serviced any

50

location at all, much less in Tennessee [*Id.*]. Moreover, the complaint does not contain any allegations as to where Windrock's customers, and therefore any actual service locations, are located [*Id.* at 13].

The complaint alleges that Paragraph 4 of the Beam Agreement stated that, for a period of one year after the termination of his employment, Beam would not work on "Competing Products" or any project in which confidential information obtained at Windrock was likely to be used or disclosed [Doc. 176 ¶ 67]. A copy of the Beam Agreement attached to the Fourth Amended Complaint shows that Paragraph 4 of the Beam Agreement states:

Covenant Not to Compete

You shall not during, or for a period of one (1) year after your termination of employment with the Company, in any form or manner, directly or indirectly, on his/her behalf or in combination with others, (as an individual, partner, stockholder, director, officer, principal, agent, independent contractor, employee, trustee, lender of money or in any other relation or capacity whatsoever . . . ),

(1) engage in any activity, directly or indirectly, that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products;

(2) engage in any activity, directly or indirectly, the performance of which any Confidential Information obtained is likely to be used or disclosed, notwithstanding your undertaking to the contrary; or

(3) promote or market, directly or indirectly, any Competing Products to any Company customer, or solicit, directly or indirectly, any Company customers for purpose of selling any Competing Products in any geographic area in which the Company rendered or sold services or products during such twelve (12) month period. Notwithstanding the foregoing, the restrictions in this Paragraph shall

51

only restrict Employee's activities during the Post-Employment Restrictive Period within the Territory. *"Territory" means servicing any location in Tennessee.*

[Doc. 176-3, p. 4 (emphasis added)]. Paragraph 4 goes on to define "Competing Products" as:

"[A]ny product, process, or service that has the same or similar purpose or use as a product, process or service researched, discovered, developed, manufactured, imported, marketed, sold, offered for sale or used by the Company which is related in any way to **Asset Integrity Management hardware and software** with the Company.

[*Id.* (emphasis in original)].

"When a contract is unambiguous, a court may determine the interpretation on a motion to dismiss as a matter of law, but when a contract is ambiguous, a court should not interpret the contract at the motion to dismiss stage." *Nashville Underground, LLC v. AMCO Insurance Co.*, 523 F. Supp. 3d 1006, 1011 (M.D. Tenn. 2021) (collecting cases); *see also Ajuba Int'l, LLC v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) ("A court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss under Rule 12(b)(6)").

Under Texas law,[6] "[a] contract is ambiguous when its meaning is uncertain and doubtful or is reasonable susceptible to more than one interpretation." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 874 (Tex. 2018). In construing a contract, a court must "give terms their plain, ordinary, and generally accepted meaning unless the instrument

---

[6] The Beam Agreement states that it "will be interpreted and governed [sic] the laws of Texas" [Doc. 176-3, p. 6]. The parties do not appear to dispute that Texas law applies to interpreting this contract. The Court will thus apply Texas law.

52

shows that the parties used them in a technical or different sense." *Id.* But if a contract is subject "to two or more reasonable interpretations after applying the pertinent rules of construction" it is ambiguous "creating a fact issue on the parties' intent." *Id.*

Defendants' motion presents two contract terms, the interpretation of which is necessary to the outcome of their motion to dismiss this claim: (1) "Territory," defined as "servicing any location in Tennessee"; and (2) "Competing Products," defined as products "related in any way to Asset Integrity Management hardware and software" [Doc. 176-3, p. 4].

As to the contractual term "Asset Integrity Management hardware and software," defendants admit that this term is ambiguous in the Beam Agreement, and therefore, it is ambiguous whether the definition would encompass RSI's products or the work Beam performed to help develop those products [Doc. 192, pp. 11–12]. The Court will accept defendants' concession that this term is ambiguous at this stage.

Moreover, as to the definition of the term "Territory" as "servicing any location in Tennessee," the Court also finds that this term is ambiguous. Although the terms of the contract define "Territory" as "servicing any location in Tennessee," the sentence immediately before that definition states that "the restrictions in this Paragraph shall only restrict Employee's activities during the Post-Employment Restrictive Period within the Territory" [Doc. 176-3, p. 4]. In context, this sentence seems to indicate that the term "Territory" is only meant to limit the geographical location where "Employee's activities" are restricted. However, read alone, the definition of "Territory" seems to limit both the

geographical location of the restriction on "Employee's activities," as well as the scope of "Employee's activities[.]" But this reading of the term "Territory" appears inconsistent with the remainder of Paragraph 4 of the Beam Agreement, which sets forth much broader restricted activities than merely "servicing" [*See id.*]. Accordingly, the Court finds that the meaning of the term "Territory" in the Beam Agreement is "uncertain and doubtful" and therefore, is ambiguous under Texas law. *See Koopmann*, 547 S.W.3d at 874.

Because the Court finds that both of the relevant terms in the Beam Agreement are ambiguous, the Court finds it inappropriate to engage in a contract interpretation analysis at the Rule 12(b)(6) stage, *see Nashville Underground*, 523 F. Supp. 3d at 1011, and therefore, plaintiff's claim for breach of Paragraph 4 of the Beam Agreement will proceed at this juncture.

### c. Paragraph 10 Enforceability

Defendants further argue that, under Texas law, which controls the Beam Agreement, Paragraph 10 of that Agreement is unenforceable [Doc. 184, p. 13]. Specifically, defendants contend that Texas courts have determined that if the limitations on any one of the elements of time, geographic area, or scope of the activity are absent or unreasonable, the covenant not to compete is unenforceable [*Id.*]. Although, under Texas law, if a noncompete does not meet this standard, a court is required to reform it, a plaintiff employer is nonetheless precluded from recovering damages for breach of such provision [*Id.* at 14]. By the complaint's own allegations, Paragraph 10 of the Beam Agreement does not contain a durational limit. It also contains no geographic limitation. Therefore,

defendants say, it is unenforceable. And, even if the Court were to reform Paragraph 10 to insert a durational period, defendants submit that the claim still fails because plaintiff would not be entitled to damages [*Id.*].

Plaintiff responds that Paragraph 10 of the Beam Agreement is not a noncompete clause, but rather, a non-disparagement clause, and the Texas law cited by defendants is therefore inapplicable [Doc. 191, pp. 12–13].

Defendants reply that it appears Windrock has conceded that Paragraph 10 does not support its claims in the complaint [Doc. 192, p. 13].

The complaint alleges that, in Paragraph 10 of the Beam Agreement, Beam agreed that he would not "engage in any activities that reasonably could be anticipated to harm" Windrock's "reputation, operations, or relationships with current or prospective customers, suppliers or employees" [Doc. 176 ¶ 69]. The copy of the Beam Agreement, attached to the Fourth Amended Complaint, confirms that Paragraph 10 of that agreement states:

> You agree to make every effort to maintain and protect the reputation of the Company, its parents and each of their subsidiaries and affiliates and that of their businesses, products, directors, officers, employees, and agents. You further agree that you will not disparage the Company, its parents or any of their subsidiaries and affiliates or their businesses, products, directors, officers, employees, and agents (or persons representing them in their official capacity) or engage in any activities that reasonably could be anticipated to harm their reputation, operations, or relationships with current or prospective customers, suppliers or employees.

[Doc. 176-3, p. 5].

Nothing in the complaint indicates that plaintiff is proceeding on a claim under Paragraph 10 of the Beam Agreement. The only mention of Paragraph 10 of the Beam

55

Agreement in the complaint is contained in Paragraphs 69 and 70 of that document [Doc. 176 ¶¶ 69–70]. And those paragraphs simply quote from Paragraph 10 of the Beam Agreement and state that it "does not contain a durational limit" [*Id.*]. Moreover, in the section specifically addressing Count 8, plaintiff only sets forth allegations that Beam breached the agreement by utilizing and disclosing confidential information and collaborating to create RSI and develop Rmonix to compete with Windrock [*Id.* ¶¶ 238–46]. Although plaintiff does not cite to specific paragraphs of the Beam Agreement in setting forth its allegations under Count 8, it appears that these allegations only relate to Paragraphs 3 and 4 of the Beam Agreement, discussed *supra*. Accordingly, the Court finds that the Fourth Amended Complaint contains no claim for breach of Paragraph 10 of the Beam Agreement, and therefore, it is unnecessary for the Court to determine whether that contract provision is enforceable.[7]

### 5. Count 9 – Capacity to Enforce McNair Agreement

Defendants argue that plaintiff has not alleged sufficient facts to show it has standing to enforce the McNair Agreement for purposes of Count 9 [Doc. 184, p. 15]. Instead, plaintiff's only factual allegations in support of its standing are that the McNair Agreement contains restrictions that apply to "Cook Compression, its parents, subsidiaries, or affiliated companies" and that Windrock was a "subordinate" entity at the time the

---

[7] To the extent that plaintiff does seek to raise a claim for disparagement in violation of Paragraph 10 of the Beam Agreement, the Court would find that plaintiff has not alleged any actions by Beam that could be reasonably inferred to have damaged plaintiff's reputation, and therefore, the Court would find that plaintiff has not adequately stated a claim for relief that is plausible on its face under Paragraph 10.

56

agreement was signed. However, defendants contend that an examination of the McNair agreement demonstrates Windrock's claim regarding its standing is contradicted by the agreement's text [*Id.*]. Defendants argue that plaintiff is not a party to the McNair Agreement and the agreement's language is not crafted to protect Windrock from the conduct alleged in Count 9 [*Id.* at 15–16]. Under Texas law, a presumption applies that the parties intended to contract solely for themselves unless the agreement contains a "clear expression" of the intent to create a third-party beneficiary [*Id.* at 16 (citing *Gonzalez v. Mission American Ins. Co.*, 795 S.W.2d 734 (Tex. 1990))]. Defendants contend that the sections of the McNair Agreement relevant to Count 9 lack any mention of Cook Compression's parents, subsidiaries, or affiliates and limit McNair's obligations to Cook Compression or the "Employer," which is, again, Cook Compression [*Id.* at 17]. While Windrock correctly notes that the McNair Agreement makes reference to Cook Compression's affiliates, this reference, in Section 4 of the agreement, only applies in the context of non-solicitation of employees and is inapplicable to the matter alleged in Count 9 [*Id.*].

Plaintiff responds that the complaint contains sufficient allegations that Windrock is a third-party beneficiary of the McNair Agreement [Doc. 191, p. 13]. It alleges that Windrock was subordinate to Cook Compression and the McNair Agreement contains restrictions that apply to Cook Compression, its parents, subsidiaries, or affiliated companies. Moreover, it alleged that McNair at all times worked for Windrock, which is sufficient to show that the contracting parties intended the agreement to benefit Windrock

57

as an "affiliated company" of Cook Compression. Plaintiff states that defendants have cited no authority to support its contention that the term "affiliated companies" must appear in each paragraph of the agreement that Windrock seeks to enforce [*Id.*].

Defendants reply that plaintiff's allegation that all terms of the McNair Agreement apply to Cook Compression's "parents, subsidiaries, or affiliated companies" does not override the text of the document attached to the complaint [Doc. 192, p. 14]. And, per defendants, under Texas law, courts presume against third-party beneficiary agreements in the absence of a clear unequivocal expression of intent to directly benefit a third party [*Id.*]. At minimum, defendants contend that there is doubt as to whether Windrock is an intended third-party beneficiary of the agreement, and such doubt must be resolved against conferring third-party beneficiary status under Texas law [*Id.*].

In the Fourth Amended Complaint, Windrock alleges that McNair entered into the McNair Agreement with "Cook Compression, a Dover Company, and its successors and assigns" [Doc. 176 ¶ 71; Doc. 176-4, p. 2]. The McNair Agreement prohibits the disclosure of confidential information [Doc. 176 ¶¶ 74, 80; Doc. 176-4 ¶ 1]. Windrock contends that, as of November 3, 2015, the date McNair entered into the McNair Agreement, Windrock was subordinate to Cook Compression within their parent company's corporate structure, and therefore, according to plaintiff, the relevant restrictions in the McNair Agreement were intended to protect Windrock as well as Cook Compression [Doc. 176 ¶¶ 33–34, 71–72, 249–50].

58

As the Court previously explained [*see* Doc. 27, p. 13], a challenge to whether a party is entitled to sue on a contract is a challenge to plaintiff's capacity, rather than standing, to maintain the breach of contract action. *See Transcon. Realty Invs., Inc. v. Wicks*, 442 S.W.3d 676, 679 (Tex. App. 2014) ("Whether a party is entitled to sue on a contract 'is not truly a standing issue because it does not affect . . . jurisdiction[.]'"). A plaintiff has capacity to maintain a breach of contract action only if it has contractual privity or is a third-party beneficiary to the contract. *John C. Flood of DC, Inc. v. Supermedia L.L.C.*, 408 S.W.3d 645, 651 (Tex. App. 2013).

On its face, the McNair Agreement states that it "shall be construed, and its enforceability and the relationship of the parties shall be determined, in all respects under the laws of Texas without regard to principals [sic] of conflicts of laws" [Doc. 176-4, p. 4]. The parties do not appear to dispute that Texas law controls whether plaintiff has capacity to sue under the McNair Agreement, and the Court will therefore apply Texas law.

To have capacity to sue under the McNair Agreement, plaintiff must "demonstrate that the contracting parties intended to secure a benefit to" Windrock and "entered into the contract directly for" Windrock's benefit. *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (internal quotation marks omitted). "It is not enough that the third party would benefit—whether directly or indirectly—from the parties' performance, or that the parties knew that the third party would benefit. Nor does it matter that the third party intended or expected to benefit from the contract . . . ." *Id.* (citations omitted).

59

In determining whether the parties intended to create a third-party beneficiary "courts must look solely to the contract's language, construed as a whole." *Id.* "The contract must include 'a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party,' and any implied intent to create a third-party beneficiary is insufficient." *Id.* at 103 (quoting *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). Courts must begin with the presumption that the parties contracted solely to benefit themselves and only a clear expression of the intent to create a third-party beneficiary can overcome this presumption. *Id.* (citing *Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 503–04 (Tex. 1975)). The "controlling factor" in this determination "is the absence of any sufficiently clear and unequivocal language demonstrating the necessary intent." *Id.* (quoting *Tawes*, 340 S.W.3d at 428) (internal quotation marks omitted).

The McNair Agreement is a contract between McNair and Cook Compression, rather than Windrock [Doc. 176-4]. In the introductory paragraph, the McNair Agreement defines "Employer" as "Cook Compression, A Dover Company, and *its successors and assigns*" [*Id.* at 2 (emphasis added)]. The Agreement goes on to say:

> 1.    Non-Disclosure of Confidential Information.
> Employee will not during, or after termination of, Employee's employment by Employer, in any form or manner, directly or indirectly, divulge, disclose or communicate to any person, entity, firm, corporation or any other third party, or utilize for Employee's personal benefit or for the benefit of any competitor of Employer, any Confidential Information.
>
> . . .
>
> 3.    Covenant Not to Compete
> Employee shall not during, or for a period of one (1) year after termination of Employee's employment with Employer, in any form or manner, directly

60

or indirectly, on his/her behalf or in combination with others . . . (1) engage in any activity, directly or indirectly, that contributes to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of one or more Competing Products; (2) engage in any activity, directly or indirectly, the performance of which any Confidential Information obtained is likely to be used or disclosed . . . ; or (3) promote or market, directly or indirectly, and Competing Products to any Cook Compression customer, or solicit, directly or indirectly, any Cook Compression customers for purpose of selling any Competing Products . . . .

       4.    <u>Non-Solicitation of Employees</u>

Employee agrees that during the term of this Agreement, and for a period of twenty-four (24) consecutive months after termination of such employment for any reason, he/she shall not, except in the course of his/her duties on behalf of Cook Compression, directly or indirectly induce or attempt to induce or otherwise counsel, advise, solicit or encourage any employee of *Cook Compression, its parents, subsidiaries or affiliated companies* to leave the employ of *Cook Compression, its parents, subsidiaries, or affiliated companies*, or to accept employment with any other person or entity.

[*Id.* at 2–3 (emphasis added)].

On its face, the McNair Agreement appears to intend all restrictions to apply as to Cook Compression "its successors and assigns," but intends the restrictions in Paragraph 4 to include the broader group of "Cook Compression, its parents, subsidiaries or affiliated companies" [*Id.* at 2–3]. "Successor" is defined in relevant part as "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Successor*, BLACK'S LAW DICTIONARY (11th ed. 2019). An "assignee," which is "[a]lso termed assign" is defined as "[s]omeone to whom property rights or powers are transferred by another." *Assignee*, BLACK'S LAW DICTIONARY (11th ed. 2019). Meanwhile, a "subsidiary corporation" is defined as "[a] corporation in which a parent corporation has a controlling share." *Corporation*, BLACK'S

61

LAW DICTIONARY (11th ed. 2019). Plaintiff only alleges that it was a "subordinate" to Cook Compression at the time of the McNair Agreement [Doc. 176 ¶¶ 34, 72]. Accordingly, it appears that plaintiff only alleges that it was a "subsidiary" or "affiliate" of Cook Compression, but not a "successor" or "assign."

However, the term "subsidiary or affiliate" is only contained in Paragraph 4, relating to the non-solicitation of employees, which is not at issue in Count 9. Plaintiff appears to contend that, because the language regarding "subsidiaries or affiliated companies" is contained in Paragraph 4, the entire contract should be construed as for the benefit of Cook Compression's "subsidiaries or affiliated companies." But under the canon of presumption of consistent usage, "[a] word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170, (1st ed. 2012); *see Perthuis v. Baylor Miraca Genetics Laboratories, LLC*, 645 S.W.3d 228, 236 (Tex. 2022) (noting that the "presumption[] favoring consistent usage" is one of the usual rules of contract construction). Applying this canon, the parties' use of "Cook Compression, A Dover Company, and its successors and assigns" to define "Employer," which is then used throughout the contract as to the restrictions imposed, and the later use of "Cook Compression, its parents, subsidiaries, or affiliated companies" presumptively have different meanings, and intentionally encompass different groups.

Moreover, the scope-of-subparts canon indicates that "[m]aterial within an indented subpart relates only to that subpart; material contained in unindented text relates to all the

62

following or preceding indented subparts." Scalia & Garner, *supra*, at 156. Applying this canon, it appears that the phrase "Cook Compression, its parents, subsidiaries, or affiliated companies" only applies to the restrictions in Paragraph 4, while the definition of "Employer as "Cook Compression . . . its successors and assigns" in the introductory portion of the contract applies to all restrictions contained in the contract.

Ultimately, the Court cannot find that the inclusion of "subsidiaries or affiliated companies" in Paragraph 4 only expresses the "clear intent" that Windrock be a third-party beneficiary of all portions of the McNair Agreement, as is necessary to find Windrock is a third-party beneficiary under Texas law. *See Brumitt*, 519 S.W.3d at 102. Because the McNair Agreement lacks an expression of clear intent to make Windrock a third-party beneficiary of the agreement, the Court is thus bound to conclude that Windrock is not a third-party beneficiary, and therefore, lacks capacity to sue for a breach of the Agreement. *See John C. Flood of DC*, 408 S.W.3d at 651. Defendants' motion to dismiss will therefore be granted as to Count 9, and this claim will be dismissed.

### 6. Count 12 – Preemption by Copyright Act

Defendants contend that Count 12, alleging Viper's breach of the License Agreement, is preempted by the Copyright Act [Doc. 184, p. 18]. Applying the test set forth in *Wrench v. Taco Bell Corporation*, 256 F.3d 446 (6th Cir. 2001), defendants contend that Windrock alleges Windrock MD is "industry leading, propriety software" and copyright protects software, whether reduced to its source code or binary code, and therefore, the subject matter of this cause of action is within the subject matter of copyright

63

[*Id.* at 19].  Further, defendants argue that plaintiff's complaint does not set forth any extra element, but only alleges that Windrock MD was improperly distributed or reproduced [*Id.* at 20].  Defendants also argue that the mere existence of a contract between the parties, and the elements of proving a contract, are not sufficient to automatically defeat preemption.  And the only promise referenced in the License Agreement is the promise not to distribute to non-employees, which is not an "extra element" [*Id.* (citing *Wrench*, 256 F.3d 446)].  Thus, defendants contend that Windrock has not alleged an "extra element" under the second prong of the *Wrench* test, and the cause of action is therefore preempted by the Copyright Act [*Id.*].

Plaintiff responds that some of the promises and restrictions set forth in the License Agreement are detailed in Paragraphs 43 to 48 of the complaint, and these allegations and restrictions exceed what is required by the Copyright Act [Doc. 191, p. 15].  Specifically, plaintiff contends that the breach of license agreement claim is not preempted by the Copyright Act because that Act (1) does not require the involved parties to have entered into an enforceable contract; (2) contains no express limitation/restriction concerning use for "internal business purposes"; (3) contains no express limitation/restriction concerning obtaining prior written consent before disclosing or allowing third parties to use the licensed software; and (4) does not require parties to "take all reasonable steps to safeguard the licensed programs so as to ensure that no unauthorized person shall have access to any of them" [*Id.* at 16].  Rather, these are all "extra elements" that exceed the Copyright Act [*Id.*].  Plaintiff alleges that other courts have found that analogous breach of contract claims

64

are not preempted by the Copyright Act, citing several out-of-circuit district court cases [*Id.* at 17]. Finally, plaintiff argues that regardless of whether its breach of contract claim survives, defendants will likely later argue that their misuses of Windrock MD under the License Agreement did not constitute distribution and/or implicate one of the exclusive rights set forth in the Copyright Act [*Id.* at 18].

Defendants reply that Windrock does not dispute that the work is within the scope of the subject matter of copyright, so the first preemption element is established [Doc. 192, p.16]. And, as to the second element, defendants argue that if a promise between the parties only relates to "reproducing, performing, distributing, or displaying the work" the claim is still preempted. The response states that the additional elements are a limitation on Viper's use of the software, a limitation on "disclosures" of the software, and a duty to prevent access to the software, all of which are promises either to not distribute the software to another party or display the software to another party, and therefore, fall within the language of *Wrench* regarding contracts the Copyright Act preempts [*Id.*].

Under Section 301 of the Copyright Act:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). The Sixth Circuit has summarized this statute as preempting a state common law or statutory claim if: "(1) the work is within the scope of the 'subject matter

65

of copyright,' as specified in 17 U.S.C. § 102, 103" known as the "subject matter requirement"; and "(2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106" known as the "equivalency" requirement. *Wrench*, 256 F.3d at 453.

At issue here is the equivalency requirement. The equivalency requirement asks "whether the state common law or statutory action at issue asserts rights that are the same as those protected under § 106 of the Copyright Act." *Id.* at 455. The Sixth Circuit explained:

> Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

*Id.* at 456 (citations omitted).

In *Wrench*, the Sixth Circuit found that a state law contract claim was not preempted by the Copyright Act because the claim was based upon a promise to pay for the use of the work. *Id.* at 456–57. However, the court explicitly stated that it "d[id] not embrace the proposition that all state law contract claims survive preemption simply because they involve the additional element of promise." *Id.* at 457. Instead, "[i]f the promise amounts only to a promise to refrain from reproducing, performing, distributing, or displaying the work, then the contract claim is preempted." *Id.*

66

The Eastern District of Michigan has held that a breach of contract claim, although "very similar to the elements of a copyright claim" was not preempted by the Copyright Act because it "require[d] the existence of a valid contract, which a copyright claim does not." *Ross, Brovins & Oehmke, P.C. v. Lexis/Nexis*, 348 F. Supp. 2d 845, 862 (E.D. Mich. 2004). Similarly, the Sixth Circuit held that mixed tort and breach of contract claims were not preempted by the Copyright Act because, to prevail on those claims, the plaintiff was required to "prove the formation and breach of an enforceable written contract which she would not be obligated to prove if these claims were merely for copyright infringement under § 106." *Lynn v. Sure-Fire Music Co., Inc.*, 237 F. App'x 49, 54 (6th Cir. 2007).

"The 'majority of courts have found that breach of contract claims are not preempted because the rights asserted in those claims were not equivalent to rights that could have been asserted in copyright.'" *Health Indus. Bus. Commc'ns Council Inc., v. Animal Health Inst.*, 481 F. Supp. 3d 941, 957 (D. Arizona 2020) (quoting *Chesler/Perlmutter Prods., Inc. v. Fireworks Ent., Inc.*, 177 F. Supp. 2d 1050, 1058 (C.D. Cal. 2001)); *see also Rumble, Inc. v. Daily Mail and General Trust PLC*, 459 F. Supp. 3d 1294, 1299 (C.D. Cal. 2020) ("Contract claims generally survive copyright preemption because they require proof of an extra element." (alterations omitted) (quoting *Montz v. Pilgrim Films & TV, Inc.*, 649 F.3d 975, 980 (9th Cir. 2011)); *Open Text Corp. v. SAS C6*, No. 1:18-cv-11697, 2020 WL 65091, at *2 (D. Mass. Jan. 7, 2020) (noting that "the Federal Circuit has held that the Copyright Act does not preempt a state-law contract claim that restrains copying" and "[o]ther circuits

67

have similarly found that a contract claim is not preempted by the Copyright Act")
(collecting cases).

Here, the Court finds that plaintiff's claim against Viper for breach of the License
Agreement is not preempted by the Copyright Act, because the breach of contract claim
contains "extra elements" that exceed the Copyright Act. First, the elements of plaintiff's
breach of contract claim against Viper in Count 12 exceed the elements required under a
Copyright Act claim, because plaintiff must prove the existence of an enforceable written
contract between the parties. *See Ross, Brovins & Oehmke*, 349 F. Supp. 2d at 862; *Lynn*,
237 F. App'x at 54. Moreover, the License Agreement amounts to more than "a promise
to refrain from reproducing, performing, distributing, or displaying" the work. *See
Wrench*, 256 F.3d at 457. For example, the License Agreement contains a provision that
the user must seek prior written consent from Windrock prior to assigning, sublicensing,
or transferring the Windrock MD software [Doc. 176 ¶ 45]. The License Agreement also
contains a provision that the user is required to "take all reasonable steps to safeguard the
licensed programs" [*Id.* ¶ 47]. Viewing the License Agreement as a whole, the Court
concludes that plaintiff's breach of contract claim involves more than a mere promise to
refrain from copying or displaying the work, and therefore, is not preempted by the
Copyright Act. Defendants' motion to dismiss will be denied as to Count 12.

### 7. Count 13 – Insufficient Allegations of Unfair/False Statements or Injury under Lanham Act

Defendants argue that Count 13 lacks sufficient factual allegations of unfair or false
statements made or injury sufficient to sustain a claim under the Lanham Act [Doc. 184, p.

68

20].  The complaint mentions emails sent on April 8, 10, 14, 16, and 21, 2020, but fails to allege how the statements on those dates were false or misleading [*Id.* at 21].  Furthermore, defendants state that the complaint alleges no facts that support an inference that plaintiff actually sustained economic or reputational injury flowing directly from the allegedly misleading statements, but rather, merely parrots the legal elements of damage and causation without any specifics as to the amount of damages, which customers plaintiff sustained reputational damage with, or how its sales have declined due to allegedly misleading statements [*Id.*].

Plaintiffs respond that defendants cite no legal authority suggesting that a plaintiff must specifically plead an explanation of why a false statement is false [Doc. 191, p. 18].  Nonetheless, it specifically alleges three false statements made in McNair's email marketing campaign: (1) that RSI "is made up of eight senior level people that used to be at Windrock," (2) "[w]e were the ones who used to design all their software and hardware," and (3) that RSI has a "new platform that is more advanced in capabilities than Windrock's platform" [*Id.* at 19].  Plaintiff later alleges that it suffered significant damages as a result of this false advertising, specifically suffering significant injury to its reputation and sales.  Moreover, because Windrock is alleging that the statements at issue are literally false (as opposed to misleading) a violation can be established without evidence that the statements actually misled customers, because actual deception is presumed [*Id.* (citing *Fed. Exp. Corp. v. United Parcel Serv., Inc.*, 765 F. Supp. 2d 1011 (W.D. Tenn. 2010))].

69

Defendants reply that, even when pleading a statement is "literally false," a plaintiff may not do so in a conclusory manner [Doc. 192, p. 17 (citing *Ashley Furniture Indus.*, 2015 WL 12999664)]. And the complaint simply states that certain statements are false without further explanation, which fails to sufficiently plead literal falsity [*Id.* at 17–18]. Moreover, the complaint alleges no facts showing proximate causation of damages, as it does not demonstrate how the statements at issue caused Windrock damage [*Id.* at 18]. Rather, Windrock argues that defendants' alleged misappropriation of customer information somehow bootstraps into proximate cause for its Lanham Act claim [*Id.*].

In Count 13, the Fourth Amended Complaint alleges that RSI and McNair engaged in false advertising in violation of the Lanham Act [Doc. 176 ¶¶ 285–293]. Specifically, Windrock contends that RSI and McNair made false or misleading statements of fact in emails sent to Windrock's customers on April 8, 2020, and continuing on at least April 10, April 14, April 16, and April 21 [*Id.* ¶ 286]. As discussed *supra*, Windrock alleges that, on April 8, 2020, McNair launched an email campaign targeted at Windrock customers that contained several false statements, including "(1) that RSI 'is made up of eight senior level people that used to be at Windrock,' (2) '[w]e were the ones who used to design all their software and hardware,' and (3) that RSI has a 'new platform that is more advanced in capabilities' than Windrock's platform" [*Id.* ¶ 130].

The Lanham Act prohibits false or misleading statements in "commercial advertising or promotion[.]" Champion *Laboratories, Inc. v. Parker-Hannifin Corp.*, 616 F. Supp. 2d 684, 694 (E.D. Mich. 2009) (quoting *Int'l Technologies Consultants, Inc. v.*

70

*Stewart*, No. 07-13391, 2008 WL 4373095 (E.D. Mich. Sept. 23, 2008)).  To state a claim for misleading advertisement under the Lanham Act, a plaintiff must establish these elements:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons, Inc. v. American Board of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999).  At issue here is whether plaintiff has adequately alleged that: (1) defendants made "false or misleading statements," and (2) there is a causal link between the statements and some harm to plaintiff.

Before delving into whether plaintiff has adequately alleged both of these elements of its Lanham Act claim, the Court notes that, absent the complaint incorporating its prior factual allegations under Count 13 [*see* Doc. 176 ¶ 285(incorporating all preceding paragraphs)], the Court would conclude that the entirety of this count was pled in the classically insufficient style of merely parroting the elements of the claim.  *See Iqbal*, 556 U.S. at 678 (stating that mere recitation of the elements of a claim will not suffice at the pleading stage).  For example, plaintiff alleges simply that the "false or misleading statements deceived or had the capacity to deceive" potential customers, the "false or misleading statements were made in interstate commerce," and "Windrock has suffered significant damages as a result of this false advertising" [*Id.* ¶¶ 288, 290–91].  The Court notes that this style of pleading creates some difficulty in determining plaintiff's specific

71

factual allegations as to each count. Nonetheless, in reviewing this motion to dismiss, the Court has reviewed the Fourth Amended Complaint as a whole and has scoured that document for any factual allegations that could reasonably be inferred to relate to a specific element of a specific claim.

### a. False or Misleading Statements

"For a plaintiff to successfully establish the first element in the Lanham Act claim, it must show that the defendant's advertisement 'is literally false or that it is true yet misleading or confusing.'" *Medison America, Inc. v. Preferred Medical Systems, LLC*, 548 F. Supp. 2d 567, 577 (W.D. Tenn. 2007) (quoting *Am. Council of Certified Podiatric Physicians and Surgeons*, 185 F.3d at 614). If statements are alleged to be literally false "no evidence that customers were actually misled is required to establish a violation because the deception is presumed." *Id.*

Here, plaintiff has pointed to three statements in McNair's April 8, 2020, email which it alleges are literally false [Doc. 176 ¶ 130]. The Court finds that this allegation is sufficient to put defendants on notice of the false statements supporting plaintiff's Lanham Act claim. Accordingly, the Court finds that plaintiff has adequately alleged this element for purposes of the Rule 12(b)(6) stage.

### b. Causal Link to Harm

"The causation standard in a false-advertising claim is a proximate causation standard, meaning that the Lanham Act 'generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct.'" *Campfield v. Safelite Group, Inc.*, 91

72

F.4th 401, 411–12 (6th Cir. 2024) (quoting *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)). "[A] plaintiff suing for false advertising 'ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising,' which 'occurs when deception of consumers causes them to withhold trade from the plaintiff.'" *Id.* at 412 (quoting *Lexmark*, 572 U.S. at 133).

As to the causal link between defendants' allegedly false statements and some harm to plaintiff, Windrock alleges that it "suffered significant damages as a result of this false advertising," "suffered significant injury to its commercial interests in reputation and sales," and defendants' false advertising "proximately caused damages and injury to Windrock" [Doc. 176 ¶¶ 291–93]. The Court has reviewed the entire complaint for any other allegations regarding how the April 2020 emails caused harm to Windrock, and, at best, has found the allegation that defendants used information about Windrock's customers to "poach customers from Windrock" [*Id.* ¶ 160]. Although a close call, accepting the allegations in the Fourth Amended Complaint as true, and drawing all reasonable inferences, the Court finds that plaintiff has at least arguably stated a plausible claim that defendants' allegedly false statements proximately caused plaintiff harm, specifically, through the loss of the customers that defendants are alleged to have poached. And the "poaching" allegation further leads to the reasonable inference that plaintiff suffered economic losses as a result of defendants' actions. Accordingly, defendants'

motion to dismiss the Lanham Act claim will be denied and this claim will proceed at this juncture.

### 8. Count 15 – Particularity Required by the TCPA

Defendants contend that Count 15 lacks the particularity required to state a violation of the TCPA [Doc. 184, p. 22]. Again, the complaint mentions emails sent on April 8, 10, 14, 16, and 21, 2020, but omits allegations of what statements were made on April 10, 14, 16, and 21 [*Id.* at 22–23]. Moreover, the complaint never alleges how the statements at issue were false or misleading representations of a present or past fact [*Id.* at 23]. Further, the complaint does not identify a single customer that allegedly received these communications [*Id.*]. And, finally, the complaint's allegations regarding damages and causation of those damages are similarly conclusory and fail to meet the particularity standard of Rule 9(b) [*Id.* at 24].

Plaintiff responds that, in its order granting Windrock leave to file the second amended complaint, this Court rejected similar arguments and found that Windrock's TCPA allegations were sufficiently pled [Doc. 191, p. 20]. Plaintiff states that it details the specific misrepresentations Windrock asserts are unlawful under that Act [*Id.* at 20–21]. Moreover, defendants are well aware of the specific statements Windrock is complaining about given that Windrock identifies the emails by date, describes them, and McNair was questioned about them in his deposition [*Id.* at 21]. Plaintiff contends that heightened pleading does not require it to specifically plead every iteration of analogous deceptive statements, particularly when they were made in writing on identified dates. Further,

74

plaintiff argues that it need not prove at this stage that specific misrepresentations were false, as the Court previously recognized [*Id.* at 21–22 (citing Doc. 142, p. 19)]. Additionally, plaintiff contends there is no merit to the allegation that it did not sufficiently plead harm as, directly after its description of the deceptive emails at issue, it pleads that RSI is a direct competitor and alleges that defendants used the deceptive emails to unlawfully poach customers from Windrock [*Id.* at 22]. Finally, plaintiff states that the Tennessee Supreme Court has mandated that the TCPA must be liberally construed to protect consumers and suggests that the Court should liberally construe the TCPA and reject defendants' arguments [*Id.* at 23 (citing *Howell v. Nautilus Ins. Co.*, No. 1:08-cv-1291, 2009 WL 2168724, at *3 (W.D. Tenn. July 17, 2009))].

Defendants reply that the Court's prior order clearly contemplated permitting them to move to dismiss this claim [Doc. 192, p. 18]. Further, it is undisputed that Rule 9(b)'s heightened pleading standard applies to this claim, and Windrock therefore must plead unfair or deceptive conduct with particularity [*Id.*]. But merely asserting that communications were false is not sufficient to meet this standard, and the complaint does not allege how or why the complained-of statements are false [*Id.* at 19 (citing *Mantsevich v. Countrywide Home Loans, Inc.*, No. 1:12-cv-157, 2013 WL 1326963 (E.D. Tenn. Mar. 29, 2013)]. Additionally, Windrock failed to plead its TCPA claim with the required specificity because it makes only a single, conclusory statement about its damages [*Id.*].

In Count 15 of the Fourth Amended Complaint, Windrock contends that RSI violated the TCPA, by making various misrepresentations concerning the quality of its

75

goods or services in comparison to Windrock's offerings and making false or misleading statements of fact in emails sent to Windrock customers starting April 8, 2020, and continuing on at least April 10, April 14, April 16, and April 21 [Doc. 176 ¶¶ 307–316]. As discussed *supra*, Windrock alleges that, on April 8, 2020, McNair launched an email campaign targeted at Windrock customers that contained several false statements, including "(1) that RSI 'is made up of eight senior level people that used to be at Windrock,' (2) '[w]e were the ones who used to design all their software and hardware,' and (3) that RSI has a 'new platform that is more advanced in capabilities' than Windrock's platform" [*Id.* ¶ 130].

"In order to recover under the TCPA, the plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated . . . .'" *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. Apr. 29, 2005) (quoting Tenn. Code Ann. § 47-18-109(a)(1)).

Allegations of unfair or deceptive acts or practices under the TCPA must be pled with specificity, as required by Federal Rule of Civil Procedure 9(b), because they are allegations of fraud. *Metro. Property & Cas. Ins. Co. v. Bell*, No. 04-5965, 2005 WL 1993446 (6th Cir. Aug. 17, 2005) (citing *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 274, 275 (Tenn. Ct. App. 1999); *see also Harding v. BMW of North America, LLC*, No. 3:20-cv-61, 2020 WL 5039439, at *2 (M.D. Tenn. Aug. 26, 2020) ("District courts in

76

Tennessee have held that Rule 9(b) applies to TCPA claims"). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake" but indicates that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "In complying with Rule 9(b) a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; *and the injury resulting from the fraud*.'" *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)) (emphasis added). "A complaint sufficiently pleads the time, place, and content of the alleged misrepresentation so long as it ensures that the defendant possesses sufficient information to respond to an allegation of fraud[.]" *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (internal quotation marks and alterations omitted).

As an initial point, the Court notes that plaintiff again seems to argue that any insufficiency in the Fourth Amended Complaint regarding this claim should be excused because defendants have actual knowledge of the facts underlying the claims and have discussed them in the course of discovery [*See* Doc. 191, p. 21]. But as the Court previously explained, the question before the Court at the Rule 12(b)(6) stage is not whether defendants have actual knowledge of the actions that underlie the complaint, but whether the complaint provides defendants with sufficient written notice of the facts supporting the claims therein. See *Welty v. Honda of Am. Mfg., Inc.*, 411 F. Supp. 2d 824,

77

830 (S.D. Ohio 2005) (addressing the purpose of notice pleading). Accordingly, regardless of what information defendants actually have knowledge of, the Court, at the Rule 12(b)(6) stage, must determine whether the complaint adequately provides written notice of the claims and the facts supporting such claims.

Additionally, plaintiff cites United States Magistrate Judge Jill E. McCook's order granting leave to amend the complaint as evidence that it has stated a claim under the TCPA [Doc. 191, pp. 20–21]. But, in that order, Judge McCook merely found that "there is sufficient particularity to be tested by way of a motion to dismiss," and that, to the extent defendants "have valid grounds for objecting to th[is] claim[] . . . they may test their argument[] in a dispositive motion" [Doc. 142, pp. 19–20]. Accordingly, the Court finds that this order has no impact on its analysis of whether plaintiff has stated a claim under the TCPA that is plausible under Rule 12(b)(6).

The Court finds that plaintiff has not established that damages resulted from defendants' alleged fraud that meet the heightened pleading standards of Rule 9(b). Plaintiff simply alleges that it "suffered an ascertainable loss of money and property as a direct result of RSI's unfair and deceptive trade practices" and that such "harm suffered by Windrock as a direct result of RSI's unlawful activity continues to mount" [Doc. 176 ¶¶ 315–16]. But, once again, plaintiff cites the McNair emails in April 2020 as the false or misleading statements [*Id.* ¶ 311], and the complaint contains no specific allegations of how Windrock suffered harm as a result of any statement in those emails, beyond the threadbare allegation that defendants "poached" Windrock's customers. Thus, the Court

78

finds that plaintiff has not stated a plausible claim under the TCPA, in light of the applicable heightened pleading standards of Rule 9(b). Accordingly, defendants' motion will be granted on this ground and Count 15 will be dismissed.

### 9. Attorney's Fees

Defendants argue that they should be granted attorney's fees under the TCPA, specifically, section 47-18-109(E)(2) [Doc. 184, p. 24]. Defendants contend that plaintiff has had the benefit of over two years of litigation before filing this iteration of its complaint and yet the complaint is still devoid of factual allegations to support a claim under the TCPA, much less with the particularity required by law [*Id.*]. The lack of assertion of a factual basis for the TCPA claim "demonstrates that this cause of action is frivolous, without merit, and was brought for the purpose of harassment" [*Id.* at 25].

Plaintiff responds that courts have declined to aware attorneys' fees under the TCPA when applicability of the statute was a "close call" [Doc. 191, p. 24]. Plaintiff further argues that there is nothing in the record to suggest that it brought the TCPA claim to harass defendants, and specifically denies this allegation [*Id.* at 24–25].

The TCPA provides that "upon finding that the action is frivolous, without legal or factual merit, or brought for the purpose of harassment, the court may require the person instituting the action to indemnify the defendant for any damages incurred, including reasonable attorney's fees and costs." Tenn. Code Ann. § 47-18-109(e)(2). The Tennessee Supreme Court has stated that the phrase "without legal or factual merit" in this statute "does not mean without sufficient merit to prevail," but rather "refers to a TCPA claim so

utterly lacking in an adequate factual predicate or legal ground as to make the filing of such a claim highly unlikely to succeed." *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 160 (Tenn. 2021) (internal quotation marks omitted). Additionally, courts have recognized that "it is difficult to impose attorneys' fees in a case in which many claims have been asserted, not just a TCPA claim." *Alexander Realty Capital, Inc. v. Laurel Cove Development, LLC*, No. 3:07-0755, 2009 WL 541340, at *12 (M.D. Tenn. Mar. 4, 2009).

Ultimately, while the Court does not find that plaintiff has adequately stated a claim for relief under the TCPA, it also does not find that plaintiff's filing of this claim was frivolous or brought for the purpose of harassment. The Court also notes that many of plaintiff's claims are inter-related, and the Court has found that plaintiff has stated some claims that survive this Rule 12(b)(6) motion. Considering plaintiff's TCPA claim, as well as the Fourth Amended Complaint as a whole, the Court does not find that an award of attorney fees is appropriate under the TCPA, and this request will be denied.

### B.    Plaintiff's Motion to Dismiss

Under Tennessee law, to set forth a viable claim of intentional interference with business relations, a party must adequately plead (1) an existing business relationship, (2) the alleged tortfeasor's knowledge of that relationship, (3) the alleged tortfeasor's intent to cause a breach or termination of the relationship, (4) the alleged tortfeasor's improper motive or improper means, and (5) damages for the tortious interference. *BNA Associates, LLC v. Goldman Sachs Specialty Lending Grp., L.P.*, 63 F.4th 1061, 1063–64 (6th Cir. 2023).

80

Although the parties dispute whether each of these elements has been adequately alleged in the amended countercomplaint, because the Court finds that RSI has not adequately alleged the element of improper motive or improper means, the Court will decline to address these alternative arguments.

### 1.    Improper Motives

Plaintiff argues that RSI makes no allegations regarding improper motives in the amended countercomplaint [Doc. 178, p. 7 n.1].

RSI contends that it has alleged both improper means and motive [Doc. 187, p. 10]. As to improper motive, RSI argues this is established by Windrock's letters to customers, the purpose of which was to make false statements about RSI's capabilities and prevent customers from doing business with RSI, preventing RSI from successfully entering into the market and competing with Windrock [*Id.* at 10–11].

Windrock replies that RSI provides no explanation for how Windrock communicating with its own customers evidences an improper motive, and states that the letters Windrock sent do not contain any misrepresentation, but rather, RSI seeks to rely on mere implication [Doc. 189, p. 8]. Further, Windrock states that RSI has not explained how its arguments regarding intent could also satisfy the motive element. And RSI does not even attempt to argue how it has alleged that Windrock's predominant purpose in communicating with its own customers was to injure RSI [*Id.*].

"Improper motive 'is dependent on the particular facts and circumstances of a given case,' but specifically requires a finding that 'the defendant's predominant purpose was to

81

injure the plaintiff.'" *Ellipsis, Inc. v. Colorworks, Inc.*, 329 F. Supp. 2d 962, 969 (W.D. Tenn. 2004) (quoting *Trau-Med*, 71 S.W.3d at 701 n.5)). "[A]llegations of mere 'malice' are not sufficient[.]" *Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC*, 461 F. Supp. 2d 629, 641 (M.D. Tenn. 2006). The Tennessee Court of Appeals has acknowledged that "a competitor who interferes with another's business relationship in an effort to gain business for itself enjoys a privilege as to the 'improper motive' alternative" as "[c]learly, it is not improper for a business to act with the intent of securing business for itself, even though the result is the loss of that business by a competitor." *Watson's Carpet*, 247 S.W.3d at 183.

The Court finds that RSI has not adequately alleged improper means for purposes of its intentional interference with business relations counterclaim. Notably, the countercomplaint only specifically alleges that Windrock "utilized improper means" to interfere with RSI's business relationships [Doc. 168 ¶ 97], and RSI has not amended this counterclaim to expand it to include a theory of improper motive. Nevertheless, to the extent a claim based on improper motive could be read into the countercomplaint, the Court finds that RSI has not adequately alleged that Windrock's "predominant purpose" was to harm RSI, rather than to secure business for itself. RSI alleges that Windrock's purpose in sending the communications to RSI's current and prospective customers were to "prevent [RSI] from selling its support services to prospective customers" or "dissuade . . . customers from purchasing or continuing to use [RSI's] products and services" [*Id.* ¶ 34, 67]. But even if RSI has adequately pled that Windrock intended to injure its business, that

82

is insufficient; RSI must plead that an improper motive was Windrock's predominant purpose. *See Shelbyville Hosp. Corp. v. Mosley*, 69 F. Supp. 3d 719, 727 (E.D. Tenn. 2014) (holding that an allegation that defendant "intended to interfere" is insufficient to show the predominant purpose was to injure plaintiff). RSI has not done so.

Moreover, courts have recognized that the "improper motives" theory is difficult to prove in the case of competing businesses, *see Watson's Carpet*, 247 S.W.3d at 183, which is the situation here. And, in fact, RSI seems to admit that competition was one of Windrock's motives, as it alleges that "Windrock's primary purpose in ending support for the 6320 [analyzer] was to force its customers to purchase its newer 6400 [analyzer]" [*Id.* ¶ 24]. Thus, the Court finds that RSI has not adequately a plausible claim of intentional interference with business relations under the improper motive theory.

### 2. Improper Means

As to improper means, Windrock argues that, regarding W, RSI references the supposed false statements in the April 2020 letter but did not plead that the letter actually contained any specific false statements at all [Doc. 178, pp. 7–8]. Instead, RSI alleges Windrock "implied" that any service or maintenance from other companies would be of lesser quality and "suggested" that calibrations performed by other companies might not be accurate [*Id.* at 8]. Windrock contends that this reliance on "implications" and "suggestions" is insufficient [*Id.*].

As to E, plaintiff argues that RSI claims Windrock made "misrepresentations" about RSI's products' capabilities and the instant lawsuit [*Id.* at 10]. But, plaintiff contends, there

83

are no allegations setting out any specific "misrepresentation" about the lawsuit [*Id.*]. And, although RSI mentions a misrepresentation that RSI was not able to maintain the 6320 analyzer, it cites no specific evidence of such [*Id.* at 11].

As to Y, RSI alleges that (1) Windrock told Y that the pending lawsuit existed and that doing business with RSI would be "risky," (2) Windrock made unspecified "threats," and (3) Windrock falsely claimed that RSI was unable to support Y's 6320 analyzer [*Id.* at 12]. But plaintiff argues that informing Y of the existence of the lawsuit is only informing Y of a fact and adding that Y should not do business with RSI because it would be "risky" is an unactionable opinion [*Id.*]. As to "threats," this allegation is not actionable as no actual threats are alleged [*Id.* at 13].

RSI responds that it alleged that Windrock made multiple misrepresentations to prevent RSI from providing services and products to W, E, Y, and other prospective customers [Doc. 187, p. 11]. First, RSI argues it alleges Windrock made false statements, including that RSI was unable to support the 6320 analyzer and that permitting parties other than Windrock to perform service work on the analyzer would cause the loss of Windrock's warranty over the products and/or invalidate safety certificates for the analyzers [*Id.* at 11–12]. Moreover, contrary to Windrock's assertion, RSI alleged that Windrock sent the letter containing false statements to W, E, and Y, and all of Windrock's customers [*Id.* at 12–13]. RSI also argues that the parties' status as competitors does not insulate Windrock from RSI's allegations that they employed improper means [*Id.* at 13].

84

RSI also alleges that, regarding Y, Windrock, through a representative, informed Y of the instant lawsuit and indicated that Y should not do any business with RSI because it would be risky [*Id.* at 13–14]. RSI contends that this constitutes more than simply stating a fact, but, instead, Windrock went out of their way to inform Y that there would be consequences if Y did business with RSI, which is a threat, and therefore, an improper means under Tennessee law [*Id.* at 14]. RSI also argues that this was not merely a statement of opinion, as it used the existence of a lawsuit and the fear of repercussions from doing business with RSI to induce Y to cancel the purchase order [*Id.*].

Windrock replies that the lynchpin of RSI's allegations is the purported "false statements" in the April 2020 letter, but no false statements or misrepresentations are contained in the letter [Doc. 189, p. 9]. Windrock accuses RSI of distorting several statements from the letter in support of its claim [*Id.* at 10]. Windrock reiterates that RSI's claim is based on "implications" in its statements and states that, while *Trau-Med* and its progeny list numerous examples of improper means, nowhere do "implications" or "suggestions" appear on those lists [*Id.* at 11–12]. Furthermore, Windrock argues that the allegation in Paragraph 83 cannot be classified as a threat [*Id.* at 12]. Specifically, Windrock states that its opinion that something may be "risky" is not a threat or intimidation, as there is no statement, or even implication, that Windrock is inflicting any sort of risk upon the customer or that Windrock is somehow acting illegally [*Id.*]. Moreover, Windrock argues that RSI's reliance on *Card-Monroe Corporation v. Tuftco Corporation*, No. 1:14-cv-292, 2015 WL 11109361 (E.D. Tenn. Aug. 18, 2015) is

85

misplaced, because, in that case, the court noted that the counter-plaintiff had pled that the counter-defendant threatened allegedly baseless patent enforcement litigation against counter-plaintiff's customers [*Id.* at 13]. Windrock contends that *Card-Monroe* lends no support to any argument that this case, a lawsuit between competitors, can constitute "improper means" [*Id.*].

Tennessee defines "improper means" as "'methods that violate an established standard of a trade or profession' and 'sharp dealing, overreaching, or unfair competition.'" *BNA Associates*, 63 F.4th at 1064 (quoting *Trau-Med*, 71 S.W.3d. at 701 n.7). Examples include violations of statues or rules, violence, threats, bribery, unfounded litigation, fraud, misrepresentation, defamation, duress, undue influence, misuse of confidential information, or breach of a fiduciary duty. *Watson's Carpet*, 247 S.W.3d at 176. However, Tennessee courts have cautioned that "'the tort should not be interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in competition.'" *BNA Associates*, 63 F.4th at 1064 (quoting *Watson's Carpet*, 247 S.W.3d at 178).

In the amended countercomplaint, RSI alleges that Windrock employed improper means, including: (1) warning RSI's existing and prospective customers that their analyzers would lose the manufacturers' warranty if they allowed third parties to provide service work on the analyzers; (2) making false statements to RSI's actual and prospective customers; (3) informing RSI's actual and prospective customers that Windrock was pursuing litigation against RSI in an effort to dissuade them from doing business with RSI;

86

and (4) bringing legal action against RSI for the improper and predominant purpose of forcing RSI out of business [Doc. 168 ¶ 98].

More specifically, in the factual background set forth in the amended countercomplaint, RSI alleges that in an April 2020 letter, Windrock "implied" that any service or maintenance customers received from companies other than Windrock would be of lesser quality and "suggested" that calibrations of the 6320 analyzers performed by other companies might not be accurate [*Id.* ¶¶ 28–29]. RSI attaches a copy of a letter dated April 20, 2020, which is directed to Windrock customers who had purchased the 6320 analyzer [Doc. 168-3]. In that letter, Windrock states that "[t]here are other companies in the industry who are claiming to be able to maintain Windrocks [sic] 6320 family of portable analyzers" [*Id.* at 2]. Windrock then stated:

- Windrock is regularly audited by an external certification body to ensure we uphold our Hazardous Area and Safety certifications of the products we market. As the OEM [original equipment manufacturer], we are the only location to maintain and carry these certifications.
- As the OEM of the portable analyzer product line, Windrock is the knowledge expert in the hardware, firmware, and software of this product.
- As an ISO 9001:2015 certified company, we are required to trace and track your equipment through out the production process and repair service to ensure your product is following our certified quality standards.
- As the OEM of the portable hardware, we are an ISO 9001:2015 certified company. As such we are required to have traceable calibration equipment to ensure when your analyzer is calibrated correctly using a NIST standard.
- As the sole propriety of Windrock MD, we have the ability to upgrade your firmware and software with the latest and greatest releases to keep your software running strong.
- As the OEM, any improvements to the hardware/software has been designed by our team of engineers and is not available to 3rd party companies.

87

[*Id.*].

RSI also alleges that at some point, Windrock informed W that RSI had received a cease-and-desist letter from Windrock's counsel [Doc. 168 ¶ 55]. RSI alleges that Windrock misrepresented to E that RSI was not able to maintain the 6320 analyzer [*Id.* ¶¶ 74–75]. RSI also alleges that Windrock informed Y about the instant lawsuit and indicated that it would be risky to Y to do business with RSI [*Id.* ¶ 83].

Ultimately, even accepting the allegations in the amended countercomplaint as true, the Court finds that these allegations are not sufficient to allege that Windrock acted through improper means, as required for a claim of intentional interference with business relations.

First, as to the April 2020 letter, upon which RSI relies significantly to support its claim of improper means, the Court cannot find that anything in this letter rises to the level of "improper means" as defined by the Tennessee Supreme Court in *Trau-Med*. In its allegations regarding this letter, RSI states that the letter makes "suggestions" and "implications," about RSI, but such is an overstatement of the letter, which RSI attaches to its countercomplaint. Nothing in the letter mentions RSI or any other competitor by name, nor does the letter contain any specific allegations regarding how RSI's products or services would be subpar. Rather, the letter largely asserts why Windrock's services are superior to its unnamed competitors. In light of Windrock and RSI's status as competitors, the Court does not find that this letter rises to the level of the type of practices that Tennessee courts have deemed "improper means."

88

Next, RSI relies on purported statements regarding the instant litigation Windrock allegedly made to RSI's current and prospective customers. As to RSI's allegations that Windrock informed any potential customers about the fact that Windrock's counsel sent RSI a cease-and-desist letter and that litigation was ongoing between the parties, it is unclear how such accurate statements of fact could be deemed improper means. Moreover, the Court finds that any allegation that Windrock informed any current or potential customer that it would be "risky" to do business with RSI in light of the ongoing litigation is insufficient to constitute an improper means. The Court finds persuasive the District of North Dakota's opinion that "[p]uffing, belief, and opinion are not actionable torts and competition for business is a protected right." *Jacam Chemical Co. 2013, LLC. v. Shepard*, No. 1:19-cv-93, 2023 WL 22139, at *9 (D.N.D. Jan. 3, 2023); *see also D'Alessandro v. Lake Developers, II, LLC*, No. E2011-1487-COA-R3-CV, 2012 WL 1900543, at *6 (Tenn. Ct. App. May 25, 2012) (stating that "puffing or other sales talk is not actionable" in the context of a negligent misrepresentation claim). And Windrock's alleged statement that it would be "risky" to do business with RSI during ongoing litigation is clearly a statement of belief or opinion. Moreover, to the extent that RSI attempts to characterize this alleged statement as a "threat," such argument wholly fails, as no reasonable person would construe a statement to a customer that engaging with another business while litigation is pending would be "risky" as Windrock threatening to cause harm to the customer. Accordingly, the Court does not find that any of the alleged statements regarding the ongoing litigation in this case constitute improper means.

89

Finally, the Court finds that RSI has not adequately pled improper means by pleading that Windrock brought the instant litigation to force RSI out of the market. As the Court discussed in detail *supra*, and in prior orders, Windrock's Fourth Amended Complaint contains several claims that the Court has now deemed plausible on their face. Moreover, the case law RSI cites in support of its claim that unfounded litigation can constitute an improper means involves a defendant that threatened to bring unfounded litigation against customers, rather than a competitor. *See Card-Monroe*, 2015 WL 11109361, at *7. The Court therefore finds that RSI's allegation that Windrock brought the instant litigation for illegitimate reasons is both contradicted by the record and insufficient, even if true, to establish improper means.

Because RSI has not established that Windrock had improper motives or acted with improper means in its communications with RSI's current and prospective customers, it has not adequately alleged a claim of intentional interference with business relations under Tennessee law. Accordingly, Windrock's motion to dismiss will be granted and the countercomplaint will be dismissed in its entirety.

IV. **CONCLUSION**

For the reasons set forth above:

1.   Defendants' motion to partially dismiss the Fourth Amended Complaint [Doc. 183] is **GRANTED in part and DENIED in part**;

2.   Counts 1 and 2 of the Fourth Amended Complaint will be **DISMISSED** as to Beam only. These counts will proceed as to all other defendants;

90

3.  Counts 3 and 4 of the Fourth Amended Complaint will be **DISMISSED** as to Beam, Flanagan, McNair, and Kelley only.  These counts will proceed as to RSI;

4.  Count 8 of the Fourth Amended Complaint will be **DISMISSED** to the extent that it alleges violations of Paragraphs 3 and 10 of the McNair Agreement.  However, Count 8 will proceed to the extent that it alleges violations of Paragraph 4 of the McNair Agreement;

5.  Count 9 of the Fourth Amended Complaint will be **DISMISSED** in its entirety;

6.  Count 12 of the Fourth Amended Complaint will proceed in its entirety;

7.  Count 13 of the Fourth Amended Complaint will proceed in its entirety;

8.  Count 15 of the Fourth Amended Complaint will be **DISMISSED** in its entirety;

9.  RSI's request for an award of attorneys' fees under the TCPA is **DENIED**;

10. Plaintiff's motion to dismiss the amended countercomplaint [Doc. 177] is **GRANTED**; and

11. The amended countercomplaint [Doc. 168] is **DISMISSED** in its entirety.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE